

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

ALC/DCP/LHE/PTH
F. #2016R00505

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

June 10, 2019

BY ECF

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Mark Nordlicht, et al.
                 Criminal Docket No. 16-640 (BMC)

Dear Judge Cogan:

      The government respectfully submits this letter to address certain questions that arose at the hearing on the defendants' motions to dismiss and motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure ("Rule 29"). As the following legal principles and trial evidence demonstrate, the defendants' motions should be denied in their entirety.

I.     Applicable Legal Standards

      In deciding a motion for acquittal pursuant to Rule 29(a), a court must ask "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Espaille, 380 F.3d 713, 718 (2d Cir. 2004) (citations and internal quotation marks omitted). As the Second Circuit has cautioned, "[c]ourts must be careful to avoid usurping the role of the jury when confronted with a motion for acquittal." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003). In this regard, a court must avoid substituting its own determination of the weight of the evidence presented and the reasonable inferences that may be drawn from that evidence. Id. Rather, "it is the task of the jury, not the court, to choose among competing inferences that can be drawn in favor of the government." United States v. Temple, 447 F.3d 130, 136-37 (2d Cir. 2001); see also United States v. Florez, 447 F.3d 145, 154-55 (2d Cir. 2006) ("the task of choosing among permissible competing inferences is for the jury, not the reviewing court").

      A judgment of acquittal may be granted only if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Cassese, 428 F.3d 92, 98 (2d Cir. 2005). Put differently, a Rule 29 motion must be denied if, "after viewing the

evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Temple, 447 F.3d at 136.

II. The Trial Evidence Establishes that the Defendants' and their Co-Conspirators' Misrepresentations and Omissions Were Material

In connection with the Investment Scheme, the government has established that the defendants and their co-conspirators deceived investors in the Platinum Partners Value Arbitrage Fund ("PPVA") through misrepresentations and omissions about the performance of the fund's assets, the fund's liquidity and the fund's redemption practices. The evidence presented was sufficient to permit a reasonable jury to find that the misrepresentations and omissions were material under well-established Second Circuit and Supreme Court precedent.

A. Legal Background

In a federal securities fraud or investment adviser fraud prosecution, "[a] misstatement in a securities transaction is material so long as there is 'a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision." United States v. Litvak, 889 F.3d 56, 64 (2d Cir. 2018) ("Litvak II") (citing United States v. Vilar, 729 F.3d 62, 88 (2d Cir. 2013)); SEC v. Nadel, 97 F. Supp. 3d 117, 123 (E.D.N.Y. 2015) (applying the same formulation of materiality to a civil investment adviser fraud under the Investment Advisers' Act); see also United States v. Tagliaferri, No. 13-CR-115 (RA) (S.D.N.Y.), ECF Docket No. 89 at 2768-69 (trial transcript of jury instructions applying this definition of materiality in the context of criminal investment adviser fraud). "A misrepresentation is important if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" Id. (citing Basic v. Levinson, 485 U.S. 224, 231-32 (1988)) (emphasis added). "A finding of materiality does not require proof of 'actual reliance.' Materiality requires proof only that a reasonable investor would deem the content of a misstatement a substantial factor to be considered in the making of the particular investment decision." Id. Only statements that are "obviously unimportant" can be deemed immaterial as a matter of law. Id. (citing Feinman v. Dean Witter Reynolds, Inc., 84 F.3d 539, 540-41 (2d Cir. 1996)); see also United States v. Litvak, 808 F.3d 160, 175 (2d Cir. 2015) ("Litvak I") ("[w]here the misstatements are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance" they may be deemed immaterial).

Likewise, a wire fraud charge requires a showing that the misstatement or omission "would naturally tend to lead or is capable of leading a reasonable person to change [his or her] conduct." United States v. Rybicki, 354 F.3d 124, 145 (2d Cir. 2003); United States v. Corsey, 723 F.3d 366, 373 (2d Cir. 2013) ("[A] false statement is material if it has a natural tendency to influence, or is capable of influencing, the decision of the [decisionmaker] to which it was addressed.").

Thus, "[u]nder any understanding of the concept, materiality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Universal Health Servs., Inc. v. United States, 136 S. Ct. 1989, 2002 (2016). And, because "[d]etermination of materiality under the securities laws is a mixed question of law and fact, [] the Supreme Court has identified [this issue] as especially 'well suited for jury determination.'" Litvak I at 175.

2

In contrast to materiality, which is an element of each of the government's charged offenses, proof of harm or loss is not. See Litvak II, 808 F.3d at 65 (concluding that proof of harm is not necessary in a criminal prosecution under Section 10(b)). Id. Moreover, as in the securities fraud context, "the elements of reliance and damages would clearly be inconsistent with the statutes that Congress enacted," and therefore are not elements of a criminal wire fraud charge. Neder v. United States, 527 U.S. 1, 24-25 (1999).

