# LEVINE LEE LLP

### NEW YORK

1500 Broadway, Suite 2501
New York, New York 10036
212 223 4400 main
www.levinelee.com

**Seth L. Levine**
212 257 4040 direct
slevine@levinelee.com

August 8, 2022

**VIA ECF**

The Honorable Brian M. Cogan
United States District Judge – Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:     *United States v. Nordlicht, et al.*, 16-cr-00640

Dear Judge Cogan:

We respectfully submit this letter on behalf of Defendant Daniel Small at the Court's request as written support for a portion of his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.  Pursuant to the Court's request, this written motion demonstrates that there is a failure of proof on the issue of fraudulent intent for the following reasons:  (1) Mr. Shearer and BakerHostetler counted all of the votes, including the votes of the bonds that Mr. Small disclosed to him were held by PPVA or other Platinum funds; (2) there was no evidence that Mr. Small knew that Beechwood was anything more than a "friendly" entity; (3) there was no evidence that Mr. Small knew whether Mr. Nordlicht had actual control over Beechwood; and (4) there was no evidence that Mr. Small had knowledge of the Indenture's definition of "control."   Mr. Small also plans to orally argue that the evidence was insufficient to establish his guilt for multiple other reasons, including, but not limited to, materiality and legal impossibility.

#### Argument

I.     **Mr. Shearer and BakerHostetler Counted All of the Platinum Votes**

The Government failed to prove that Mr. Small acted with fraudulent intent because the evidence demonstrates that regardless of whether any bonds ***should*** have been excluded from either consent solicitation vote by virtue of an affiliate rule, no bonds actually ***were*** excluded.  In fact, Mr. Shearer's testimony established that he and his firm counted all of the Platinum votes, including the votes of PPVA, in both the private and public consent solicitations.  Thus, Mr. Small had no knowledge that the underlying standard was violated.

With respect to the private consent solicitation (the "Private Process"), it is undisputed that not a single lawyer from any of the three law firms working on that process (BakerHostetler, Emmet Marvin,

and Blank Rome) raised the affiliate rule as a potential issue.  (*See* Tr. 417:6–24.)  Indeed, the **only** votes cast in the Private Process were cast by Platinum entities.  (*See* GX-266; GX-268; Tr. 423:6–8 ("Q. And every single one of those consents was from one of the three Platinum entities; right? A. Yes.").)  Nevertheless, Mr. Shearer, on behalf of BakerHostetler, issued a clean opinion letter.  (GX-267 (BakerHostetler's private consent opinion letter; *see also* Tr. 199:17–19, 392:13–16, 393:24–394:4 (Shearer's testimony on opinion letters).)  And John Hoffman, Black Elk's CEO, signed an Officer's Certificate, in which he certified that he reviewed the consent forms demonstrating that all votes cast were by Platinum entities.  (*See* DX1-268 at EDNY-PP-MISC-0000091–92.)  Further, Mr. Shearer did not tell anyone (let alone Mr. Small) at the time that the Platinum entities' votes should not have counted.  (*See* Tr. 452–58).  Nor did anyone else.  (*See* Tr. 416:11–22 (Shearer's testimony that Trustee's only issue with the private consent process was record date, not affiliate rule).)  Accordingly, the only rational conclusion that Mr. Small could have drawn from the Private Process was that there was no impediment to Platinum entities voting their bonds in a consent solicitation.