The government has been unable to identify any case, in this Circuit or elsewhere, that has held that in order for a misrepresentation or omission to be material, the government must prove that the hypothetical "reasonable investor" would have been able to somehow mitigate his or her losses by changing his or her conduct in response to receiving an accurate or complete disclosure from the fraudster.[1] The government respectfully submits that to require such proof would effectively, and impermissibly, import the concept of loss into the elements of criminal securities fraud, wire fraud and investment adviser fraud. Cf United States v. Weaver, 860 F.3d 90, 96 (2d Cir. 2017) ("'[I]t will not do for appellate judges to roll reliance into materiality; that would add through the back door an element barred from the front."); see also United States v. Rosby, 454 F.3d 670, 674 (7th Cir. 2006). Thus, despite whatever analytic relationship might exist between materiality and reliance, courts have consistently maintained the distinction between materiality (in the sense of tendency to influence) and reliance (in the sense of actual influence)."). This is so because requiring the government to prove that investors could have mitigated their loss if they changed their conduct would, in effect, require the government to prove that the defendants' deception was the proximate cause of their victims' losses. Such proof is not required to convict under any of the statutes charged in this case. The law is clear that materiality is viewed from the perspective of a reasonable investor, and the "likely or actual behavior of the recipient of the alleged misrepresentation"—not whether that behavior would have mitigated the recipient's losses. Universal Health Servs., 136 S. Ct. at 2002.

This principle is illustrated further by this Circuit's precedent regarding lulling statements, pursuant to which misrepresentations and omissions can be material even if made after the relevant transaction, so long as such misrepresentations or omissions furthered the fraud by "lull[ing] the victim [ ] into a false sense of security, postpon[ing] their ultimate complaint to the authorities, and therefore mak[ing] the apprehension of the defendants less likely." United States v. Rutigliano, 790 F.3d 389, 397 (2d Cir. 2015) (quoting United States v. Lane, 474 U.S. 438, 451–52 (1986) (first alteration in Rutigliano)). This precedent rejects an interpretation of materiality that would require the government to prove that a victim would have avoided his or her losses if given full and accurate information.

B. Application

The defendants' and their co-conspirators' misrepresentations and omissions were material under any reasonable interpretation of the law. It is difficult to conceive of attributes of

---

[1] To the contrary, a number of securities fraud and wire fraud cases have been predicated, at least in part, upon misrepresentations and omissions to investors made to conceal the failure of an investment. See, e.g., United States v. McGinn, 787 F.3d 116, 122-124 (2d Cir. 2015) (finding evidence was sufficient to support convictions on mail fraud and securities fraud charges where such charges were based upon misrepresentations designed to conceal the failure of a business endeavor).

3

a hedge fund that could possibly be more important to investor than (1) the performance of the fund's investments, (2) the liquidity of the fund and its redemption terms, (3) the fund's ability to pay redemptions and (4) fund managers' adherence to principles of good faith and fair dealing. While this is common sense, the government's victim witnesses all explained to this jury why those factors are so important in choosing an investment fund.[2] No misrepresentation or omission touching on these subjects could conceivably be deemed to be "obviously unimportant" so as to be immaterial as a matter of law. Consequently, the government's evidence as to the materiality of its misrepresentations has certainly exceeded the standard under Rule 29.

The defendants' reliance upon United States ex rel. Edward O'Donnell v. Countrywide Home Loans, 822 F.3d 650 (2d Cir. 2016) ("Countrywide") is yet the latest iteration of their effort to persuade this Court that the instant criminal fraud prosecution is, instead, a contract dispute governed by civil legal principals. Countrywide is wholly inapplicable to this case, by its own express terms. Countrywide was a civil prosecution brought on behalf of government-owned lenders, premised upon an allegation that the entity Countrywide, in contravention of a purchase agreement that obligated it to supply the lenders "investment quality" mortgages, knowingly sold loans to the lenders that were not "investment quality." The Court of Appeals illustrated the central issue in that case in a hypothetical involving a contract for widgets:

> Imagine that two parties—A and B—execute a contract, in which A agrees to provide widgets periodically to B during the five-year term of the agreement. A represents that each delivery of widgets, "as of" the date of delivery, complies with a set of standards identified as "widget specifications" in the contract. At the time of contracting, A intends to fulfill the bargain and provide conforming widgets. Later, after several successful and conforming deliveries to B, A's production process experiences difficulties, and the quality of A's widgets falls below the specified standards. Despite knowing the widgets are subpar, A decides to ship those nonconforming widgets to B without saying anything about their quality.

Id. at 656.[3] The Court of Appeals asked whether the above-described scenario amounted to fraud, or to a breach of contract. Id. In holding that in order for a breach of contract to be actionable under the fraud statutes, a defendant must have fraudulent intent at the time they enter the contract in question, id. at 662, the Court expressly distinguished those cases where "the

---

[2] As illustration, see, e.g., Tr. at 208 (Huth), 220 (Huth), 252 (Huth), 1480 (Gulkowitz), 1749 (Shaked), 1754 (Shaked), 1756 (Shaked), 1756 (Shaked), 1772 (Shaked), 1774 (Shaked), 1776 (Shaked), 1789 (Shaked), 1805 (Shaked), 1988 (Shaked), 1989 (Shaked), 2001 (Shaked), 2111 (Shaked), 2136 (Shaked), 2592 (Zeitman).

[3] In addition to the distinguishing characteristics of this case discussed infra, the instant case does not involve a widget factory entering into a contract to supply widgets. It involves an SEC-registered investment adviser, with custody of investor funds, engaging in deceptive practices and material misrepresentations and omissions in its dealings with its investors. See GX-3105 (Form ADV filed by Platinum Partners registering it as an investment adviser).

defendants made affirmative fraudulent misrepresentations to their counterparties in the course of performance or to feign performance under the contract." Id. at 658.