A few months later, in the public consent solicitation (the "Consent Solicitation"), Mr. Shearer actually **advised** Mr. Small to vote Platinum's bonds (*see* GX-737 (August 1, 2014 email)), and Mr. Small followed that advice (*see* DX-3402 (July 23, 2014 form indicating that PPVA was taking no action); DX-3403 (August 6, 2014 form indicating that PPVA was consenting without tendering)).  Then, on August 14, 2014, even after Mr. Small sent Mr. Nordlicht's Officer's Certificate that disclosed, in addition to PPVA's approximately $18.3 million bonds, other Platinum entities that "may be deemed affiliates" held an additional $43.3 million bonds to Mr. Shearer (GX-761; GX-761-A; GX-761-B), Mr. Shearer and BakerHostetler counted **all** the Platinum-held bonds and issued a public press release confirming that fact.  (*See* GX-270; GX-8526-1.)  Indeed, Mr. Shearer represented in a public press release that was filed with the SEC that $110 million in bonds—a number which he testified included the Platinum bonds—"***validly consented*** to the Consent Solicitation."  (GX 270 (emphasis added); GX-8526-1; *see, e.g.*, Tr. 510:9–12 (admitting that the $110 million figure includes "all of the consents"); Tr. 650:2–652:13; GX-761.)  The purported victims in this case—Dixon Yee and Todd Pulvino—both testified that they understood the press release to mean that bondholders of roughly $99 million bonds voted to consent without tendering.  (*See* 927:9–14 (Yee); 705:17–21 (Pulvino).)  Once again, Mr. Shearer, on behalf of BakerHostetler, issued a clean opinion letter.  (*See* GX-286 at SKV_BH_00025010–12 (BakerHostetler's public consent opinion letter); Tr. 199:17–19, 392:13–16, 393:24–394:4 (Shearer's testimony on opinion letters).)  And, once again, Mr. Hoffman executed an Officer's Certificate blessing the transaction.  (*See* GX-286 at SKV_BH_00025005–06.)

Thus, in both consent solicitations, the Platinum entities' votes were counted.  Given the fact that both processes were conducted under the auspices of well-regarded and knowledgeable attorneys and blessed by Mr. Hoffman, upon whose Officer's Certificate Mr. Shearer relied (*see* Tr. 302:13–16), the fact that these votes were counted precludes a finding that Mr. Small acted with fraudulent intent.  Put simply, even if Mr. Small was advised in connection with the Consent Solicitation that Platinum bonds were to be excluded, the fact that they were permitted to vote introduces reasonable doubt as to his fraudulent intent.

Notably, the evidence on this point differed in several key respects from that in the prior trial.  Whereas, in 2019, Mr. Shearer testified that he "decided to exclude the PPCO- and PPLO-owned bonds from the consent calculation," *see United States v. Landesman*, 17 F.4th 298, 316 (2d Cir. 2021), Mr. Shearer provided no such testimony in this case, and the press release showed that he and his firm, in fact, counted the votes of PPVA and the other Platinum funds.  Because the evidence totally failed to

demonstrate that any rule was applied to this vote, the evidence fails to show that Mr. Small could have acted with fraudulent intent.

## II.   There Was No Evidence that Mr. Small Knew that Beechwood Was Anything More than a "Friendly" Entity

Mr. Shearer testified that there is a difference between a "friendly" and an "affiliate" and that, so long as a friendly was not an affiliate, it was permitted to vote in the Consent Solicitation.  (Tr. 357:20–358:2; 362:24–363:3; 363:15–21.)  This testimony arose in the context of Platinum entities buying approximately $65 million of Black Elk bonds in March 2014.  (*See* DX-6701 (Milbank purchase); DX1-8134-2 (MSD purchase).)  In February 2014, Mr. Nordlicht wrote to Mr. Hoffman and Marizza Piché, Black Elk's General Counsel, noting that his plan was to buy bonds and that he could "change covenants" by "flipping [] bonds to friendlies."  (DX1-271; DX1-272.)  Ms. Piché then forwarded Mr. Nordlicht's email to Mr. Shearer and asked him for advice on the legality of "buy[ing] and trad[ing] these bonds," and Mr. Shearer responded that there was nothing illegal about buying these bonds, provided there was not any violation of insider trading laws that are not at issue in this case.  (DX1-272; Tr. 350:9–352:5.)  A few weeks later, in early March 2014, Mr. Nordlicht sent another email concerning friendlies to Mr. Small and others, which was again forwarded by Ms. Piché to Mr. Shearer.  (*See* DX1-533.)  Thus, by early March 2014, Mr. Shearer was fully informed about the fact that Platinum "friendlies" were buying Black Elk bonds.  This was the context for Mr. Shearer's learning in late June 2014 that John Hoffman was contending that Platinum's plan was to "pay themselves back (preferred equity) ahead of so called friendly bondholders."  (*See* DX-6291.)  Against this backdrop, the evidence was insufficient to establish Mr. Small's fraudulent intent because Mr. Shearer understood that friendly bondholders voted in the Consent Solicitation process and did not believe that this conduct was illegal.