The instant prosecution falls squarely within the category that the Countrywide court itself distinguished. The defendants here did not merely sign contracts in good faith and then find themselves unable to perform in later years. Instead, they made affirmative fraudulent misrepresentations throughout the duration of the scheme, both to solicit new investments and to avoid redemptions by misleading their existing investors as to the fund's performance. As just one example, in October 2015, co-conspirator Andrew Kaplan and the defendant Mark Nordlicht represented to existing investors that PPVA was 50/50 liquid and illiquid, and advised that the fund was experiencing normal inflows and outflows at that time. See Tr. at 3218-3222. As Kaplan testified, both of those representations were materially false, in that they concealed the true extent of the fund's liquidity crisis. Id. In addition, the fund's Due Diligence Questionnaire, which was distributed to testifying investor Amir Shaked as late as September 2015, see GX 4103, continued to misrepresent the fund's liquidity and redemption practices, including by claiming that the fund "manage[d] [its] exposure such that it [could] meet the liquidity terms at all times." See Tr. at 2141.

This evidence, and other evidence presented by the government, shows why, even if the materiality element of the charged offenses could be interpreted to require proof that the victims of the fraud could have mitigated their losses if they were given correct information—and they were not—the government's proof is still sufficient to establish its case. The defendants' misrepresentations and omissions were not only lulling statements to existing investors (though such statements are also clearly material under governing precedent, see supra), but they also served to allow the defendants and their co-conspirators to elicit additional investors and investments through lies. In addition to the examples cited above, in March 2015 the defendants also encouraged existing investors to postpone their redemptions and encouraged them to invest more money in anticipation of earning a purported 8% return in April 2015; and several investors, including Mr. Shaked, did indeed invest money into PPVA as a result of those efforts. See GX-7112.

Finally, the government disputes the premise that nothing would have changed for PPVA's investors if the defendants ceased their campaign of deception and disclosed the truth about the liquidity crisis and their inability to pay redemptions. First, the defendants and their co-conspirators continued to accept new investors for PPVA, and new investments, throughout 2015. That capital could have been preserved. Second, a revelation of this kind could have resulted in investors who were invested in multiple Platinum funds withdrawing their full investment, thereby avoiding losses they would go on to suffer as investors in PPCO. See, e.g., GX-1325 (investor threatening to withdraw from PPCO if PPVA will not honor its redemption terms); GX-1377 (investor expressing his concern at lack of communication and asserting his intention to withdraw from both PPVA and PPCO). Third, timely disclosure likely would have hastened the involvement of regulators, resulting in, at an absolute minimum, avoidance of a scenario in which insiders and certain select PPVA redeeming investors received payment, and ensuring that all similarly situated investors were instead treated fairly.

5

III.   The Defendants' Practice of Concealing Preferential Repayment of Redemptions Constituted Fraud

To prove the defendants guilty of any of the charged offenses, the government need not prove that their conduct violated any specific regulation or rule governing investment advisers, or the securities industry. Thus, the question of whether a practice of selectively paying investors or insiders over others with pending redemption requests itself violates any specific regulatory prohibition is irrelevant. The pertinent question is, instead, whether the charged conduct violated the anti-fraud provisions of the Securities Exchange Act of 1934, the Investment Advisers' Act, and/or the wire fraud statute, i.e., did the defendants engage in a scheme to defraud by means of trick, deceit, deception or by concealing from investors, through misrepresentations and omissions, the fact that the fund was paying certain pending redemption requests to investors hand-picked by defendant Nordlicht. The government has presented sufficient evidence that this question is appropriately submitted to the jury.

In SEC v. Conrad, 16-CV-2572 (LMM), 2019 U.S. Dist. LEXIS 46159 (N.D. Ga. Jan. 17, 2019), a court in the Northern District of Georgia entered summary judgment on behalf of the SEC on its claims of fraud arising out of the defendant's practice of "allowing redemptions on the part of friends, family members and favored investors, while denying the redemption requests of [other investors]." Id. at *1. The court there found that false representations to certain investors claiming that the fund had lost the ability to pay redemptions when, in fact, the fund was paying redemptions to preferred investors, were so obviously significant that they were material as a matter of law. Id. at *52.[4]

Likewise here, the defendants misrepresented to investors the fund's practices for handling redemptions during the liquidity crisis. For example, on May 11, 2016, Kaplan sent an email to PPVA investor John Huth, claiming that PPVA expected the proceeds of upcoming transactions to "provide the cash for all redemptions." GX-1865. This representation was materially misleading in that it suggested that all pending redemptions awaited the incoming cash from upcoming transactions in order to be paid, when, in reality, some investors were already being paid before those anticipated transactions were completed. Also, on May 1, 2016, Kaplan sent an email to PPVA investor Abraham Gulkowitz in which he represented that "we anticipate paying/wiring the whole 3/31 class together sometime in July (or maybe earlier)." GX 1629. Kaplan contends in his email that this forecast is based upon Platinum's "current liquidity and anticipated sales of two companies." Id. His statement in this email thereby misrepresents the state of play with Platinum's redemption payments in May 2016, in that it suggests that the fund plans to pay classes of investors with pending redemptions at the same time (which was not true), and that Platinum is unable to pay redemptions until the anticipated sales of these two companies (which is partly untrue, because Platinum was paying some select individuals' redemptions at this time). Id.

Similarly, on November 23, 2015, co-conspirator Uri Landesman sent an email to PPVA investor Jack von Oosterbosch that was later forwarded to Nordlicht. GX-1332. In that email, Landesman told von Oosterbosch that "[a]s with all redemptions from that point on, [von

---

[4]   Likewise, a practice of concealing preferential payments to some investors formed part of the basis for the SEC's charges in SEC v. Falcone, No. 12-CV-5028 (S.D.N.Y.)