In June 2014, Mr. Shearer was involved in other discussions concerning Platinum's use of friendly bondholders to change covenants—this time in connection with the Consent Solicitation vote. Specifically, Mr. Shearer testified that, in late June 2014, shortly before the Consent Solicitation was issued, Mr. Hoffman contacted BakerHostetler "to obtain advice on Platinum's use of friendly bondholders as part of the consent solicitation process."  (Tr. 548:15–549:4.)  Despite knowing that Platinum intended to use friendly bondholders as part of the Consent Solicitation process, Mr. Shearer never told Mr. Small or anyone else at Platinum or Black Elk that "there was anything improper about Platinum flipping bonds to friendly companies in order to change the terms of the Indenture."  (Tr. 363:22–364:1.)  Mr. Shearer further acknowledged that he would have spoken up if he had thought that anyone was violating the law in connection with the Consent Solicitation.  (Tr. 364:2–9.)  Not only did he not speak up, he and his firm issued a clean opinion letter—without which the Black Elk Indenture could not have been amended (Tr. 390:24–392:4)—opining that all conditions precedent have been met in order for the transaction to close, including obtaining the requisite number of consents.  (Tr. 597:21–599:23; *see* GX-286 at SKV_BH_00025010–12.)  The fact that Mr. Shearer—the seasoned lawyer hired to advise Black Elk on the deal—believed that it was permissible, and not illegal, for friendly bondholders to vote in the Consent Solicitation process provides further confirmation that Mr. Small did not act with fraudulent intent.  Additionally, the counting of all the votes is consistent with the fact that three law firms believed that counting the votes of Platinum entities was appropriate in connection with the Private Process.

Given this testimony, even had Mr. Shearer excluded the Platinum entities' votes, to establish fraudulent intent, the Government was required to present evidence that Mr. Small knew that Beechwood was something more than a "friendly."  As the Court aptly put it, "if [Mr. Shearer] recognizes

that distinction [between friendlies and affiliates], can Mr. Small have had criminal intent by recognizing the same distinction?" (Tr. 555:10–11.)

The answer is a resounding "no." Not only did the Government fail to present any evidence that Mr. Shearer's distinction between friendlies and affiliates was unreasonable, *see United States v. Connolly*, 24 F.4th 821, 834 (2d Cir. 2022) (stating that the Government's burden is to "*negate any reasonable interpretation*" of the relevant standard) (citing trial court's jury instruction) (emphasis in original), Mr. Shearer testified that he never told anyone at Black Elk or Platinum (including Mr. Small) "that there was anything improper about Platinum flipping bonds to friendly companies in order to change the terms of the indenture" (Tr. 363:23–364:1).

The Government presented no evidence concerning Mr. Small's understanding of Beechwood's status sufficient to prove that he knew that it was anything other than a friendly. The evidence concerning Beechwood's actual status was comprised of the testimony of two witnesses who, by their own admissions, never discussed Beechwood with Mr. Small, and several emails that Mr. Small neither sent nor received. None of this evidence provided any basis from which a rational jury could infer that Mr. Small had any knowledge concerning Beechwood's actual status.

The first of the Government's witnesses who provided testimony relating to Beechwood—Paul Poteat—set up Beechwood's information technology (IT). As the IT person, Mr. Poteat's understanding of Beechwood's operations was extremely limited, and the fact that the Government even called him as a Beechwood witness reflects the weakness of its case. Tellingly, Mr. Poteat testified that Mr. Small never worked at Beechwood and that he had no conversations with Mr. Small about Beechwood. (Tr. 813:11–814:2.) Similarly, the only other witness who provided evidence concerning Beechwood—Israel Wallach—***did not recall ever meeting or speaking to Mr. Small***. (Tr. 885:7–886:1.) Further, Mr. Wallach testified that Messrs. Feuer and Taylor, not Mr. Nordlicht, ran Beechwood. (Tr. 888:23–889:5.)