Oosterbosch's] would be paid 35% in cash with the rest subject to monetizations." Id. Again, Landesman misrepresented to one of the fund's investors the co-conspirators' intention to treat all redemptions the same going forward, when, in reality, Platinum was already prioritizing some investors' redemptions over other investors' redemptions at the time the email was written. As a final example, on November 24, 2015, Landesman sent an email to Shaked, copying Levy and Nordlicht, in which he falsely told Shaked that his redemption would be treated like every other 12/31 redemption. GX-1338.

These misrepresentations were clearly material because any reasonable investor who was told by the defendants and their co-conspirators that "you must wait for your money due to tight liquidity" would consider the news that the fund in fact had sufficient cash to pay certain select investors of its choosing to substantially alter the total mix of information available to him or her. Upon learning of such information, a reasonable investor would have stopped waiting for his or her money, and would have instead notified the authorities and/or sought civil remedies. Moreover, given the troubled state of the fund at the time, the practice of paying investors preferentially had much greater significance than it would have at a healthy fund, in that it routed capital to a select few and put the remaining unredeemed investors at greater risk.

In sum, to prove the defendants guilty of the charged crimes the government need not prove that the preferential payment of redemptions was, in and of itself, a violation of a specific legal prohibition. Instead, the government must prove that this course of conduct and the concealment of such conduct through material misrepresentations and omissions perpetrated a fraud upon PPVA's investors. The government has clearly met that burden.

IV.   Evidence of the Defendants' Misrepresentations Relating to the Performance and Valuation of PPVA's Assets Should Be Submitted to the Jury

The government has introduced evidence at trial, consistent with the allegations in the Indictment,[5] that proves that the defendants and their co-conspirators made affirmative misrepresentations to PPVA investors about the performance of certain of PPVA's Level 3 positions.[6] Accordingly, the Court should not preclude the government from arguing that such

---

[5]   See, e.g., Indictment ¶ 44 (describing decline at Black Elk following the West Delta 32 explosion); ¶ 46 (Golden Gate's disappointing oil production); and ¶ 50 (negative impact of decline in price of oil on the performance of PPVA's oil and gas positions).

[6]   Based on colloquy between the Court and the parties at oral argument on June 7, 2019, the government believes it is necessary to clarify that third-party valuation firms and auditors did not play a role with respect to the monthly net asset value calculations generated by Platinum. The valuation companies, Sterling Valuation and Alvarez & Marsal, only supplied a range of values for certain specific investments, and did not calculate or confirm the determination of PPVA's NAV. That number was selected by Nordlicht, and circulated within Platinum for "substantiation" before being released to Platinum's administrator for distribution to investors. See Tr. 4253:10-19. This is one of the many reasons why the hard-to-value Level 3 assets that comprised a large portion of PPVA's portfolio gave Nordlicht the ability to manipulate the fund's NAV. Finally, although PPVA's auditor performed a financial statements audit of the fund's NAV, it did so only as of year-end. And, as elicited during the re-direct of Special Agent Julie Amato, audits were never completed for PPVA for 2015 or 2016, such that PPVA's NAVs for those years were never validated by auditors.

7

misrepresentations were made in furtherance of the Investment Scheme conspiracies, charged in Counts One and Two, or the substantive securities fraud and investment adviser fraud offenses charged in Counts Three and Five. Moreover, evidence of the poor performance of PPVA's largest Level 3 positions—namely, its oil and gas investments—is inextricably intertwined with the other aspects of the defendants' scheme to defraud involving PPVA's liquidity crisis and inability to pay redemption requests from its investors. Precluding the government from making arguments to the jury based on evidence adduced at trial of the performance of PPVA's assets would deprive the jury of critical direct and background evidence of the Investment Scheme and would prejudice the government irremediably in the presentation of its case.

> A. <u>The Government Has Proven Through Witness Testimony and Other Evidence That the Defendants and Their Co-Conspirators Made Material Misrepresentations and Omissions Relating to the Performance of Certain of PPVA's Level 3 Assets</u>

The evidence adduced at trial clearly shows that the defendants knew that by late 2013, PPVA's portfolio was dominated by underperforming, cashflow-negative oil-and-gas investments. The evidence also shows that the defendants knew that the high values at which they were marking those oil companies could not be realized for PPVA's investors, in part because the positions were saddled with substantial debt that had to be paid off. In fact, those large and illiquid positions comprised such a large percentage of PPVA's portfolio that, when redemptions came due even as early as 2014, the defendants and their co-conspirators shared their desperation and fear with one another over coming up with the cash to meet those redemptions. Among themselves—but not to investors—the defendants and their co-conspirators further acknowledged that PPVA could continue <u>only</u> if its liquidity terms were significantly altered, giving the fund much more time in which to come up with the cash to pay investors' redemptions. GX-7126 (audio recording of conversation between Kaplan and Nordlicht) at 14-15, 17-18. Meanwhile, the performance of the oil-and-gas assets' positions continued to decline as PPVA failed to provide those assets with sufficient financing to successfully complete drilling projects, sustain their existing production or pay overdue vendor bills. For example, Golden Gate remained cashflow-negative and Platinum could not sell it even to another company it controlled, Black Elk; Black Elk was driven into bankruptcy; and Northstar failed nearly as soon as it began once Platinum saddled it with high-interest debt it could not afford and withheld the financing it had promised.