Similarly, Mr. Small did not send or receive a single email discussing Beechwood's actual status. For example, the Government showed Mr. Wallach a number of emails relating to Beechwood, but, as he testified, Mr. Small did not send or receive (either as a direct recipient or a CC) any of those emails. (*See* Tr. 884:5–885:6.) Nor was he even mentioned in any of the emails admitted through Mr. Wallach. While Mr. Small received emails reflecting that Beechwood had a relationship with Platinum, and that Beechwood had similar investments to Platinum, including holding Black Elk Bonds (*see, e.g.*, GX-8; GX-34; GX-35; GX-68; GX-69; GX-73; GX-584; GX-719), none of these emails discussed the ownership or management of, or how decisions were made at, Beechwood. These emails also contain no discussion about the process concerning the voting of the Beechwood bonds, including who directed that they be voted in favor of the Consent Solicitation. They therefore provide no basis from which the jury could reasonably infer that Mr. Small knew that Beechwood was an affiliate, as opposed to merely a friendly.

III.   **There Was No Evidence that Mr. Small Knew the Nature or Details of Mr. Nordlicht's Relationship with Beechwood or his Authority Over It**

The Government failed to prove that Mr. Small acted with fraudulent intent because no evidence was presented concerning Mr. Small's knowledge of Mr. Nordlicht's influence over Beechwood. According to the Government, the Indenture required the exclusion of votes of Black Elk and entities "directly or indirectly controlling or controlled by or under direct or indirect common control" with Black Elk. (*See, e.g.*, GX-9507 at BH-BEFILE0013923 (§ 2.09).) The Indenture defined "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management or

4

policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control."  (GX-9507 at BH-BEFILE0013896 (definition of "Affiliate").)  It also provided that "the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings."  (*Id.*)

While derived from TIA § 316(a), the Indenture's definition of "control" is common in the securities laws, and it is used in the regulations applicable to the control person liability provisions of the Securities Act and Securities Exchange Act.[1]  Courts interpreting these provisions have repeatedly held that the "control" standard requires "'*[a]ctual control*'" over both the controlled entity and the transaction in question.  *See, e.g.*, *In re BioScrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 740 (S.D.N.Y. 2015) (alteration and emphasis in original) (quoting *In re Blech Sec. Litig.*, 961 F. Supp. 569, 586 (S.D.N.Y. 1997)); *In re Alstom SA*, 406 F. Supp. 2d 433, 486–87 (S.D.N.Y. 2005) (stating that the alleged control person "must not only have actual control over the primary violator, but have actual control over the *transaction* in question") (citation and internal quotation marks omitted); *In re Flag Telecom Hldgs., Ltd. Sec. Litig.*, 352 F. Supp. 2d 429, 458 (S.D.N.Y.2005) (requiring "actual control" and noting that "the mere ability to persuade" is insufficient) (citation and internal quotation marks omitted).  Conversely, the ability to influence is not enough—even if such influence is "substantial."  *BioScrip*, 95 F. Supp. 3d at 740 ("Substantial influence is not the same as actual control[.]"); *see, e.g.*, *Kuhns v.* Ledger, 202 F. Supp. 3d 433, 440 (S.D.N.Y. 2016) ("Actual control, and not merely power to influence managerial decisions is required.") (citation and internal quotation marks omitted); *Alstom*, 406 F. Supp. 2d at 487 ("[E]xercise of influence, without power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is not sufficient to establish control[.]").  Accordingly, to prove Mr. Small's guilt, the Government was required, at the very least, to establish that Mr. Nordlicht's alleged "control" of Beechwood exceeded the threshold established by these decisions (i.e., was more than mere influence) and that Mr. Small knew that to be the case.  *See Connolly*, 24 F.4th at 834; *Fezzani v. Bear, Stearns & Co., Inc.*, 384 F. Supp. 2d 618, 645 (S.D.N.Y. 2004) ("Allegations of influence are not the same as the power to direct the management and policies[.]").