The defendants and their co-conspirators conceded the extraordinarily negative performance of these portfolio companies internally but lied about the companies' performance to PPVA's investors and prospective investors. For example, in an email on March 13, 2014, a geologist working on Golden Gate's drilling project emailed defendant Nordlicht and Platinum portfolio manager Ari Hirt reporting, "[w]e have just aborted our timed drilling after an unsuccessful night of trying to establish a sidetrack." GX-548. As established by the testimony of Dennis Corkran, then the Chief Executive Officer of Golden Gate, Corkran was reporting regularly to Hirt, Nordlicht and Levy at that point, see Tr. at 2719-2727, about the failure of Golden Gate's drilling program. Nevertheless, rather than tell the truth to PPVA's investors about Golden Gate—namely, that it had proved unsuccessful and efforts to realize value in its undeveloped reserves were fruitless—the co-conspirators lied about Golden Gate's performance in order to keep up the appearance that one of PPVA's largest investments was viable and PPVA's investment strategy was sound. When PPVA investor Shaked emailed Mann shortly after the foregoing email, asking, "[C]an you please give me the PPVA carrying value for Black

Elk common equity as of Feb month end?", Mann replied that the fund's CFO [the defendant Joseph SanFilippo] had reported that Black Elk's common equity had a "carrying value of 150 million." GX-563, at 2. When Shaked emailed back the question, "[h]ow does this reconcile to the $300 million total value at year end 2013 per the marketing reports?" on March 25, 2014, Mann responded as follows the next day:

> I spoke with Mark [Nordlicht] regarding your question. He said that Black Elk had the option to buy 50% of Golden Gate back in December and therefore PPVA was planning on combin[in]g Black Elk and Golden Gate and from there take the company public. However, since Golden Gate has been doing very well since then, Mark has decided not to combine Black Elk and Golden Gate for the time being. If you take a look at the February Marketing Report, you will see that Golden Gate is now at a higher carrying value than the December report. So the $300 million total value at year end compared to the $150 total value at the end of February is because Mark decided not to combine Black Elk and Golden Gate. If you have any questions, please let me know.

GX-563, at 1. This email contained the lie, which had originated with Nordlicht, that the reason Black Elk and Golden Gate were not combined was that "Golden Gate has been doing very well since [December of 2013]." That statement was proven false at trial by the testimony of Corkran and emails in evidence about the poor performance of Golden Gate in that time period, as well as the testimony of former Black Elk Chief Technical Officer Arthur Garza. Garza testified that he told defendant Levy in July of 2013 that they should "trade down" on the Golden Gate purchase price because of major performance issues at Golden Gate. See GX-258. In May 2014, Nordlicht confirmed to Garza that Golden Gate was no longer on the "black elk agenda" and that horizontal drilling results hadn't been "great" at Golden Gate. GX-259.

In addition, as established by the testimony of witnesses who worked at Black Elk (Garza and Clifford Joseph Bruno), Golden Gate (Corkran) and Northstar (Glynn Roberts), the testimony of reserve engineer Lily Cheung and documentary exhibits, the defendants pointed their investors to what they knew to be misleadingly high "PV-10" values when describing PPVA's oil and gas positions despite knowing that such a metric was very different from fair market value—the price at which a company would change hands between a willing buyer and seller in the market—which Platinum was supposed to be providing to its investors. Tr. at 1442 (Cheung clarifying that her report did not establish fair market value). For example, Roberts testified that he made that point directly to Nordlicht and Levy. Tr. at 5347 and 5374-75. And with respect to Golden Gate, although Nordlicht and Levy and others at Platinum knew that Black Elk had the option to buy all of Golden Gate for merely $60 million, see GXs 8516 & 620 (noting as an "issue" that the option, disclosed in a public Black Elk SEC filing, "pegs GGO's value to $60M")—an option Black Elk never exercised because the price was too high—the defendants and their co-conspirators nevertheless reported Golden Gate's value as $176 million as of June 30, 2014. 1-DX-5214.

The co-conspirators' affirmative, material misrepresentations relating to PPVA's oil-and-gas positions also extended to the rates at which their reported values were discounted. As Shaked testified, Landesman discussed with Shaked a table in PPVA's audited financial statements

9

for 2012 that identified the discount rates for a number of PPVA's Level 3 assets. As Shaked testified, the table revealed that the discount rates for those assets "were high." Tr. 2028. Among the Level 3 assets for which high discount rates were indicated in that table was Black Elk, the value of which was reported to be "$274 million." Id. Shaked testified that he and Landesman discussed "the various discounts that were being applied as to why they were what [they] were generally," in order for Shaked "to get comfort that they were appropriate." Id. at 2029. Shaked further testified that he did get comfort from the table and his discussions with Landesman about it, "[b]ecause it appeared that the discount rates were sufficiently high, such that if Platinum wanted to sell any of these assets, they should be able to do it with no issue." Id.

In reality, and as the defendants and their co-conspirators knew, PPVA could not sell these positions for anywhere near the purportedly discounted values at which the fund was carrying them (including, in the case of Golden Gate, to other portfolio companies Platinum controlled). The defendants and their co-conspirators also failed to fund the positions sufficiently to enable them to realize whatever potential value inhered in their reserves, and PPVA received negligible cash from these investments. These lies and omissions relating to the performance of these positions were material to investors because they left investors with the false impression that PPVA's investment strategy was successful and its largest positions could and would realize substantial gains for the fund—all of which were important to their investment decisions as to whether to invest in PPVA in the first place, whether to add money to their PPVA investments, and whether to redeem from PPVA (including in years preceding 2015).