For the reasons discussed in the preceding section, no rational juror could conclude based on the evidence that Mr. Small knew whether Mr. Nordlicht had actual control—as opposed to mere influence— over Beechwood.  (*See* Tr. 367:6–17 (Shearer's testimony that there is a difference between influence and control).)  As an initial matter, the Government failed to demonstrate that Beechwood was, in fact, an affiliate of Black Elk.  Indeed, the evidence was either lacking or to the contrary.  For instance, a 2015 certification from Elliott Feit states that Beechwood did not "characterize any Beechwood Investor . . . as a related party or an affiliate of any Platinum entity."  (DX-2102-B.)  Nor did the Government offer any corporate governance or ownership documents reflecting who had actual authority to control the management or policies of Beechwood.

---

[1]  *See* 17 C.F.R. § 230.405 (Securities Act regulation providing that "[t]he term control (including the terms controlling, controlled by and under common control with) means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise"); 17 C.F.R. § 240.12b-2 (Securities Exchange Act regulation providing that "[t]he term "control" (including the terms "controlling," "controlled by" and "under common control with") means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise").

More important, as Mr. Shearer testified, to determine whether Beechwood was an affiliate, one "would have to look at the facts and determine whether there was control." (Tr. 215:3–4.) Even assuming the Government presented sufficient evidence to support the inference that Mr. Nordlicht controlled Beechwood (it did not), the Government presented no evidence that **Mr. Small** was privy to Mr. Nordlicht's supposed control.  The Government called just two Beechwood witnesses to testify— Mr. Poteat and Mr. Wallach—both of whom testified that they never even discussed Beechwood with Mr. Small, and their testimony therefore does not raise any inference concerning Mr. Small's understanding of Beechwood's status or decision-making.   (813:19-814:2 (Poteat); 884:17-885:11 (Wallach).)  Similarly, Mr. Small did not send or receive **any** emails discussing or reflecting Beechwood's status, ownership, or management, or how decisions were made at Beechwood.  The Government therefore presented no evidence that would have permitted the jury to reasonably find that Mr. Small knew whether Mr. Nordlicht had actual control over Beechwood and had the power to make decisions over its management or policies, as required to meet its burden to establish fraudulent intent.

Moreover, the Second Circuit's decision in *Landesman* poses no impediment to granting Mr. Small's motion because there are several key distinctions between the proof in that case on the issue of control and the absence of such proof in this case as to Mr. Small.  First, placing significant emphasis on a document that the Court has ruled is inadmissible against Mr. Small, the Second Circuit found in *Landesman* that the evidence showed that both Messrs. Nordlicht and Levy "retained significant control over Beechwood's investment decisions."  *Landesman* 17 F.4th at 307 (discussing GX-476).  Here, in contrast, the Government failed to introduce any evidence that Mr. Small had any control over Beechwood's investment decisions, or that he was even involved in them (or knew who was).

Second, the *Landesman* court relied on evidence of Mr. Levy's "dual role working at Beechwood and Platinum, coupled with his position as Beechwood's CIO and the email correspondence demonstrating that he was apprised of Beechwood's purchases of Black Elk bonds" in finding that he "understood Beechwood's role in the Black Elk scheme, was part of the conspiracy, and was acting in furtherance of the conspiracy as Beechwood's CIO."  *Landesman* 17 F.4th at 324–25.  Mr. Small, on the other hand, had no role at Beechwood, and there is no evidence in the record indicating that he was privy to the details of how Beechwood was run. (*See, e.g.,* Tr. 884:5–885:6 (Mr. Wallach's testimony that none of the emails he was shown were sent or received by Mr. Small).)  The absence of any evidence concerning Mr. Small's personal knowledge of Beechwood's management forecloses the inference that he knew that Mr. Nordlicht or anyone that he arguably controlled had control over Beechwood.