B. The Government's Proof and Arguments Pertaining to PPVA's Investments' Performance Are Inextricably Intertwined with Those of the Fund's Liquidity Crisis and Inability to Pay Investor Redemptions

Perhaps most importantly, the defendants' and their co-conspirators' own statements, in evidence via emails and recordings, prove that PPVA's oil and gas positions' performance problems and substantial cash needs directly caused PPVA's liquidity crisis and inability to pay redemptions. During the period of the charged conspiracy, PPVA's two largest positions were Black Elk and Golden Gate (which, later in the conspiracy period and together with Northstar, became PPVA Oil & Gas). In a March 16, 2014 email that is critical evidence of both the Investment Scheme and the Black Elk Bond Scheme, Nordlicht wrote the following in response to co-defendant Daniel Small's request to be paid portfolio manager fees for his work on the Black Elk position and others:

> This is also the week I need to figure out how to restructure and raise money to pay back 110 million of preferred which if unsuccessful, wd be the end of the fund. This "liquidity" crunch was caused by our mismanagement – yours David and I – of the black elk position so I will multitask and also address your concerns but forgive me if I am a little distracted.

GX-552, at 1. Nordlicht's concession in the foregoing email to Small that he, Small and Levy together had mismanaged the Black Elk investment, resulting in PPVA's liquidity problems, demonstrates both the untenable position in which that investment left PPVA and the defendants' motive for engaging in the Black Elk Bond Scheme—to strip out whatever value remained in Black Elk for Platinum before the company formally went into bankruptcy. Tellingly, Nordlicht

10

made that concession well before the price of oil plummeted later in 2014. The dire performance issues at Black Elk and the imminence of bankruptcy were well known to the defendants by March 2014, as Nordlicht's email confirms.

PPVA's extreme difficulty in paying its investors' redemptions—with which the conspirators grappled in 2014—stemmed primarily from the fact that so much of its reported assets under management were tied up in Black Elk and other illiquid oil-and-gas positions that the fund could not sell for anywhere near their reported values. Nordlicht conceded that again much later, during the November 23, 2015 PPVA investor call in which he announced the sidepocket. In that call, in his own words, Nordlicht for the first time conceded that PPVA's oil-and-gas positions—all of which were going to be sidepocketed—were overvalued and could not be assigned values with the level of precision necessary to enable paying redemptions off of those investments:

> Um, our current valuation of our energy assets in the side pocket—we'll call they'll be around uh, 2, a little bit shy of $300 million. Call it $280 million. Based on the public comps, um, and our $700 million in, in uh, in proven reserves, uh, the public comps that this level of oil of call it 45-dollar oil are comfortably trading about one and a half times PV-10. So, we, we have a situation now where it's on our books, uh, call it about 280, 290 million on an equity value. And in fact, if we looked at the public comp analysis, it would be $800 million. So that gives you the idea of, of just the range of, of values that we're talking, and, and <u>I will readily admit that it's not like I could sell it at 290 million, I can't.</u> So you have this situation where it's not sellable, yet at the same time, you know, we feel it could be worth… as much as three times, um, three times the current value. <u>So um. . . you know obviously there is a reason why—there are reasons why I do think we should be at a discount. Number one, we have a greater amount of PUD—proven undeveloped reserves. Number two, our California assets [Golden Gate] which is part of our package, it's a significant part of our package—call it, uh 250—call it 300 million of the 700 million reserves, off the top of my head, I feel like those reserves might be a little bit over booked because we really don't have an efficient method yet to extract the oil. Number three, we have no real cash flow right now to speak of from our current asset base.</u> But on the other hand we do feel that our Gulf of Mexico reserves are significantly under booked, and I actually like having less cash flow now, because we're maintaining our current reserves, so I like having proven undeveloped reserves because that's basically near term reserves. You know, you don't want to have your reserves running off at 39-dollar oil, and so you want to have reserves that are going to kick in in a year, maybe two years from now, and that you could turn on and do drilling. And so I kind of actually like our reserve base where it is, but so when you think about it why we're setting aside half the portfolio to a separate vehicle, when you have an asset where the public comp standpoint is $800 million, you have it less than $300 million. You can't sell it

11

> in the current environment. You know, you have to kind of take action. <u>You can't win because you don't want to take in subscriptions on what could be a hugely undervalued asset, and you really shouldn't be paying redemptions out in cash as you have the largest asset on your books that's not monetizable.</u>

GX-4510, at 3 (emphases added). Only at the time of announcing the sidepocket, which Nordlicht needed investors to sign on to, did Nordlicht concede the valuation and performance issues surrounding PPVA's largest positions—issues that the defendants and their co-conspirators had known existed and were driving the fund's liquidity crisis for over a year at that point.

The foregoing evidence cannot be removed from the government's other evidence of the Investment Scheme relating to PPVA's illiquidity and inability to pay its redemptions. The jury should be presented with all of this evidence and should be permitted to consider the conspirators' scheme to defraud as a whole, not subdivided into parts that should and must be analyzed together. Moreover, the government intends and should be permitted to argue to the jury that the defendants failed to advise their investors and prospective investors about these aspects of the fund's performance time and time again. For example, the defendants failed to tell investors in 2014 that they were unable to realize cash from their illiquid, underperforming and even insolvent oil and gas positions and thus they could not meet investor redemptions on a quarterly schedule with 60 days' notice, which was the reason that they had to categorically change the fund's liquidity terms. And the defendants failed to tell investors and prospective investors that they could only pay redemptions in kind because of the illiquidity of their positions, or that they needed to wind down the fund. The defendants and their co-conspirators deliberately chose to conceal from their investors and prospective investors all of this information, and instead, made material misrepresentations and omissions to investors on all of these important subjects. Accordingly, the Court should permit the government to make all of these arguments to the jury as part of its presentation of evidence of the Investment Scheme.