Third, the *Landesman* court relied on two emails from Beechwood employee Samuel Adler to the banks that held Beechwood's Black Elk bonds—Wilmington Trust and Nomura—advising these banks that Beechwood was consenting without tendering its bonds.  *Id.* at 325; (*see* GX-727; GX-728).  Given that Mr. Levy was copied on these emails, the Second Circuit concluded that this evidence permitted the jury to infer that Mr. Levy had instructed Mr. Adler to vote the Beechwood bonds.  *Landesman*, 17 F.4th at 325.  The Government introduced those same two emails in this case (Tr. 895:12–24; GX-727; GX-728), but because Mr. Small did not send or receive them, they have no bearing on Mr. Small's intent.  Unlike *Landesman*, therefore, there was no evidence from which the jury could reasonably infer that Mr. Small knew that Mr. Nordlicht, Mr. Levy, or anyone else played any role in voting Beechwood's Black Elk bonds.

Additionally, other evidence that the Second Circuit relied on to establish that Messrs. Nordlicht and Levy understood Beechwood to be an affiliate was either not admitted at this trial or simply does not speak to Mr. Small's knowledge and intent.  *See Landesman*, 17 F.4th at 326–27 (citing to the 2019 trial testimony by Mr. Bruno, a witness who did not testify against Mr. Small, concerning Mr. Levy's purported

"it's covered" statement; Mr. Nordlicht's August 18, 2014 email to Mr. Levy concerning wire transfers (which Mr. Small did not receive) (GX-773 (top email)), and Mr. Levy's conversation with Mr. Mandelbaum). Similarly, the Second Circuit relied on the fact that Mr. Nordlicht was a founder of both Platinum and Beechwood and "actively monitored the number of Black Elk bonds collectively and individually held by the Platinum and Beechwood entities, and exercised control over Beechwood's investments, including Black Elk." *Id.* at 337. Of course, the same cannot be said of Mr. Small.

Accordingly, the Second Circuit's decision in *Landesman* is distinguishable, and the Government cannot avoid acquittal for failing to prove that Mr. Small acted with fraudulent intent by pointing to a different case with a different record and a different defendant.

IV.   **There Was No Evidence that Mr. Small Had Knowledge of the Indenture's Definition of "Control"**

As the Court found and instructed the jury, the TIA was not violated in this case. This finding necessarily leads to the conclusion that Mr. Small did not act with fraudulent intent because the Government presented no evidence that Mr. Small ever reviewed § 2.09 of the Indenture or its definition of "control" (the only other potential sources of an affiliate rule), let alone understood them. Notably, none of the documents in this case—emails, officer's certificates, opinion letters, the consent solicitation statement—included the Indenture's definition of control. (*See, e.g.*, GX-267 (BakerHostetler's private consent opinion letter); DX1-268 at EDNY-PP-MISC-0000091–92 (Mr. Hoffman's private consent officer's certificate); GX-286 at SKV_BH_00025010–12 (BakerHostetler's public consent opinion letter); GX-286 at SKV_BH_00025005–06 (Mr. Hoffman's public consent officer's certificate); GX-8406 (consent solicitation statement); GX-690; GX-1899; GX-695; GX-699.)

Nor did the Government present any evidence that Indenture § 2.09 or its definition of "control" was ever explained to Mr. Small. In fact, Mr. Shearer admitted that he advised Mr. Small on *the TIA* (Tr. 487:13–488:22; *see also* Tr. 499:15–25), which is the only source cited in the emails between Mr. Small, Mr. Shearer, and Ms. Sakowitz (*see, e.g.*, GX-690; GX-1899) and is cited in the Consent Solicitation Statement itself (*see* GX-8406 at BNYM_SEC_000041–42). Accordingly, against this backdrop, there is no factual basis from which a reasonable jury could conclude that Mr. Small had fraudulent intent because there was no evidence that he reviewed or understood Indenture § 2.09 or its definition of "control."

Respectfully submitted,


/s/ Seth L. Levine
Seth L. Levine
Paul A. Murphy
Alison M. Bonelli


cc: All Counsel of Record (via ECF)