V. <u>The Government's Admission of Evidence Pursuant to the Co-Conspirator Exception to the Hearsay Rule Was Proper</u>

The evidence the government offered during its direct case provided independent corroborating evidence that the government has met its burden to show by a mere preponderance that the unindicted individuals whom the government has identified and relied on as co-conspirators of the defendants during trial—Bernard Fuchs, Gilad Kalter, Michael Kimelman, David Steinberg and Zach Weiner—were in fact among the defendants' co-conspirators. The government will first address the governing legal standard and then the evidence demonstrating that each of the individuals listed above is clearly a co-conspirator.[7]

---

[7] As the instant submission relates to the basis for the admission of co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E), the government discusses herein only those unindicted co-conspirators whose statements have been admitted into evidence pursuant to that rule.

12

A. Applicable Law

"The law is well settled within this circuit that declarations that are otherwise hearsay may nevertheless be provisionally admitted, subject to connection of the defendant with the conspiracy alleged, as long as the trial court is ultimately satisfied that the participation of the defendant against whom the declaration is offered has been established by a fair preponderance of the evidence independent of the hearsay utterances." United States of America v. Cambindo Valencia, 609 F.2d 603, 630 (2d Cir. 1979). "To admit a statement under the coconspirator exception to the hearsay definition, a district court must find two factors by a preponderance of the evidence: first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of the conspiracy." United States v. Gigante, 166 F.3d 75, 82 (2d Cir. 1999).

"The conspiracy between the declarant and the defendant need not be identical to any conspiracy that is specifically charged in the indictment." Id. "[W]hile the hearsay statement itself may be considered in establishing the existence of the conspiracy, 'there must be some independent corroborating evidence of the defendant's participation in the conspiracy.'" Id. (quoting United States v. Tellier, 83 F.3d 578, 580 (2d Cir. 1996)). Moreover, statements that "provide reassurance, or seek to induce a coconspirator's assistance, or serve to foster trust and cohesiveness, or inform each other as to the progress or status of the conspiracy" are admissible. Id. However, the "Government need not show that the listener, or the person who heard the declarant's statement, was also a member of the conspiracy." United States v. Paredes, 176 F. Supp. 2d 183, 187 (S.D.N.Y. 2001). Indeed, a communication "with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the plan's goals" is admissible. Id.

Crucially, the independent evidence must corroborate the hearsay statements to show that they are reliable. The requirement is not that the government must establish fully that an individual is a co-conspirator before admitting hearsay statements of such co-conspirator. That requirement would swallow the hearsay exception because it is often the communications among individuals that fully establish the scope, nature and duration of the conspiracy. Indeed, conspiracy depends on a verbal or non-verbal communicative act—an agreement. Rather, as Cambindo Valencia, Paredes and Gigante demonstrate, there must be "some independent corroborating evidence of the defendant's participation in the conspiracy" and the totality of the evidence—both the independent corroborative evidence and the hearsay statements themselves—must be considered when the Court determines whether a particular individual is a co-conspirator. Gigante, 166 F.3d at 82.

B. Application

1. Bernard Fuchs

Extensive evidence introduced at trial proved by a preponderance of the evidence that Fuchs, who was a partner at Platinum during the time period of the charged Investment Scheme conspiracy, was a co-conspirator of the defendants. This evidence includes emails and testimony showing that Fuchs made material misrepresentations to prospective investors to convince them to invest in Platinum. Such evidence also includes Fuchs' participation in the March 16, 2015 recorded meeting, during which he made suggestions regarding how the co-conspirators might most effectively lie to investors about April 2015's purported 8% return, so

13

that existing PPVA investors would cancel their redemptions and prospective PPVA investors would invest new money based on the co-conspirators' false representations. Moreover, Fuchs then called investors in and after March 2015 to tell them about the fund's fabricated returns. After CFO Daniel Mandelbaum confronted him on the propriety of that statement, Fuchs responded: "this is how I have to save the firm. This is what I have to do." Tr. 4213. As Your Honor stated on June 7, 2019 with respect to Fuchs' co-conspirator status: "I can see the theory as to him." Tr. at 6092.

      2.    Gilad Kalter

Evidence introduced at trial proved by a preponderance that Kalter, who worked in the operations and marketing departments at Platinum during the charged conspiracy period and whose sister is married to Nordlicht, was a co-conspirator of the defendants. First, as the government explained during the Rule 29 arguments on June 7, 2019, Kalter participated in the March 16, 2015 recorded meeting, during which he, Nordlicht, Levy, co-conspirators Landesman, Fuchs and Kaplan discussed how to carry out their plan to deceptively forecast an 8% return in April 2015 to convince investors to cancel or defer their existing redemption requests and convince prospective investors to invest. In a later recording, Kalter responded to a comment by Landesman asking what they would do in the event that an investment proposed by defendant Nordlicht were to fail and they would "have to figure out how we're coming up with 100 million dollars," by joking that the fund would "promise an 8% return." GX-7114-1. This joke shows that Kalter appreciated the falsity of the 8% guidance issued in advance of April 2015.

      3.    Michael Kimelman

Evidence introduced at trial proved by a preponderance that Kimelman, who was in the operations department at Platinum and wired money to certain investors in furtherance of the defendants' fraud during the relevant Investment Scheme conspiracy period, was a co-conspirator of the defendants. In particular, Mandelbaum testified that, when he suggested to Nordlicht that Nordlicht fire Kimelman, Nordlicht responded: "if [there is] anyone we can't let go, it's Michael Kimelman because he knows stuff that we don't want anyone else to know." Tr. at 4321. After this evidence was introduced, Your Honor stated, "Okay. Go ahead," to the government and permitted the government to introduce GX 1240, thereby acknowledging that the government had made a sufficient showing that Kimelman was a co-conspirator and overruling the defense's objection on hearsay grounds. Id.

      4.    David Steinberg

Evidence introduced at trial proved by a preponderance that Steinberg, who was a portfolio manager and later Co-Chief Risk Officer at Platinum during the charged conspiracy period, was a co-conspirator of the defendants.

For example, on May 13, 2014, Nordlicht wrote Steinberg: "R u there? I want to sell bee bonds to beechwood." See GX-1794. Steinberg responded: "I'm still in fl. But calls should forward to my cell . . . That's not a problem. Nick [Nicholas Marzella] just needs beechwood's DTC instructions." Id.

14

About seven months later, in December 2014, when Platinum's hedge funds faced large margin calls as a result of the plummeting price of the Black Elk Bonds in the wake of the defendants' Black Elk Bond Scheme, Steinberg assisted the defendants in artificially propping up the BE Bonds' price to conceal from Platinum's investors Platinum's inability to pay the brokerage firms their margin calls and their investors their redemptions. See GXs-890, 273.[8]

A couple of months later, on February 23, 2015, Steinberg and co-conspirator Fuchs participated in an email chain that showed Steinberg's awareness of Platinum's liquidity crisis and his efforts to help Fuchs' and Nordlicht's efforts to drum up any positive news regarding Platinum's investments. See GX-1883. Specifically, Fuchs wrote: "I appreciate any news you forward to me. We really need something to happen so that Mark can breathe a little easier," and Steinberg responded: "Yes agreed. No worries." Id.

Finally, about five months later, on August 5, 2015, Steinberg received an email from Nordlicht directing him to make various payments to select individuals and entities, an instruction that he passed along to Nordlicht, Levy and Mandelbaum. See GX-289. This email again made clear that Steinberg was aware of Platinum's liquidity crisis and was intimately involved in trying to selectively pay only certain individuals and entities, while deliberately failing to disclose to investors Platinum's dire situation.

5. Zach Weiner

Evidence introduced at trial proved by a preponderance of the evidence that Weiner, who was the portfolio manager at Platinum handling the Black Elk investment in 2015, was a co-conspirator of the defendants.[9]

For example, on July 21, 2015—just weeks before Weiner met with Dixon Yee, a victim of the Black Elk Bond Scheme, to try to convince him Black Elk was doing well despite the evidence to the contrary—Weiner exchanged emails with Jed Latkin, whom Platinum had made CEO of Black Elk, and Levy. See GX-1816. On page 2 of the email chain, Weiner asked the status of Platinum's previous auditor, BDO, potentially signing off on an audit of Black Elk, and Latkin responded: "Nothing worth discussing they made an offer that is completely unreasonable." Id. At the bottom of page 1, Latkin wrote: "I literally called every local accounting firm and no one can get a 10k done before dec 1." Id. When Weiner then asked Latkin, "What did BDO want?," Latkin responded with a list of requests and conclusions that BDO voiced indicating that Platinum had acted illegally with respect to the Black Elk Bond Scheme. Id. This list included the following: "1) a full breakdown of where every dollar went from the renaissance transaction including a breakdown of the payouts to platinum and its related entities[;] 2) they wanted to state in the notes that they believe this transaction violated the

---

[8] The Court initially held these Government Exhibits to be admissible, see Tr. at 937, but subsequently reversed its decision on Federal Rule of Evidence 403 grounds, see ECF Docket No. 704.

[9] This evidence includes certain Government Exhibits that the government had prepared prior to the Rule 29 arguments on June 7, 2019 and is providing to the defense in its final list of Government Exhibits that it seeks to offer into evidence before formally resting on June 11, 2019.

indenture and was a preferential payment[;] 3) they wanted to use the Netherland and Sewell report that showed that as of year end we basically had no reserves due to the limitations brought on by the capex needs[;] 4) they would indicate in the filing that there was control and manipulation by the parent ownership entity [Platinum]." Id. In the final email in the chain, Weiner wrote to Latkin, with a "cc" to Levy: "Let's talk in the morning - we gotta figure out how to get this done." Id.

In addition, three months earlier, on April 6, 2015, defendant Nordlicht wrote to Levy with a "cc" to Werblowsky, Weiner and Latkin, the following: "Maybe Zach and Jed shd go down to Houston tomorrow and they can come back Wednesday night. It's urgent at this point. Close Northstar, dump jeff, get medius in place with new mgmt. We are out of time. Let Jed represent company as the issuer and he can start navigating some of these issues." See GX-1101. Furthermore, on February 23, 2015, Levy wrote to Weiner regarding the weak Black Elk oil production report: "Every day is worse than the one b4 what the hell." GX-1039.

For the foregoing reasons, the evidence offered during the government's direct case has provided independent corroborating evidence that the unindicted individuals whom the government has identified and relied on as co-conspirators of the defendants—Fuchs, Kalter, Kimelman, Steinberg and Weiner—were in fact among the defendants' co-conspirators.

VI. Conclusion

For the reasons detailed above and during the government's oral argument on June 7, 2019, the defendants' Rule 29 motions should be denied in their entirety.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By: /s/
Alicyn L. Cooley
David C. Pitluck
Lauren H. Elbert
Patrick T. Hein
Assistant U.S. Attorneys

Cc: Clerk of the Court (BMC) (by ECF)
Defense Counsel (by ECF)

16