**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: 1:16-cr-00640-BMC |
| v. | ECF Case |
| MARK NORDLICHT, et al., | ORAL ARGUMENT REQUESTED |
| Defendants. | |

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT DANIEL SMALL'S MOTION FOR A JUDGMENT OF ACQUITTAL AND A NEW TRIAL

**LEVINE LEE LLP**
1500 Broadway, Suite 2501
New York, New York 10036
Telephone: (212) 223-4400

*Attorneys for Defendant Daniel Small*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 1

**THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL** ................................. 4

I. Legal Standard ............................................................................................................ 4

II. The Government Failed to Present Sufficient Evidence of Mr. Small's Criminal Intent ......... 7

   A. The Government Failed to Demonstrate that Mr. Small Knowingly and Willfully Violated the "Affiliate Rule" ............................................................................. 7

      1. The Government Failed to Present Sufficient Evidence that Mr. Small Knew that Mark Nordlicht "Controlled" Beechwood Within the Meaning of the Indenture ....... 8

      2. The Government Failed to Present Sufficient Evidence that Mr. Small Knew or Understood the Indenture's Definition of "Control" ................................... 14

      3. The Actions of Non-Conspirators Demonstrate that the Inference that Mr. Small Acted with Criminal Intent Was Unreasonable ........................................ 17

      4. The Evidence Relied on by the Second Circuit in *Landesman* Is Not Present Here .. 23

   B. The Evidence Showed that Mr. Small's Goal Was to Pay Bondholders ......................... 25

III. The Evidence Was Insufficient to Demonstrate a Fraudulent Act Because the Government Failed to Show that Mark Nordlicht Had Actual Control of Beechwood .............................. 29

IV. The Government Failed to Present Sufficient Evidence of Materiality ................................. 31

V. Mr. Small's Conviction Violates the Due Process Clause of the Fifth Amendment ............. 36

      1. The Indenture's Definition of "Affiliate" Is Impermissibly Vague ......................... 41

      2. The Government Failed to Negate a Reasonable Interpretation of the Indenture's Definition of "Affiliate" that Renders Mr. Small's Conduct Lawful ........................ 45

**THE COURT SHOULD GRANT MR. SMALL A NEW TRIAL IN THE INTEREST OF JUSTICE** ................................................................................................................................. 47

I. Letting the Partial Guilty Verdict Stand Would Be a Manifest Injustice .............................. 48

   A. Legal Standard ........................................................................................................ 48

   B. Argument ................................................................................................................ 49

II. The Government's Misconduct Warrants a New Trial ........................................................ 52

   A. Legal Standard ........................................................................................................ 52

   B. The Government's Knowing Mischaracterization of the Record Has Substantially Prejudiced Mr. Small ............................................................................................. 53

      1. The Government Misled the Jury About "Friendly" Bondholders ........................... 54

      2. The Government Misled the Jury About Critical Exculpatory Evidence ................... 55

      3. The Government Misled the Jury About Mr. Small's Alleged Motive ...................... 58

      4. The Government Misled the Jury About the Value of Black Elk .............................. 59

5.  In Combination, the Government's Rebuttal Summation Misstatements Substantially Prejudiced Mr. Small and Violated his Right to a Fair Trial ...................................... 60

III. The Government's Rebuttal Summation Amounted to a Constructive Amendment of the Indictment Warranting a New Trial ........................................................................ 63

A.  Legal Standard ....................................................................................................... 63

B.  The Government's Constructive Amendment Warrants a New Trial ............................ 64

IV. The Government's Rebuttal Summation Amounted to a Prejudicial Variance to the Indictment ........................................................................................................... 67

A.  Legal Standard ....................................................................................................... 67

B.  The Rebuttal Summation Varied from the Indictment and Prejudiced Mr. Small .......... 67

**IF THE COURT IS NOT PREPARED TO GRANT HIS MOTIONS ON THIS RECORD, MR. SMALL IS ENTITLED TO AN EVIDENTIARY HEARING** ...................................... **68**

**CONCLUSION** .......................................................................................................... **71**

# TABLE OF AUTHORITIES

Page(s)

**<u>Cases</u>**

*Berger v. United States,*
  295 U.S. 78 (1935) ................................................................................................ 51, 58

*Connally v. Gen. Constr. Co.,*
  269 U.S. 385 (1926) ...................................................................................................... 38

*Copeland v. Vance,*
  893 F.3d 101 (2d Cir. 2018) ........................................................................................ 41

*Emerson v. Mutual Fund Series Tr.,*
  393 F. Supp. 3d 220 (E.D.N.Y. 2019) ..................................................................... 9, 31

*Fezzani v. Bear, Stearns & Co., Inc.,*
  384 F. Supp. 2d 618 (S.D.N.Y. 2004) .......................................................................... 9

*Floyd v. Meachum,*
  907 F.2d 347 (2d Cir. 1990) ............................................................................. 52, 53, 62

*Hill v. Colorado,*
  530 U.S. 703 (2000) ...................................................................................................... 41

*In re Alstom SA,*
  406 F. Supp. 2d 433 (S.D.N.Y. 2005) ...................................................................... 9, 31

*In re Bioscrip, Inc. Sec. Litig.,*
  95 F. Supp. 3d 711 (S.D.N.Y. 2015) .............................................................................. 8

*Johnson v. United States,*
  576 U.S. 591 (2015) ................................................................................................. 38, 43

*Kelly v. United States,*
  140 S. Ct. 1565 (2020) .................................................................................................. 40

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ........................................................................................... 41, 42, 45

*Koufakis v. Carvel,*
  425 F.2d 892 (2d Cir. 1970) ......................................................................................... 53

*Kuhns v. Ledger,*
  202 F. Supp. 3d 433 (S.D.N.Y. 2016) ............................................................................ 9

*Lavender v. Kurn,*
  327 U.S. 645 (1946) ........................................................................................................ 5

*Manning v. Caldwell for City of Roanoke,*
  930 F.3d 264 (4th Cir. 2019) ........................................................................................ 43

*Napue v. Illinois,*
  360 U.S. 264 (1959) ...................................................................................................... 63

*Posters 'N' Things, Ltd. v. United States*,
    511 U.S. 513 (1994) ................................................................................................ 44

*Siewe v. Gonzales*,
    480 F.3d 160 (2d Cir. 2007) ...................................................................................... 5

*Skilling v. United States*,
    561 U.S. 358 (2010) ............................................................................................ 40, 42

*Smith v. Goguen*,
    415 U.S. 566 (1974) ................................................................................................ 42

*Thibodeau v. Portuondo*,
    486 F.3d 61 (2d Cir. 2007) .............................................................................. 42, 43, 44

*United States v. Aguiar*,
    737 F.3d 251 (2d Cir. 2013) .................................................................................. 47, 48

*United States v. Alston*,
    899 F.3d 135 (2d Cir. 2018) .................................................................................. 47, 48

*United States v. Archer*,
    977 F.3d 181 (2d Cir. 2020) ................................................................................... 3, 49

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000) ...................................................................................... 5

*United States v. Bryant*,
    556 F. Supp. 2d 378 (D.N.J. 2008) ................................................................... 7, 41, 46

*United States v. Burns*,
    104 F.3d 529 (2d Cir. 1997) ..................................................................................... 62

*United States v. Clemente*,
    22 F.3d 477 (2d Cir. 1994) ....................................................................................... 64

*United States v. Connolly*,
    24 F.4th 821 (2d Cir. 2022) ............................................................................... Passim

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994) .................................................................................. 5, 17

*United States v. Davis*,
    2017 WL 3328240 (S.D.N.Y. Aug. 3, 2017) ............................................................... 67

*United States v. Drummond*,
    481 F.2d 62 (2d Cir. 1973) ...................................................................................... 52

*United States v. Elias*,
    285 F.3d 183 (2d Cir. 2002) ..................................................................................... 53

*United States v. Espinal*,
    981 F.2d 664 (2d Cir. 1992) .................................................................................. 61, 62

*United States v. Ferguson*,
    246 F.3d 129 (2d Cir. 2001) ..................................................................................... 48

*United States v. Forlorma,*
   94 F.3d 91 (2d Cir. 1996) ..............................................................................Passim

*United States v. Frampton,*
   382 F.3d 213 (2d Cir. 2004) ................................................................................. 6

*United States v. Frank,*
   156 F.3d 332 (2d Cir. 1998) ............................................................................... 67

*United States v. Glenn,*
   312 F.3d 58 (2d Cir. 2002) ................................................................................... 6

*United States v. Glover,*
   588 F.2d 876 (2d Cir. 1978) ............................................................................... 63

*United States v. Guadagna,*
   183 F.3d 122 (2d Cir. 1999) ..................................................................... 4, 5, 25

*United States v. Halloran,*
   821 F.3d 321 (2d Cir. 2016) ......................................................................... 42, 44

*United States v. Hawkins,*
   547 F.3d 66 (2d Cir. 2008) ................................................................................... 6

*United States v. Jones,*
   393 F.3d 107 (2d Cir. 2004) ................................................................................. 6

*United States v. L. Cohen Grocery Co.,*
   255 U.S. 81 (1921) ............................................................................................. 38

*United States v. Landesman,*
   17 F.4th 298 (2d Cir. 2021) ...........................................................................Passim

*United States v. Lanier,*
   520 U.S. 259 (1997) ............................................................................... 36, 38, 41

*United States v. Litvak,*
   808 F.3d 160 (2d Cir. 2015) ............................................................................... 25

*United States v. Litvak,*
   889 F.3d 56 (2d Cir. 2018) ..................................................................... 31, 32, 35

*United States v. Lorenzo,*
   534 F.3d 153 (2d Cir. 2008) ....................................................................... 5, 6, 16

*United States v. Mariani,*
   725 F.2d 862 (2d Cir. 1984) ................................................................................. 5

*United States v. McCourty,*
   562 F.3d 458 (2d Cir. 2009) ......................................................................... 47, 48

*United States v. Millar,*
   79 F.3d 338 (2d Cir. 1996) ................................................................................. 53

*United States v. Miller,*
   471 U.S. 130 (1985) ........................................................................................... 64

*United States v. Milstein*,
   401 F.3d 53 (2d Cir. 2005) .................................................................. 64

*United States v. Modica*,
   663 F.2d 1173 (2d Cir. 1981) ......................................................... 52, 61

*United States v. Mollica*,
   849 F.2d 723 (2d Cir. 1988) .............................................................. 64

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991) .................................................... 6, 14, 31

*United States v. Nadi*,
   996 F.2d 548 (2d Cir. 1993) ......................................................... 43, 44

*United States v. Nusraty*,
   867 F.2d 759 (2d Cir. 1989) ............................................................... 7

*United States v. Patino*,
   962 F.2d 263 (2d Cir. 1992) .............................................................. 64

*United States v. Pauling*,
   924 F.3d 649 (2d Cir. 2019) ..................................................... 5, 6, 32

*United States v. Pierce*,
   785 F.3d 832 (2d Cir. 2015) .............................................................. 67

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000) ............................................................... 67

*United States v. Regan*,
   937 F.2d 823 (2d Cir. 1991) .............................................................. 14

*United States v. Resendiz-Ponce*,
   549 U.S. 102 (2007) ......................................................................... 67

*United States v. Richter*,
   826 F.2d 206 (2d Cir. 1987) .............................................................. 52

*United States v. Rigas*,
   490 F.3d 208 (2d Cir. 2007) ................................................... 64, 66, 67

*United States v. Rodriguez*,
   392 F.3d 539 (2d Cir. 2004) ............................................................ 5, 6

*United States v. Rosen*,
   409 F.3d 535 (2d Cir. 2005) ............................................................... 7

*United States v. Roshko*,
   969 F.2d 1 (2d Cir. 1992) ................................................................. 64

*United States v. Salmonese*,
   352 F.3d 608 (2d Cir. 2003) .............................................................. 67

*United States v. Sanchez*,
   969 F.2d 1409 (2d Cir. 1992) ............................................................ 48

*United States v. Schneiderman*,
   968 F.2d 1564 (2d Cir. 1992) ................................................................. 44

*United States v. Scott*,
   979 F.3d 986 (2d Cir. 2020) ................................................................... 42

*United States v. Shareef*,
   190 F.3d 71 (2d Cir. 1999) ..................................................................... 52

*United States v. Taylor*,
   464 F.2d 240 (2d Cir. 1972) ..................................................................... 4

*United States v. Thomas*,
   377 F.3d 232 (2d Cir. 2004) ............................................................. 52, 53

*United States v. Universita*,
   298 F.2d 365 (2d Cir. 1962) ................................................................... 52

*United States v. Valle*,
   807 F.3d 508 (2d Cir. 2015) ........................................................ 5, 16, 22

*United States v. Wallach*,
   935 F.2d 445 (2d Cir. 1991) ................................................................... 63

*United States v. White*,
   673 F.2d 299 (10th Cir. 1982) ........................................................... 4, 25

*United States v. Whiteside*,
   285 F.3d 1345 (11th Cir. 2002) .............................................................. 46

*United States v. Williams*,
   553 U.S. 285 (2008) ........................................................................ 41, 44

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982) ............................................................................... 42

## **Rules**

Fed. R. Crim. P. 29 ....................................................................... Passim

Fed. R. Crim. P. 33 ....................................................................... Passim

Fed. R. Crim. P. 16 ............................................................................ 69

## **Regulations**

17 C.F.R. § 230.405 ........................................................................... 38

17 C.F.R. § 240.12b-2 ......................................................................... 38

## Other Authorities

Am. Tel. & Tel. Co.,
   No-Action Letter, 1984 WL 47286 (Feb. 10, 1984)................................................................. 39

Disqualification of Felons and Other "Bad Actors" From Rule 506 Offerings,
   78 Fed. Reg. 44730-01, 2013 WL 3809014 (July 24, 2013)..................................................... 38

King World Prod., Inc.,
   No-Action Letter, 1986 WL 66602 (Apr. 25, 1986) ................................................................. 15

Procedures Utilized by the Division of Corporation Finance for Rendering Informal Advice,
   1980 WL 25632 Securities Act Release No. 33-6253 (Oct. 28, 1980) .............................. 38, 39

Seymour Richman and Schacher, Greentree & Co., Inc.,
   No-Action Letter, 1986 WL 66844 (May 29, 1986) .......................................................... 14, 15

## PRELIMINARY STATEMENT

Daniel Small respectfully files this memorandum of law in support of his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29 because the Government failed to present sufficient evidence to establish multiple elements of the two remaining charges against him and allowing his conviction to stand violates due process.[1]   The Court should also vacate his conviction and order a new trial under Federal Rule of Criminal Procedure 33 because the paucity of evidence against Mr. Small, the Government's misconduct throughout this case and particularly during its rebuttal summation, and the Government's last-minute shift in legal theories, both alone and in combination, strongly favor a new trial to avoid a miscarriage of justice.   Moreover, the Court should conclude that Mr. Small's conviction cannot stand because the Government constructively amended the Indictment and committed a prejudicial variance through its evidence and argument at trial.   The Government's failure of proof, its ever-shifting theories of wrongdoing, and, ultimately, its repeated and pervasive prosecutorial misconduct stem from the fact that Mr. Small is an innocent man who committed no crime.

First, the evidence was insufficient to establish that Mr. Small acted with criminal intent.   As the Government itself acknowledged, its burden on this element required that, at the very least, it establish that Mr. Small knew that Beechwood and Black Elk were affiliates under the standards set forth in the Indenture.   (*See, e.g.*, Tr. 1143:12–14.)   Under this standard, the Government was required to demonstrate, beyond a reasonable doubt, that Mr. Small knew that Mark Nordlicht had actual "control" over Beechwood.   The Government failed to do so.   To the contrary, none of the Beechwood witnesses provided any evidence of Mr. Small's knowledge.   Similarly, the Government's key witness against Mr. Small (who also provided no

---

[1] The jury acquitted Mr. Small on Count 7 (Conspiracy to Commit Wire Fraud).

evidence concerning Mr. Small's knowledge of Beechwood), Robert Shearer, acknowledged what the case law interpreting the applicable "control" definition makes clear: there is a difference between "influence" and "control," and influence, even if substantial, does not establish legal control for purposes of the standard set forth in the Indenture. He further testified that "friendly" bondholders are different from "affiliates," and that the Indenture did not prohibit a "friendly" bondholder from voting in favor of an amendment to an indenture like the one at issue here. (Tr. 363:15–21; Tr. 362:24–363:3.) As such, the Government was required to prove beyond a reasonable doubt that Mr. Small knew that Beechwood was something more than a "friendly" bondholder. No such evidence was presented, and, for this reason alone, no rational jury could have concluded beyond a reasonable doubt that Mr. Small knowingly violated the Indenture's "affiliate rule," or that he acted with criminal intent. In addition, there also was a failure of proof on the issue of intent because the Government failed to present any evidence at trial that Mr. Small knew about or understood the Indenture's definition of "control." Rather, the trial evidence reflected that the actions of non-conspirators were consistent with Mr. Small's actions, rendering any inference of intent unreasonable. The evidence also failed to prove Mr. Small's intent because it showed that his goal was to pay bondholders.

Second, the evidence was insufficient to establish that there was a fraudulent act because the Government failed to present sufficient evidence that Mr. Nordlicht exerted actual control over Beechwood. The evidence did not support any inference that Mr. Nordlicht exercised anything other than influence over Beechwood's trading in Black Elk bonds. Moreover, for Beechwood to be an "affiliate" under the Indenture, Mr. Nordlicht must have had the power to direct the management or policies concerning Beechwood's entire business, including Beechwood's

reinsurance operations, but the uncontroverted testimony from the Government's witnesses showed that Mr. Nordlicht did not run Beechwood's business.

Third, the evidence was insufficient to establish materiality. The Government's failure of proof on this point is made clear by the fact that the Government's witness testified that there was no reason to hold up the transaction or make further disclosures after learning about additional potentially affiliated bonds that had not been initially disclosed. Further, the actions of the two purported victims the Government called as proxies for the reasonable investor show that the disclosures in the Consent Solicitation statement were not, in fact, material to them (or to any other reasonable investor).

Fourth, Mr. Small's conviction violates due process. The Government prosecuted Mr. Small under the inherently vague and uncertain prong of the Indenture's definition of "control," which provides that one can "otherwise" possess "the power to direct or cause the direction of the management or policies of" an entity. Given the absence of any standard to evaluate whether there is "control" under this prong of the definition, the Government's case failed to satisfy the most basic requirements of the Due Process Clause for a criminal prosecution. The Government compounded this due process violation by failing to negate a reasonable interpretation of the Indenture's affiliate rule that rendered Mr. Small's conduct lawful.

Even were the Court to conclude that the evidence was sufficient to sustain Mr. Small's conviction under Rule 29 (it is not), it should grant Mr. Small a new trial. Rule 33 gives the Court discretion to do so, even based on the weight of the evidence alone, where the evidence, viewed in its totality, "preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *United States v. Landesman*, 17 F.4th 298, 330 (2d Cir. 2021) (quoting *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020)). Here, a new trial is necessary

to avoid manifest injustice.  For all the reasons discussed above regarding the evidentiary shortfalls, the paucity of evidence, alone, is grounds for a new trial.  Moreover, the Government's conduct during the pendency of this case, and especially in its rebuttal summation at trial, plainly prejudiced Mr. Small in a way that could not be cured.  In addition to injecting materially false and misleading information at the very end of the case (a continuation of its pattern of knowingly eliciting false testimony), the Government's conduct amounted to a constructive amendment of the Indictment.  This was done intentionally in an effort to salvage the Government's flagging prosecution, and it had the desired result.  At bottom, the Government failed to conduct itself in a manner consistent with its obligations and with the principles of justice.  For all these reasons, the Court should exercise its discretion and grant Mr. Small a new trial to avoid manifest injustice.  At minimum, the Court should hold an evidentiary hearing on the Government's pattern of misconduct.

**THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL**

**I.**     **Legal Standard**

Under Federal Rule of Criminal Procedure 29, the Court "may set aside the verdict and enter an acquittal."  Fed. R. Crim. P. 29(c)(2).  Entering a judgment of acquittal is appropriate if the Court determines that "the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).  Accordingly, if the Court "concludes that upon the evidence there must be such a doubt in a reasonable mind, [it] must grant the motion."  *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972).

The Court "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a

reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).  In doing so, the Court "must view the evidence presented in the light most favorable to the government" and draw "[a]ll permissible inferences" in the Government's favor.  *Guadagna*, 183 F.3d at 129.

Still, the "jury's inferences . . . must be reasonable." *Landesman*, 17 F.4th at 320.  "[S]pecious inferences [should] not [be] indulged, because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015) (quoting *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).  Accordingly, "a conviction based on speculation and surmise alone cannot stand." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).  "An inference is not a suspicion or a guess.  It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist." *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019) (quoting *Siewe v. Gonzales*, 480 F.3d 160, 168 (2d Cir. 2007)).  "Impermissible speculation, on the other hand, is 'a complete absence of probative facts to support the conclusion reached.'" *Id.* (quoting *Lavender v. Kurn*, 327 U.S. 645, 653 (1946)).

"Where a fact to be proved is also an element of the offense . . . it is not enough that the inferences in the government's favor are permissible," but rather, the Court "must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *Pauling*, 924 F.3d at 657 (internal quotation marks and alteration omitted); *see also D'Amato*, 39 F.3d at 1256 ("[T]he government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt.").  Although direct evidence is

not required, the Government's circumstantial evidence must demonstrate "each element of the charged offense beyond a reasonable doubt." *Lorenzo*, 534 F.3d at 159 (quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)). "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Landesman*, 17 F.4th at 320 (quoting *United States v. Hawkins*, 547 F.3d 66, 71 (2d Cir. 2008)).

The Second Circuit has not hesitated to find insufficient evidence where, as here, there has been a failure of proof. For example, the Second Circuit has reached this conclusion where an essential element of the offense was based on "surmise or guesswork," *Pauling*, 924 F.3d at 662 (affirming district court's grant of defendant's Rule 29 motion); where evidence of intent was "far too attenuated," *United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004) (affirming district court's grant of defendant's Rule 29 motion); where "weak circumstantial evidence" made a conspiracy involving defendants "plausible" but had not "established [the conspiracy] beyond a reasonable doubt," *United States v. Jones*, 393 F.3d 107, 112 (2d Cir. 2004) (reversing district court's denial of defendants' Rule 29 motions); where the Government's "evidence gave 'nearly equal circumstantial support' to competing explanations for [the victim]'s death," *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (reversing district court's denial of defendant's Rule 29 motion); where there was insufficient evidence to show knowledge of a key fact and the requisite intent, and, "[a]t best, [the defendant's] convictions [we]re based on evidence that is 'at least as consistent with innocence as with guilt,' . . . and 'on inferences no more valid than others equally supported by reason and experience,'" *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir. 1991) (citations omitted) (dismissing indictment for conspiracy and securities fraud); and where the conviction was based on major flaws in the government's case, including, among others, the lack

of "evidence of any inculpatory conversations between [the defendant] and his alleged co-conspirators." *United States v. Nusraty*, 867 F.2d 759, 763–64 (2d Cir. 1989) (reversing conviction and noting that "[s]uspicious circumstances . . . are not enough to sustain a conviction for conspiracy").

**II.**  **The Government Failed to Present Sufficient Evidence of Mr. Small's Criminal Intent**

To obtain a conviction on Counts Six (Conspiracy to Commit Securities Fraud) and Eight (Securities Fraud), the Government was required to demonstrate, beyond a reasonable doubt, that Mr. Small "acted willfully and knowingly and with the intent to defraud." *Landesman*, 17 F.4th at 321 (quoting *United States v. Rosen*, 409 F.3d 535, 549 (2d Cir. 2005)); (*see also* Tr. 1777:15–21 (jury charge on criminal intent)).   Mr. Small's convictions cannot stand because the Government failed to present sufficient evidence that he acted willfully, knowingly, and with the intent to defraud.

**A.**  The Government Failed to Demonstrate that Mr. Small Knowingly and Willfully Violated the "Affiliate Rule"

The Government was required to present sufficient evidence for a rational jury to conclude that Mr. Small knew that Mr. Nordlicht controlled Beechwood and it therefore qualified as an "affiliate" under the Indenture.  *See United States v. Bryant*, 556 F. Supp. 2d 378, 442 (D.N.J. 2008) (noting that in a fraud prosecution premised on the violation of an extrinsic standard or rule, the government is required to prove the rule was violated and the defendant knew it); *United States v. Connolly*, 24 F.4th 821, 834 (2d Cir. 2022) (similar); (*see also* Tr. 1143:12–14 (Government's acknowledgment that "[it had] to establish that Beechwood and Platinum were affiliates under the standards set forth in the [Indenture] and then [it had] to establish Dan Small knew that"); Tr. 1780:1–7 (jury instruction that Government was required to prove that Mr. Small "knew that the rule governing which bonds were required to be disclosed to bond holders as affiliated and

which bonds were permitted to vote in connection with the consent solicitation was violated" and jury was to "apply the definition of affiliate" from the Indenture in assessing whether the Government had met its burden).)

It failed to do so.  The Government failed to show that Mr. Small viewed Beechwood as anything more than a friendly or that Mr. Small understood the Indenture's definition of "control." Further, the evidence that the Government presented concerning the other participants in the Consent Solicitation process undercuts any inference of criminal intent.  Significantly, the Second Circuit's decision in *Landesman* poses no impediment to granting Mr. Small's motion because, as the Court has already acknowledged, that case involved a very different record.

> *1.*     *The Government Failed to Present Sufficient Evidence that Mr. Small Knew that Mark Nordlicht "Controlled" Beechwood Within the Meaning of the Indenture*

The Indenture defines "affiliate" as follows:

> "*Affiliate*" of any specified Person means any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person.  For purposes of this definition, "*control*," as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a Person will be deemed to be control.  For purposes of this definition, the terms "*controlling*," "*controlled by*" and "*under common control with*" have correlative meanings.

(GX-9507 at BH-BEFILE0013896.)[2]

Courts interpreting definitions of "control" materially identical to the Indenture's have repeatedly held that the ability to "influence" a person or entity is insufficient to demonstrate "control"—even if such influence is "substantial."  *In re Bioscrip, Inc. Sec. Litig.*, 95 F. Supp. 3d

---

[2] To avoid unnecessarily burdening the Court, we have not attached the exhibits cited herein to this Memorandum.  To the extent the Court would like copies of some or all of the cited exhibits, we are happy to provide them at the Court's request.

711, 740 (S.D.N.Y. 2015) ("Substantial influence is not the same as actual control . . . ."); *see also, e.g.*, *Kuhns v. Ledger*, 202 F. Supp. 3d 433, 440 (S.D.N.Y. 2016) ("Actual control, and not merely power to influence managerial decisions is required." (citation and internal quotation marks omitted)); *In re Alstom SA*, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) ("[E]xercise of influence, without power to direct or cause the direction of management and policies through ownership of voting securities, by contract, or in any other direct way, is not sufficient to establish control . . . ."); *Fezzani v. Bear, Stearns & Co., Inc.*, 384 F. Supp. 2d 618, 645 (S.D.N.Y. 2004) ("Allegations of influence are not the same as the power to direct . . . management and policies . . . ."). Courts also consistently require "actual control" over ***both*** the entity ***and*** the transaction in question.  *See, e.g.*, *Emerson v. Mutual Fund Series Tr.*, 393 F. Supp. 3d 220, 260 (E.D.N.Y. 2019) ("To plead a control person violation, a plaintiff must allege that the defendant had '[a]ctual control over the wrongdoer *and* the transactions in question.'" (alteration in original) (emphasis added) (quoting *Alstom SA*, 406 F. Supp. at 487)).

The uncontroverted testimony of the Government's primary witness, Robert Shearer—the BakerHostetler corporate attorney tasked with overseeing the Consent Solicitation process—is consistent with these principles.  Mr. Shearer testified that: (1) there is a difference between having "control" and having "influence," (2) there is a difference between an "affiliate" and a "friendly," (3) "friendlies" were allowed to vote in the Consent Solicitation if they were not "affiliates," and (4) assessing whether an entity was an "affiliate," and therefore more than just a "friendly," is a fact-bound evaluation.

Specifically, Mr. Shearer testified that there is a discernible difference between "control" and "influence":

Q. There's a difference between having control and having influence; right?
A. That's fair.

9

> Q. So if I've got 85 percent of a company and I want them to make a change, I can ask nicely, but in the end of the day, I can force that change because I have legal control; right?
>
> A. True.
>
> Q. If I don't have legal control, I can ask, or advocate, or beg for somebody to do something for me, but at the end of the day, I can't force that person to do it because I don't have legal control; right?
>
> A. That's fair.

(Tr. 367:6–17.)  He also testified unequivocally that there is a distinction between "friendlies" and

"affiliates":

> Q. So, just for summary, we have friendlies in one thing; right? That's one thing. Yes?
>
> A. Okay.
>
> Q. And there's also something called "an affiliate"; right?
>
> A. Yes.
>
> Q. They're not - - they are two different concepts; right?
>
> A. Yes.

(Tr. 363:15–21; *see also* Tr. 357:20–358:2 (Shearer's confirmation of his prior testimony that there

is a difference between a friendly and an affiliate).)

Further, Mr. Shearer testified that friendlies were permitted to vote in the Consent

Solicitation so long as they were not affiliates:

> Q. Isn't it true, as long as the friendly bondholder is not an affiliate, they vote the way that Platinum would like them to vote, and that would be proper?  That was your understanding; right?
>
> A. Yes.

(Tr. 362:24–363:3.)

Mr. Shearer also testified that, absent ownership of voting securities or agreement,

determining whether there is "control" under the Indenture (i.e., whether an entity is actually an

affiliate or merely a friendly) requires one to "look at the facts and determine whether there was

control."  (Tr. 214:22–215:4 ("So I guess would [sic] have to look at the facts and determine whether there was control.").)

> ### a.   The Evidence Showed the Use of Friendlies in the Consent Solicitation

Mr. Shearer's testimony was not merely theoretical.  Beginning as early as February 2014, Mr. Nordlicht, Mr. Small's purported co-conspirator, made clear to non-conspirators John Hoffman (Black Elk's CEO), Marizza Piché (Black Elk's General Counsel), and Mr. Shearer that he planned to use "friendlies" to amend the Indenture.  (*See* DX1-271 ("It will at that point be easy task to buy additional 25 if bondholders don't behave and we can change covenants at any time by flipping our bonds to friendlies who will so [sic] right by the company."); DX1-272 (Mr. Shearer providing legal advice to Ms. Piché concerning Mr. Nordlicht's email); DX1-533 ("We have friendly buying 20 million.").)  And the evidence demonstrates that is exactly what happened.  Platinum entities bought more than $65 million in Black Elk bonds, at par or just below par, from various bondholders in March 2014.  (*See* DX-6701 (Milbank purchase agreement); DX1-8134-2 (MSD bond purchase).)

Between June 23, 2014 and July 7, 2014, Platinum entities then sold some of their Black Elk bonds to Beechwood entities.  (*See* GX-9510 (demonstrative exhibit demonstrating Black Elk bond purchases).)  In late June 2014, Mr. Hoffman (with the help of Ms. Piché) solicited legal advice from multiple partners at Mr. Shearer's law firm to discuss Platinum's use of friendly bondholders in connection with the Consent Solicitation.  (*See* Tr. 548:15–549:4; Tr. 560:22–561:3.)  And ultimately, during the Consent Solicitation vote, the Beechwood entities voted to consent without tendering.  (*See* Tr. 895:12–24 (parties' stipulation as to the fact that Beechwood voted its Black Elk bonds to consent without tendering).)

11

**b.    The Evidence Did Not Demonstrate that Mr. Small Viewed Beechwood as Anything More than a Friendly**

The Government failed to present evidence sufficient to demonstrate that Mr. Small viewed Beechwood as anything more than a "friendly" bondholder or that he knew that its holdings needed to be disclosed in connection with the Consent Solicitation.  Not a single witness testified that Mr. Small knew that Beechwood was more than a "friendly" or that he knew that Mr. Nordlicht had anything more than influence over Beechwood.

Throughout the trial, the Government refused to call the witnesses who might have known the relevant facts, instead relying on witnesses who largely were ignorant of the key issues or testified in a way that was contrary to what the Government was trying to prove.  For instance, the Government did not call anyone from the senior management of Black Elk who actually participated in the Consent Solicitation—like Mr. Hoffman (the CEO) or Ms. Piché (the General Counsel)—nor did it present any evidence from any member of the senior management of Beechwood or the actual owners of its voting stock—like Mark Feuer (CEO) or Scott Taylor (President).   This is likely because the Government recognized that such testimony would not support its position.   Instead, the Government called only two witnesses to testify about Beechwood: Paul Poteat and Israel Wallach.  Neither provided any testimony suggesting Mr. Small knew *anything* about Beechwood, let alone testimony suggesting that Mr. Small knew that Mr. Nordlicht had the power to direct Beechwood's management or policies and therefore controlled the company within the meaning of the Indenture.

Mr. Poteat testified that Mr. Small was a Platinum (not Beechwood) employee and that he had no conversations with Mr. Small about Beechwood. (Tr. 813:11–814:2). As for Mr. Wallach, he did not even recall ever meeting Mr. Small or speaking with him about anything, much less Beechwood.  (Tr. 885:7–886:1.)  He further confirmed that Mr. Small did not send or receive any

12

of the emails the Government showed him reflecting his communications with Mr. Nordlicht and others about Beechwood's purchase of the Black Elk bonds. (Tr. 884:17–885:6.)

None of the Government's other witnesses provided any evidence about Mr. Small's knowledge of Beechwood. Mr. Shearer, the only witness who actually interacted with Mr. Small in connection with the Consent Solicitation, never met Mr. Small in person (*see* Tr. 663:20–664:4) and communicated with Mr. Small almost exclusively via email. Further, he provided no testimony concerning Beechwood at all, much less any testimony concerning Mr. Small's knowledge about Mr. Nordlicht's relationship to Beechwood. Additionally, Mr. Shearer offered no testimony concerning what facts and circumstances would be relevant to a determination of "control" under the Indenture's definition of "affiliate." Absent such testimony from the one witness who interacted with Mr. Small on this subject, the jury could only have guessed at Mr. Small's intent.

At most, the evidence showed that (1) Mr. Nordlicht exerted some influence over Beechwood with respect to the Black Elk bonds, (2) Beechwood was a "friendly" bondholder, (3) Beechwood bought Black Elk bonds from Platinum entities, and (4) Beechwood voted to consent without tendering in the Consent Solicitation. None of these facts, however, supports a reasonable inference that Mr. Small knew Beechwood was an "affiliate" under the Indenture, not just a "friendly" bondholder, and that he willfully violated the "affiliate rule."

The Government's failure of proof is fatal to the prosecution and requires entry of a judgment of acquittal on both counts of conviction. As the Court aptly noted, "if [Mr. Shearer] recognizes th[e] distinction [between friendlies and affiliates], can Mr. Small have had criminal intent by recognizing the same distinction?" (Tr. 555:10–11.) The answer is a resounding "no."

2.      *The Government Failed to Present Sufficient Evidence that Mr. Small Knew or Understood the Indenture's Definition of "Control"*

The Government's failure to prove that Mr. Small acted with criminal intent is underscored by the complete lack of evidence at trial that Mr. Small knew or understood the Indenture's definition of "control."   *See United States v. Regan,* 937 F.2d 823, 827 (2d Cir. 1991) ("The Government is required to prove beyond a reasonable doubt that the defendant was guilty of a conscious knowing intent to defraud." (citation omitted)); *Mulheren*, 938 F.2d at 369 (finding that the government's evidence was insufficient to show defendant's requisite intent, including knowledge of key issue).

This lack of evidence dooms the Government's case because the Government did not proceed under the more straightforward bases for establishing "control"—namely, ownership of voting stock or an agreement to control.  Because of this theory of prosecution, the lack of evidence concerning Mr. Small's knowledge or understanding of the "control" definition is a crucial deficiency.  As noted *infra* in connection with Mr. Small's due process-based arguments, the "otherwise" prong was so arcane as not to be susceptible of clear understanding by the average person and there were no objective standards against which a person of ordinary intelligence could determine what qualifies as "control."  As such, the notion that one would necessarily understand what it means to "otherwise" control the management or policies of an entity is a murky legal area that even Mr. Shearer testified would require an examination of the facts and circumstances.  (*See* Tr. 214:22–215:4.)  Notably, the Government presented no evidence that Mr. Small was ever advised on this definition.  Further, the United States Securities and Exchange Commission ("SEC"), which is charged with interpreting control liability provisions of the securities laws, has routinely refused to stake out a position when asked to opine on issues of control and affiliation and presented with facts and circumstances.  *See, e.g.*, Seymour Richman and Schacher, Greentree

& Co., Inc., SEC Staff No-Action Letter, 1986 WL 66844 (May 29, 1986) ("[T]he staff is not in a position to resolve questions involving affiliate or control status.  Such a determination is to be made by counsel  . . ., as the facts requisite for such a determination are more readily available to the parties concerned and their counsel.  Therefore, we are unable to advise you concerning the questions presented in your letter."); King World Prod., Inc., SEC Staff No-Action Letter, 1986 WL 66602 (Apr. 25, 1986) ("[T]he staff is not in a position to resolve questions as to affiliate status.  Accordingly, we will express no view as to whether or not [a particular individual] is an affiliate of the Company.").

Given the inherent uncertainty of such a question, it was incumbent on the Government to demonstrate that Mr. Small understood what "control" meant under the Indenture and knew how to apply it to the relevant facts—or even what the relevant facts were—when examining the relationship among Black Elk, Platinum, Mr. Nordlicht, and Beechwood.  But the Government failed to introduce any evidence that Mr. Small had ever even seen or heard about the definition, let alone evidence sufficient for a rational jury to conclude that he understood the term as defined in the Indenture.  Accordingly, there was insufficient evidence to show that Mr. Small knowingly and willfully violated the provision in connection with the Consent Solicitation.

Mr. Shearer, the sole witness who interacted with Mr. Small in connection with the Consent Solicitation, did not testify that he advised Mr. Small on the Indenture's definition of "control."[3] And while the evidence supports the inference that Mr. Small reviewed and understood other portions of the Indenture (*see, e.g.*, GX-1901), any inference that Mr. Small must therefore have understood the Indenture's definition of "control" is "specious" and undeserving of deference.  *See*

---

[3] The email that Mr. Small received relating to the affiliate rule was tied to the TIA's affiliate rule and did not mention the Indenture's rule (or its definition of "control").  (*See* GX-1899.)

*Valle*, 807 F.3d at 515 (remarking that "specious inferences are not indulged[] because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty" (quoting *Lorenzo*, 534 F.3d at 159)).  This is especially true where, according to the Government's own characterization of the Indenture, it was a "really long legal document" with a "whole bunch of rules in it" (Tr. 1525:19–1526:2), and where even Mr. Shearer testified that he was familiar with only "***some*** of [the Indenture's] provisions."  (Tr. 179:3–4 (emphasis added).)

Indeed, not a single one of the hundreds of other documents admitted into evidence contains the Indenture's definition of "control."   (*See, e.g.*, GX-267 (BakerHostetler's private consent opinion letter); DX1-268 at EDNY-PP-MISC-0000091–92 (Mr. Hoffman's private consent officer's certificate); GX-286 at SKV_BH_00025010–12 (BakerHostetler's public consent opinion letter); GX-286 at SKV_BH_00025005–06 (Mr. Hoffman's public consent officer's certificate); GX-8406 (consent solicitation statement); GX-690 (email between Mr. Small and BakerHostetler); GX-1899 (same); GX-695 (same); GX-699 (same).)

While there are documents in evidence containing various iterations of the phrase "directly or indirectly controlling or controlled by or under direct or indirect common control," the Indenture contains a particular definition of "control," rendering that generic language meaningless.[4]

The record also contains emails in which Mr. Small used the term "control" (*see, e.g.*, GX-681; GX-699), but Mr. Small's mere recitation of the ***word*** "control" in those emails in no way evidences an understanding of the ***Indenture's legal definition*** of "control."  None of the emails the Government offered where Mr. Small repeated the word "control" makes any reference to the legal definition of that term in the Indenture.  Any suggestion that when Mr. Small used the

---

[4] Even voting equity apparently was difficult to understand for the many sophisticated attorneys involved in the private consent solicitation process who permitted Platinum entities, including PPVA, to cast the only votes in that process.  (*See* Tr. 417:6–24; Tr. 423:6–8; GX-266; DX1-268.)

term "control," he was referring to a definition that there is no evidence he knew about, let alone understood, is the type of speculation that cannot provide a lawful basis for conviction. *See, e.g.*, *D'Amato*, 39 F.3d at 1256 ("[A] conviction based on speculation and surmise alone cannot stand.").

In sum, the Government's circumstantial evidence simply does not support its theory that Mr. Small understood the Indenture's definition of "control" and acted with criminal intent.

<blockquote>

3.     *The Actions of Non-Conspirators Demonstrate that the Inference that Mr. Small Acted with Criminal Intent Was Unreasonable*
</blockquote>

The evidence demonstrates that key players involved in the Consent Solicitation—Mr. Shearer, Mr. Hoffman, Ms. Piché, and Mr. Yee—acted in a manner that renders unreasonable the inference that Mr. Small understood the "affiliate rule" and willfully violated it.

<blockquote>

a.     **Robert Shearer**
</blockquote>

Mr. Shearer, the key lawyer in charge of the Consent Solicitation, understood that votes by "friendlies" in the Consent Solicitation were lawful, and he raised no issues concerning the "affiliate rule" during either the private consent solicitation process or the Consent Solicitation despite being aware of the proposed use of friendlies, fatally undercutting any inference that Mr. Small acted with criminal intent.  The following facts are illustrative:

Even though the ***only*** votes cast in the private consent solicitation were those of Platinum entities (*see* GX-266; GX-268; Tr. 423:6–8), neither Mr. Shearer nor any of the other experienced and sophisticated lawyers involved raised the affiliate rule as a potential issue (*see* Tr. 417:6–24). Indeed, in connection with the private consent solicitation, Mr. Shearer, on behalf of BakerHostetler, issued a clean opinion letter despite his knowledge that all those Platinum bonds had been voted.  (GX-267.)

Following the private consent solicitation, neither Mr. Shearer nor anyone else involved specifically informed any Platinum employee—let alone Mr. Small—that the Platinum entities' votes should not have been counted.  (Tr. 416:11–13; Tr. 417:6–24; Tr. 452–58.)

In the months leading up to the Consent Solicitation, Mr. Shearer was repeatedly informed of Platinum's extensive Black Elk bond holdings.  (*See* DX-6105 (Apr. 25, 2014 email to Mr. Shearer from Mr. Shulse informing him that Platinum owned "85% of the equity, 70% of the bonds and 100% of the Series E"); Tr. 403:5–405:12 (discussing DX-6105 and Shearer's acknowledgment that 70% of $150 million outstanding bonds is "a little over 100 million"); GX-266 (private consent solicitation consents demonstrating that Platinum entities owned more than $90 million in Black Elk bonds); DX1-268 (same).)  While Mr. Shearer testified that the Black Elk bonds were freely tradeable (Tr. 658:17–23), he never testified that he learned, heard, or had any reason to believe that Platinum traded any of its bonds.  Nevertheless, even though Mr. Small repeatedly disclosed a number of affiliated bonds significantly lower than $93 million (*see* GX-695; GX-699), Mr. Shearer did not raise any concerns or ask Mr. Small any questions about the $18.3 million figure.

Mr. Shearer also was aware that Mr. Nordlicht intended to use "friendlies" to change Indenture covenants.  (*See* DX1-271 ("It will at that point be easy task to buy additional 25 if bondholders don't behave and we can change covenants at any time by flipping our bonds to friendlies who will so [sic] right by the company."); DX1-272 (same); DX1-533 ("We have friendly buying 20 million.").)  And when he was asked by Ms. Piché to opine on Mr. Nordlicht's plan, he raised no issue with the lawfulness of doing so.  (*See* DX1-272.)  Mr. Shearer acknowledged the extent of his understanding about the proposed use of friendlies during the Consent Solicitation when he testified:

Q. Sir, does seeing this document refresh your recollection that Mr. Hoffman communicated to your law firm or communicated to lawyers that he wanted to understand whether there was a plan by Platinum to isolate Black Elk, pay themselves back preferred equity ahead of so-called friendly bondholders and fire some people?  Does that refresh your recollection on that issue?

A. I see that reference, yes.

Q. So your firm you now recall was contacted on or about 26 of June of 2014 for advice on Platinum's use of friendly bondholders as part of the consent solicitation process; that statement is true, is it not?

      [Objection Overruled]

A. Yes.

(Tr. 548:15–549:4; *see also* Tr. 560:22–561:3 (Shearer's agreement with the statement that "the issue of the use of friendly bondholders at the end of June [2014] was raised by Mr. Hoffman *for BakerHostetler's consideration*" (emphasis added)).)   Nevertheless, even though Mr. Shearer received the final Bank of New York Mellon activity report (GX-761-B), which showed that, in addition to PPVA's $18.3 million, holders of roughly $81 million Black Elk bonds voted to consent without tendering, a decision he viewed as economically irrational (*see* Tr. 643:9–14), he did not raise any concerns or ask Mr. Small for additional information about these votes.

Moreover, Mr. Shearer **advised** Mr. Small to vote Platinum's bonds in the Consent Solicitation.  (*See* GX-737.)  This was utterly inconsistent with the Government's theory that it was clear that none of those bonds could be voted.[5]

Similarly, following the close of the Consent Solicitation vote, Mr. Shearer issued a public press release indicating that $110 million in bonds—a number which excluded no bonds that either consented or tendered (including PPVA's)—"validly consented to the Consent Solicitation."

---

[5] In addition, even after purportedly explaining the "affiliate rule" to Mr. Small in connection with the Consent Solicitation, Mr. Shearer still needed to ask his associate, Ms. Sakowitz, to do legal research in response to Mr. Small's question because Mr. Shearer was "not positive" how to properly apply the rule.  (Tr. 488:14–22; Tr. 490:12–491:16; GX-690.)  This undermines the inference that Mr. Small understood and willfully violated the "affiliate rule."

(GX-270; GX-8526-1; *see, e.g.*, Tr. 510:9–12 (admitting that the $110 million figure includes "all of the consents"); Tr. 650:2–652:13 (conceding that the column from Mr. Small's August 14, 2014 email analysis, which he used for the press release, was the column that included "all the bonds including everything that tendered and everything that consented"); GX-761.)

Finally, Mr. Shearer issued a clean legal opinion on behalf of BakerHostetler.  (*See* GX-286 at SKV_BH_00025010–12.)  In so doing, he allowed the deal to close even though, as he admitted, he could not have if the transaction even ***potentially*** was unlawful.  (*See* Tr. 601:7–602:6; *see also* GX-8406 at BNYM_SEC_0000033 (Consent Solicitation statement closing condition indicating that transaction could not close if, among other things, "any statute, rule, regulation . . . ***would or might*** prohibit, make illegal, or affect the making of the offer and the Consent Solicitation" (emphasis added)); GX-286 at SKV_BH_00025011 (BakerHostetler opinion letter opining that "all conditions precedent set forth in the Indenture to the execution and delivery of the Second Supplemental Indenture by the Indenture Trustee have been satisfied").)

### b.    John Hoffman and Marizza Piché

The actions of non-conspirators Mr. Hoffman and Ms. Piché likewise demonstrate that the inference that Mr. Small acted with criminal intent was unreasonable.  Further, their knowledge of the extent of Platinum's holdings, plus the intent to have "friendlies" help amend the Indenture's covenants, upends the entire theory of conspiracy here as well as Mr. Small's alleged criminal intent.  The following facts are illustrative:

Even though the ***only*** votes cast in the private consent solicitation were those of Platinum entities (*see* GX-266; GX-268; Tr. 423:6–8), Mr. Hoffman signed an Officer's Certificate approving the transaction.  (*See* DX1-268 at EDNY-PP-MISC-0000091–92.)

In February and March 2014, Mr. Hoffman and Ms. Piché received the same emails regarding "friendlies" that Mr. Shearer did, and Ms. Piché sought advice from Mr. Shearer about

the issue.  (*See* DX1-271; DX1-272; DX1-533.)  The evidence indicates that "friendlies" remained on Mr. Hoffman and Ms. Piché's radar throughout the relevant period.  Indeed, the use of "friendlies" in the Consent Solicitation was significant enough to them that they sought legal advice from Mr. Shearer's partners at BakerHostetler—Paul Francis and Eric Kristiansen—on that very topic in late June and early July of 2014.  (*See* Tr. 548:23–549:4; 560:22–561:3.)  Mr. Hoffman and Ms. Piché would have had far less reason to seek such advice about Platinum's plan had Platinum and its friendly entities not controlled significantly more than the $18.3 million bond held by PPVA.

Despite being copied on Mr. Small's emails to Mr. Shearer disclosing the $18.3 million figure (*see* GX-695; GX-699), neither Mr. Hoffman nor Ms. Piché ever questioned it.  To the contrary, Mr. Hoffman executed an Officer's Certificate blessing the Consent Solicitation transaction.  (GX-286 at SKV_BH_00025005–06.)

### c.      Dixon Yee

Dixon Yee was one of two witnesses to testify about the Indenture's definition of "control."  Notably, after preparing for trial twice and being under oath, even Mr. Yee—a sophisticated bond investor who was demonstrably biased in favor of the Government and provided false testimony about a variety of topics to aid the Government (*see, e.g.*, Tr. 924:4-14; Tr. 996:6–18)—offered testimony about the "control" definition that was completely at odds with the Government's theory of the case.  Specifically, Mr. Yee's testimony showed that he understood the definition of "control" in the Indenture to mean that to qualify as an "affiliate," equity control was required.  This would be consistent with an understanding that only bonds held by PPVA—the Platinum entity with equity control over Black Elk and whose $18.3 million in bonds Mr. Small disclosed—would be subject to the "affiliate rule."  Mr. Yee's testimony is completely inconsistent with the

Government's theory and renders the inference that Mr. Small understood the "control" definition and acted with criminal intent in violating the "affiliate rule" unreasonable.

Mr. Yee had the following exchange on direct examination:

> Q. Mr. Yee, what was your understanding of [the Indenture's definition of "affiliate"]?
> A. Well, the way it reads is that anyone that owns more than 10 percent of the voting stock of a company or, you know, basically is an affiliate of the company.
> Q. Under this definition, is anyone else an affiliate of the company?
> A. No.

(Tr. 909:13–19.)  When given an opportunity to correct or adjust his testimony, he doubled down, confirming that, in his view, equity ownership is the only path to control under the "Indenture." Significantly, Mr. Yee's understanding cannot be chalked up to a failure of memory or other confusion.  He provided this testimony while ***reading*** the Indenture's definition of "affiliate."  (*See* Tr. 909:11–12.)

Given Mr. Yee's testimony, the inference that Mr. Small understood the "control" definition becomes the type of "specious inference[]" that cannot be "indulged" on a Rule 29 motion.  *Valle*, 807 F.3d at 515.  There is no basis on this record to infer that Mr. Small knew about, much less correctly understood, the definition of "control" where the Government's own witness could not.  This is especially true where Mr. Yee gave his interpretation after being prepared to testify and while actually reviewing the definition of "control" in the Indenture.

\*       \*       \*

Thus, the evidence concerning how others involved in the Consent Solicitation acted renders the inference that Mr. Small acted with criminal intent unreasonable.

4.    *The Evidence Relied on by the Second Circuit in* Landesman *Is Not Present Here*

The Second Circuit's ruling in *Landesman* poses no impediment to granting Mr. Small's motion because much of the evidence that the Second Circuit relied on in upholding the jury verdicts against Mark Nordlicht and David Levy is not present here and/or does not bear on Mr. Small's knowledge of whether Beechwood was an "affiliate" of Black Elk.   Indeed, the *Landesman* court was presented with different issues and a different factual record.   (*See* Tr. 1402:7–8.)

It is undisputed that the defendants in *Landesman*, Messrs. Nordlicht and Levy, were positioned quite differently with respect to Beechwood than Mr. Small was.   Moreover, as set forth below, much of the evidence that the Second Circuit found sufficient to sustain the convictions of Messrs. Nordlicht and Levy does not implicate Mr. Small (or was not offered against him) and is therefore insufficient to demonstrate that Mr. Small acted with criminal intent:

- ***Mr. Small Had No Role at Beechwood and Was Unaware of Mr. Nordlicht's Precise Role***.   In *Landesman*, the Second Circuit relied on the facts that Mr. Nordlicht founded both Platinum and Beechwood and that Mr. Levy was Beechwood's Chief Investment Officer.   17 F.4th at 324–25, 334, 337.   The evidence showed that Mr. Small had no role at Beechwood whatsoever, and there was no evidence showing that he knew Mr. Nordlicht founded Beechwood or "controlled" Beechwood, as defined in the Indenture.   Unlike Mr. Nordlicht, who was personally involved in the actions and circumstances that the Second Circuit considered germane to the control analysis, the evidence failed to show Mr. Small's knowledge of all those facts (or even Mr. Small's knowledge regarding which facts were relevant to the "control" analysis under the Indenture).   As such, Mr. Small plainly did not have the same insight into the direction of Beechwood's management or policies that Messrs. Nordlicht and Levy did.

- ***Mr. Small Was Not Involved in Beechwood's Investments***.   In *Landesman*, the Second Circuit found that Messrs. Nordlicht and Levy retained "significant control over Beechwood's investment decisions." 17 F.4th at 307.   Here, there is no allegation, let alone evidence, that Mr. Small had any control over Beechwood's investment decisions.   Further, there is no evidence that Mr. Small was involved in Beechwood's investment decisions.   Nor is there evidence that he knew the extent of Mr. Nordlicht's involvement in Beechwood's investment decisions.   In particular, there is a complete lack of evidence demonstrating that Mr. Small understood that Mr. Nordlicht had anything more than influence at Beechwood (as contrasted with actual control).

23

Finally, the document on which the *Landesman* court placed significant reliance in concluding that Mr. Nordlicht controlled Beechwood's investments, GX-476, was not admitted against Mr. Small.

- ***Mr. Small Was Not Involved in Beechwood's Acquisition of Black Elk Bonds***.  In *Landesman*, the Second Circuit relied on evidence of Mr. Levy's "dual role working at Beechwood and Platinum, coupled with his position as Beechwood's CIO and the email correspondence demonstrating that he was apprised of Beechwood's purchases of Black Elk bonds" in finding that Mr. Levy "understood Beechwood's role in the Black Elk scheme, was part of the conspiracy, and was acting in furtherance of the conspiracy as Beechwood's CIO." 17 F.4th at 324–25.  Here, there is no evidence indicating that Mr. Small was privy to the details of Beechwood's acquisition of its Black Elk bonds. (*See, e.g.*, Tr. 884:5–885:6 (Wallach's testimony that none of the emails he testified about, which demonstrated Mr. Nordlicht's involvement in Beechwood's Black Elk bond trading, were sent to or received by Mr. Small).)  Although he was aware of Platinum and Beechwood's Black Elk bond holdings, there is no evidence that Mr. Small knew the details of Beechwood's acquisition, further highlighting the unreasonableness of any inference that he knew Beechwood qualified as an "affiliate" as opposed to a "friendly."

- ***Mr. Small Was Not Involved in Voting Beechwood's Black Elk Bonds***.  In *Landesman*, the Second Circuit relied on two emails from Beechwood employee Samuel Adler to the banks that held Beechwood's Black Elk bonds—Wilmington Trust and Nomura—advising these banks that Beechwood was consenting without tendering its bonds.  17 F.4th at 325; (*see also* GX-727; GX-728).  Given that Mr. Levy was copied on these emails, the Second Circuit concluded that this evidence permitted the jury to infer that Mr. Levy had instructed Mr. Adler to vote the Beechwood bonds.  17 F.4th at 325.  Here, in contrast, although the Government introduced those same two emails (Tr. 895:12–24; GX-727; GX-728), they have no bearing on Mr. Small's intent because he did not send or receive them.  There is no evidence from which the jury could reasonably infer that Mr. Small played any part in voting Beechwood's Black Elk bonds or knew the precise role Mr. Nordlicht, Mr. Levy, or anyone else purportedly played in doing so.

- ***Key Testimony Purportedly Demonstrating Guilt Was Not Offered at Mr. Small's Trial***.  In *Landesman*, the Second Circuit relied on Joe Bruno's 2019 trial testimony concerning Mr. Levy's purported "it's covered" statement, 17 F.4th at 326, and on Daniel Mandelbaum's 2019 trial testimony concerning a conversation with Mr. Levy about the timing of Black Elk's bankruptcy, *id.* at 327.  Neither Mr. Bruno nor Mr. Mandelbaum testified against Mr. Small.  Nor was there any other testimony or evidence regarding those statements or suggesting that Mr. Small was aware of them.

- ***Mr. Small Did Not Receive Key Emails***.  In *Landesman*, the Second Circuit relied on Mr. Nordlicht's August 18, 2014 email to Mr. Levy concerning wire transfers.  17 F.4th at 326 (citing GX-773 (top email)).  Mr. Small did not receive Mr. Nordlicht's email.

Given these significant differences, the Government cannot salvage its failure of proof by relying on *Landesman*.

*     *     *

For all the reasons above, the Government's evidence was insufficient to prove Mr. Small's knowledge that Mr. Nordlicht purportedly "controlled" Beechwood (rendering it an "affiliate" under the Indenture).  In short, the evidence was "so meager that no reasonable jury could find guilt beyond a reasonable doubt."  *Guadagna*, 183 F.3d at 130 (quoting *White*, 673 F.2d at 301).

B.  The Evidence Showed that Mr. Small's Goal Was to Pay Bondholders

The Second Circuit has held that "'[l]iability for securities fraud [ ] requires proof that the defendant acted with scienter, which is defined as a mental state embracing intent to deceive, manipulate or defraud."  *United States v. Litvak*, 808 F.3d 160, 178 (2d Cir. 2015) (alteration in original) (citation and internal quotation marks omitted).  Thus, to sustain a conviction, there must be sufficient evidence for a rational jury to find an intent to deceive, manipulate, or defraud beyond a reasonable doubt.  *Id*.

Here, the Government's theory, as stated in its Indictment and during both opening statements and summations, was that Mr. Small rigged the Consent Solicitation vote to steal from the bondholders for Platinum's benefit.  (*See* Indictment ¶ 73 (alleging that Mr. Small "engaged in a scheme to defraud third-party holders of the BE bonds . . . and to deprive the Bondholders of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets . . . ."); *id.* ¶ 75 (alleging that Mr. Small "began devising a scheme to bypass the Bondholders' rights and misappropriate proceeds of Black Elk's asset sales for Platinum's benefit through deceptive means"); Tr. 20:6–14; Tr. 1521:6–10; Tr. 1528:10–17; 1530:23–1531:7.)  In other words, the intent to deceive went hand in glove with the alleged plan to harm the bondholders.  But the Government's evidence was insufficient to support a finding of fraudulent intent because the

25

evidence presented as to Mr. Small's state of mind showed that he wanted to buy Black Elk bonds from the bondholders—at par, plus accrued interest—not steal from them.  The Government offered no evidence that Mr. Small intended to "deceive, manipulate or defraud" the bondholders for some other reason, and as a result the evidence was insufficient to sustain the conviction.

Whereas in *Landesman*, the Second Circuit noted that fraudulent intent could be inferred because, in its view, there was evidence that "the Black Elk scheme benefitted Platinum investors to the detriment of the Black Elk bondholders," and therefore a rational jury could have inferred that "those involved in it acted with criminal intent to defraud the bondholders," 17 F.4th at 321–22,[6] the evidence at this trial demonstrates the opposite—namely, that Mr. Small intended to ***pay*** bondholders.   Tellingly, Mr. Shearer, the only witness to provide any direct evidence of Mr. Small's intent, agreed that "from the first time [he was] involved, Dan Small want[ed] to pay bondholders their full value." (Tr. 471:4–6.)  Additionally, Mr. Small received and forwarded to Messrs. Nordlicht and Levy a sources and uses statement indicating that Black Elk had set aside $65 million to pay tendering bondholders.    (DX-6793.)    If Mr. Small and his alleged co-conspirators intended to steal from the bondholders, it defies belief that they would set aside $65 million to pay them.  The rest of the record similarly demonstrates that Mr. Small intended to pay bondholders.

---

[6] At least in part, the *Landesman* court's conclusion as to the necessary result of the alleged scheme is based on a misapprehension concerning the mechanics of the Consent Solicitation.  Specifically, whereas the *Landesman* court appears to have believed that the "Consent Solicitation Statement's proposed amendments allowed Black Elk to pay Black Elk's preferred equity holders . . . with proceeds from the Renaissance Sale ***before*** paying the Black Elk bondholders," *id.* at 322 (emphasis added), the undisputed record here demonstrates that this simply was not true.  Notwithstanding the Government's efforts to muddy the record with false and misleading testimony from Messrs. Pulvino and Yee on this issue (*see, e.g.*, Tr. 923:2–13), it is clear that the preferred equity holders could be paid only ***after*** all tendering bondholders had been paid in full. (*See* Tr. 465:3–12.)

Black Elk's CEO, Mr. Hoffman—whom the Government admits was not a member of the conspiracy—announced a bond-buying strategy in early 2014.  As reflected in the transcript of a January 9, 2014 investor call, Mr. Hoffman publicly stated that Black Elk planned to sell assets that he thought would bring in "well in excess of $100 million which will be used for debt reduction and growth."  (DX1-510-A at SEC-WB-0621–22.)  He further stated that "[w]e only want partners who want to be our partners and so if there are some bond holders that want out, frankly it fits within our strategy in 2014 which calls for reducing debt."  (*Id.* at SEC-WB-0629.)

Consistent with this strategy, Mr. Small took the lead on buying Black Elk bonds on behalf of Platinum.  In March 2014, Mr. Small signed a note purchase agreement on behalf of PPVA concerning its purchase of roughly $45 million in bonds at par from a group of displeased bondholders represented by Milbank LLP.  (DX-6701.)  Platinum entities also purchased an additional roughly $22 million in Black Elk bonds from MSD, Michael Dell's hedge fund, for ninety-eight cents on the dollar.  (DX1-8134-2.)

In addition, during the Consent Solicitation, Mr. Small advised Mr. Shearer that Black Elk wanted to pay par value for all of the bonds.  (GX-1897.)  The fact that Mr. Small offered to pay full value for the bonds of a company that the Government claims was in distress refutes any inference that Mr. Small knew that the vote was rigged to disadvantage bondholders, as the Government claims.  (*See* Tr. 955:11–14 (Yee's acknowledgment that the "consent offer . . . would have been very favorable in terms of the overall returns [he] would have achieved for [his] investors").)

The evidence also reflects that Platinum reached out to investors, including Mr. Pulvino's firm, through an intermediary to attempt to convince them to tender their bonds during the Consent Solicitation process.  (Tr. 780:8-15 ("Q. Sir, do you recall that during the consent solicitation, you

27

and your colleagues got a communicated with Chardan, the broker who had arranged the transaction between PPVA and your company for preferred equity, and they came to you and said that Platinum has said they really think it would be a good idea for you to tender, they would like you to tender your bonds?  A. Yes.").)  Again, if Mr. Small and Platinum intended to rig the vote and receive payment to the detriment of the bondholders, then Platinum would not have actively solicited bond sales from investors at or near full value as the evidence reflects that it did.

In fact, Mr. Nordlicht, in an email sent to Mr. Small, expressed disappointment that more bondholders did not tender their bonds during the Consent Solicitation.  (DX-6405.)  After Jeffrey Shulse advised Messrs. Nordlicht, Levy, and Small that, while the proposed amendment to the Indenture passed, "only $2.8 million of the bonds have tendered" as of that time, Mr. Nordlicht responded that "[t]hat's not really our desired result.  I think some tenders will show up at the last minute."  (*Id.*)

Viewed in its totality, this evidence renders the inference that Mr. Small acted with fraudulent intent unreasonable.  Far from showing that "the Black Elk scheme benefitted Platinum investors to the detriment of the Black Elk bondholders," *Landesman*, 17 F.4th at 321–22, as discussed above, the evidence here shows that the plan was to pay bondholders one hundred cents on the dollar plus all accrued interest (a price which had been accepted by multiple savvy investors just months earlier).  And although the Government was not required to demonstrate intent to harm in connection with the securities fraud counts, because the Government's (debunked) theory of the case was that Mr. Small defrauded the bondholders to steal money from them, its failure to prove that he intended to steal from the bondholders forecloses a rational jury from finding fraudulent intent.  Such a conclusion is, of course, consistent with the jury's verdict acquitting Mr. Small on Count Seven, conspiracy to commit wire fraud.

**III.**     **The Evidence Was Insufficient to Demonstrate a Fraudulent Act Because the Government Failed to Show that Mark Nordlicht Had Actual Control of Beechwood**

As the Government acknowledged, to prove a fraudulent act to support the convictions, it had to prove that Mr. Nordlicht actually controlled Beechwood.  (*See, e.g.*, Tr. 1143:12–14; Tr. 1771:13–21.)  But the Government's evidence failed on this point as well.

On cross-examination, the Government's primary Beechwood witness, Israel Wallach, testified that Mr. Nordlicht had no ability to direct Mr. Wallach's portfolio, let alone "direct or cause the direction of the management or policies of [Beechwood]":

> Q. Okay.  But just to be clear, Mark Nordlicht did not have authority to direct you to take any action in your portfolio at Beechwood, is that right?
>
> A. That is correct.
>
> Q. Okay.  So if Mark asked you to buy or invest in a certain investment and you thought it was a bad idea for your portfolio, you didn't have to follow his instruction, did you?
>
> A. I would not follow it.

(Tr. 888:7–14.)  Mr. Wallach further testified that while Mr. Nordlicht had influence over certain investment decisions that Beechwood made (*see* Tr. 887:23–25 ("Q. And so it's fair to say that or would you say that Mark had influence with you in terms of your investment decisions? A. Sure.")), Mr. Feuer and Mr. Taylor controlled the company.  (*See* Tr. 889:3–8 (Q. Is it fair to say that [Feuer and Taylor] were the two people who sort of ran the company called Beechwood? A. Yes. Q. And that was true the entire time that you worked there, is that right? A. Yes.").)

Indeed, when asked whether Mr. Nordlicht was the person who made the decision to transfer the Black Elk bonds from Platinum to Beechwood, Mr. Wallach said he did not know who made that decision, further highlighting the limited evidence of Mr. Nordlicht's actual control over the bond transactions:

> Q. Who -- do you know who made the decision to transfer those bonds from Platinum to Beechwood?

A. Mark mentioned to transfer them, *but I don't know who made that decision*.

Q. Mark mentioned to transfer them, but you don't know who made the ultimate decision?

A. Yes, yes.

Q. But it was not you?

A. It was not me.

(Tr. 828:21–829:4 (emphasis added).)

Additionally, Beechwood itself certified that it was not an affiliate of any Platinum entity (and therefore not an affiliate of Black Elk). Beechwood's Finance Director, Elliot Feit, signed the CohnReznick certification, which makes clear that Beechwood did not view "any Beechwood Investor . . . as a related party or an affiliate of any Platinum Entity." (DX-2102-B at 3). Faced with this unambiguous evidence, the Government intentionally misled the jury and falsely described Mr. Feit as a founder of Beechwood, conjuring from thin air a conspiracy involving Mr. Feit that has no basis in evidence or reality. (Tr. 1681:1–2; 1683:10–15.) Although the Court issued a curative instruction, the jury was not told plainly that Mr. Feit was not alleged to be a co-conspirator. (*See* Tr. 1747:12–16.) Notwithstanding the Government's tactics, the CohnReznick certification is clear evidence that Beechwood and Platinum were not affiliates.

Moreover, as the Court has already recognized (Tr. 1735:22–1736:5), the Government's evidence on "control" concerned only one discrete aspect of Beechwood's business (i.e., Mr. Nordlicht's purported control over Beechwood's trading in Black Elk bonds), not control over Beechwood's management or policies generally. This limited showing is insufficient as a matter of law. (*See* ECF 800 at 35 ("As the Court noted above, Nordlicht may have been able to direct trading in particular bonds at Beechwood without having the power to direct or cause the direction of Beechwood's management or policies.").)

The text of the Indenture's definition of "affiliate" makes clear that the "power to direct or cause the direction" of only the management or policies germane to the Black Elk bonds is insufficient to bestow affiliate status.  And, as noted above, in civil cases, courts interpreting definitions of "control" in securities regulations that are materially identical to the Indenture's definition consistently require "actual control" over ***both*** the entity ***and*** the transaction in question. *See, e.g.*, *Emerson* 393 F. Supp. 3d at 260 ("To plead a control person violation, a plaintiff must allege that the defendant had '[a]ctual control over the wrongdoer *and* the transactions in question.'" (alteration in original) (emphasis added) (quoting *Alstom SA*, 406 F. Supp. 2d at 487)); *Alstom SA*, 406 F. Supp. 2d at 487 ("Moreover, the Section 20(a) defendant must not only have actual control over the primary violator, but have actual control over the transaction in question." (citation and internal quotation marks omitted)).

In light of this standard, the Government's case suffered from a failure of proof.  The Government failed to demonstrate that Mr. Nordlicht exerted any actual control whatsoever over Beechwood's reinsurance operations.  And for Beechwood to be an "affiliate" under the Indenture, Mr. Nordlicht must have had the power to direct the management or policies concerning Beechwood's ***entire business***, including Beechwood's reinsurance operations.   Given Mr. Wallach's unequivocal and uncontradicted testimony that Messrs. Feuer and Taylor ran Beechwood, the evidence of control of the enterprise shows that the evidence was "at least as consistent with innocence as with guilt," thereby mandating a finding of insufficient evidence on this key issue.  *Mulheren*, 938 F.2d at 372 (citation and internal quotation marks omitted).

## IV.      The Government Failed to Present Sufficient Evidence of Materiality

To obtain convictions on the conspiracy to commit securities fraud and securities fraud counts, the Government was required to demonstrate materiality beyond a reasonable doubt.  *See United States v. Litvak*, 889 F.3d 56, 64 (2d Cir. 2018) ("*Litvak II*") (discussing materiality as an

element of criminal securities fraud); (Tr. 1775:13–1777:14).  The evidence here was insufficient

to allow a rational juror to find materiality established beyond a reasonable doubt.  *See Pauling*,

924 F.3d at 657 (observing that the court must "be satisfied that the inferences are sufficiently

supported to permit a rational juror to find that [a fact that is also an element], like all elements, is

established beyond a reasonable doubt").

> As noted in the Second Circuit's recent decision in *Litvak II*:

> A misstatement in a securities transaction is material so long as there is a substantial
> likelihood that a reasonable investor would find the . . . misrepresentation important
> in making an investment decision.  A misrepresentation is important if there is a
> substantial likelihood that the disclosure of the omitted fact would have been
> viewed by the reasonable investor as having significantly altered the total mix of
> information made available.

889 F.3d at 64 (citations and internal quotation marks omitted).  Notably, "[t]he standard of a

"reasonable investor" is an objective one.  *Id.*  The Government may demonstrate materiality via

victim-witness testimony "so long as the testimony about the significance of the content of a

defendant's misstatements and each trader's 'own point of view' is shown to be within the

parameters of the thinking of reasonable investors in the particular market at issue."  *Id.* at 65.

"[T]here must be evidence of a nexus between a particular trader's viewpoint and that of the

mainstream thinking of investors in that market."  *Id.*

As an initial matter, Mr. Shearer provided testimony conclusively demonstrating that the

$18.3 million figure in the Consent Solicitation statement was ***immaterial***.  Prior to issuing the

Consent Solicitation statement to Black Elk's bondholders, Mr. Shearer did not obtain a formal

certification concerning the number of bonds held by Black Elk's affiliates.  (Tr. 625:24–626:6.)

He was satisfied that emails from Mr. Small, indicating that PPVA held $18.3 million bonds, was

sufficient even though the emails were "neither precise nor official."  (Tr. 625:9–11.)  This cavalier

attitude concerning the disclosure, alone, undercuts a finding of materiality.  Additionally, when

he learned of an additional $43 million in potentially affiliated bonds, Mr. Shearer did not re-start

the process:

> Q. . . . The consent solicitation went out to the bondholders said 18 million in it;
> right?
>
> A. Yes.
>
> Q. Then you found out that there was actually - - there was [sic] 43 million more
> bonds that wasn't [sic] in the consent solicitation; right?
>
> A. Correct.
>
> Q. But you didn't decide to reissue the consent solicitation and do the vote again;
> right?
>
> A. Correct.
>
> Q. And if you thought you had a legal obligation to do that, you would have done
> it, right?
>
> A. Yes.

(Tr. 664:25–665:12.)  If the $18.3 million figure were material, when he learned that it was

potentially inaccurate, Mr. Shearer would have re-issued the Consent Solicitation statement.  He

elected not to.  It thus follows that in doing so, he determined that the $18.3 million figure was

immaterial.  As an attorney who practices "[c]orporate and securities law" (Tr. 172:16),

Mr. Shearer undoubtedly understands the concept of materiality.  Indeed, in assessing whether to

make a corrective disclosure, Mr. Shearer almost surely undertook the exact same "reasonable

investor's investment decision" analysis that the jury was charged with undertaking.  (See Tr.

1775:15–22.)  In essence, the jury had the benefit of unrebutted expert testimony from Mr. Shearer

that the $18.3 million disclosure was immaterial, even in light of the Consent Solicitation closing

condition precluding the transaction from closing if there was "any statute, rule, [or] regulation"

that "would or might" make the transaction unlawful (GX-8406 at BNYM_SEC_0000033).

The actions of Messrs. Pulvino and Yee further undercut a reasonable inference of

materiality.  The Government attempted to prove materiality through the testimony of Messrs.

Pulvino and Yee.  Bondholders had three options in the Consent Solicitation: tender; consent

without tendering; or neither tender nor consent.  (*See* Tr. 691:18–692:9.)  Both selected the third option (*see* Tr. 700:19–23 (Pulvino); Tr. 924:24–925:2 (Yee)), because, among other reasons, they believed that given the number of affiliated bonds disclosed in the Consent Solicitation statement (approximately $18.3 million bonds), it was unlikely that the proposed amendments to the Indenture would be adopted (*see* Tr. 696:24–697:14 (Pulvino); Tr. 922:1–12 (Yee)).

More specifically, Messrs. Pulvino and Yee testified that the number of affiliated bonds disclosed in the Consent Solicitation statement mattered to them because the more affiliated bondholders there were, the fewer votes would be required to pass the vote, and the more likely the vote would be to pass.  (*See* Tr. 696:8–697:17 (Pulvino); Tr. 921:18–922:12, 936:15–937:3 (Yee)).  The implication of this testimony is that if the number of affiliated bonds were higher than $18.3 million, Messrs. Pulvino and Yee would have been more likely to tender their bonds.  This is because, if given the choice between holding bonds governed by the amended Indenture and tendering, it would be preferable to tender because the bonds would be less attractive were the vote to pass and the bonds were then governed by the amended Indenture.  (*See* Tr. 983:9–23.)

The problem for the Government's case is that even after the Consent Solicitation vote passed and Messrs. Pulvino and Yee learned the results of the vote, Mr. Pulvino's firm did not sell (or even attempt to sell) its bonds.  (*See* Tr. 760:15–761:3.)  And not only did Mr. Yee's firm not sell its bonds after the vote passed, it bought over 500,000 ***more*** bonds above par shortly after the Consent Solicitation and another $11 million subsequently.  (Tr. 983:14–985:12.)  The fact that these alleged victims either stood pat (Pulvino) or increased their investment in Black Elk (Yee) renders unreasonable any inference of materiality.  If the reason that Messrs. Pulvino and Yee elected to hold their bonds instead of tendering was because the $18.3 million disclosure made it ***unlikely*** that the vote ***would*** pass, it is nonsensical that Messrs. Pulvino and Yee would not sell

34

when the August 14 press release made it ***certain*** that the vote ***had*** passed.  Clearly, the number of affiliated bondholders (and the amended Indenture itself) had no bearing on the investment decisions of Messrs. Pulvino and Yee.  Because the Government identified Messrs. Pulvino and Yee as proxies for the hypothetical "reasonable investor" described in *Litvak II,* and the $18.3 million figure in the Consent Solicitation statement was immaterial to Messrs. Pulvino and Yee, the Government necessarily failed to meet its burden on materiality.

Additionally, the record demonstrates that the news that the Consent Solicitation vote had passed did not significantly affect the market price of the Black Elk bonds.  (*Compare* Tr. 682:4–9 (Pulvino's testimony that the Black Elk bonds were trading "close to par" in "June and July of 2014"), *with* Tr. 760:15–18 (Pulvino's testimony that he could have tried to sell his firm's Black Elk bonds for "a high price" after the Consent Solicitation vote had passed) *and* Tr. 984:18–20 (Yee's testimony that, on August 19 and 20, 2014, after the Consent Solicitation vote had passed, his firm bought Black Elk bonds above par).)   In other words, the "mainstream thinking of investors in th[e] market"—the key consideration under *Litvak II*, 889 F.3d at 65; (*see also* Tr. 770:2–15 (Pulvino's testimony concerning his reliance on the market as an indicator of value))—was that the amendments to the Indenture did not negatively affect (and may have even positively affected) the value of the Black Elk bonds.  And if the ***actual passage*** of the Consent Solicitation vote was immaterial, then surely the disclosure of $18.3 million in the Consent Solicitation—which, according to the Government, was material insofar as it was a method for ***forecasting*** the likelihood of the Consent Solicitation vote's passage—was also immaterial.

On this record—where (1) Mr. Shearer provided definitive testimony indicating that the $18.3 million disclosure was immaterial and (2) there was no evidence that any investor

(reasonable or otherwise) cared enough about the Consent Solicitation vote's passage to act on it —no rational jury could find materiality established beyond a reasonable doubt.

## V.        Mr. Small's Conviction Violates the Due Process Clause of the Fifth Amendment

Mr. Small's convictions also cannot stand because they violate the fair warning requirement of the Due Process Clause of the Fifth Amendment.  "There are three related manifestations of the fair warning requirement." *United States v. Lanier*, 520 U.S. 259, 266 (1997).  First, the criminal law, both as written and as applied, must give a person of ordinary intelligence fair notice of what is prohibited. *Id.*  Relatedly, the rule of lenity requires that the criminal statute be strictly construed so as to resolve any ambiguity such that it applies only to conduct that is clearly covered. *Id.*  Finally, the fair warning standard bars a "novel construction of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Id.*  Mr. Small's convictions must be set aside on due process grounds for two reasons.  First, the Indenture's definition of "affiliate"—the lynchpin of the Government's case—is too vague to serve as the basis for a criminal conviction.  Second, even if that definition were sufficiently precise in some circumstances, the Government failed to negate a reasonable interpretation of that definition that renders Mr. Small's conduct lawful, as was its burden under *Lanier* and the Second Circuit's recent decision in *Connolly*.

Because the following background is germane to both due process arguments, Mr. Small provides it here.

As noted above, the Government attempted to prove that Black Elk and Beechwood were "affiliates" under the Indenture by demonstrating that they were both under Mr. Nordlicht's control.  (*See* Tr. 1533:1–4.)  The Government did not present evidence that Mr. Nordlicht controlled Beechwood by owning stock or through an agreement.  Instead, it endeavored to meet

36

this burden by demonstrating that Mr. Nordlicht "otherwise" had "the power to direct or cause the direction of the management or policies" of Beechwood.

And as Mr. Shearer testified, (1) there is a difference between an affiliate and a "friendly" entity, (2) there is a difference between having "control" and having "influence," and (3) determining whether there is "control," as opposed to influence, under the Indenture (i.e., whether an entity is actually an affiliate or merely a friendly) is a fact-dependent evaluation. (*See* Tr. 363:15–21; Tr. 367:6–17; Tr. 214:22–215:4.)

Notably, however, the jury was provided with no guidance whatsoever as to which facts should be considered, how to consider them, or whether certain facts are to be accorded more weight than others in the assessment of whether "control" over management or policies "otherwise" exists for purposes of the Indenture's definition of "affiliate." Put another way, during trial, the Government failed to articulate where one must draw the line between an affiliate, over which one exercises control, and a non-affiliate (including, but not limited to, a friendly), over which one exercises mere influence.

Instead, the Government seemingly has taken the position that the limited evidence it adduced at trial relating to Mr. Nordlicht's role vis-à-vis Beechwood "otherwise" demonstrates his "control" over the management or policies of Beechwood. (*See* Tr. 1532:19–1533:7; Tr. 1539:2–1546:8.) But the jury had no framework to assess whether those facts were sufficient to satisfy the test (because there is no framework), and, as a result, was essentially asked to conclude that there was "control" within the meaning of the Indenture based on the Government's *ipse dixit*. The fact that the Government could not even articulate a clear standard (because there is none) to the jury at trial underscores the due process issues with this conviction. Put simply, the Indenture's definition of "affiliate" was "so vague that men of common intelligence" were required to "guess

at its meaning." *Lanier*, 520 U.S. at 266 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)).

The due process concern is further illustrated by the position that the SEC—the civil regulatory body charged with interpreting the control liability provisions of the Securities Act of 1933 and the Securities Exchange Act of 1934, which contain a definition of "control" materially identical to the Indenture's[7]—has taken vis-à-vis the issues of control and affiliation. *See Johnson v. United States*, 576 U.S. 591, 598 (2015) (noting that the "failure of 'persistent efforts . . . to establish a standard' can provide evidence of vagueness" and that the Court's "repeated attempts and repeated failures to craft a principled and objective standard . . . confirm [the statute's] hopeless indeterminacy") (first ellipsis in original) (first quotation quoting *United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 91 (1921))). Specifically, the SEC has consistently warned market participants that the test for determining whether one person or entity controls another is a facts-and-circumstances analysis that must be applied *ad hoc* to a given situation. *See, e.g.*, Disqualification of Felons and Other "Bad Actors" From Rule 506 Offerings, 78 Fed. Reg. 44730-01, 2013 WL 3809014, at 44735 (July 24, 2013) (characterizing the rejected test for "control," similar to the test in the Indenture, as a "facts-and-circumstances based standard" that may give rise to . . . uncertainty in [] application," and contrasting it with the adopted and easily applicable "bright-line" standard). Indeed, the SEC's Division of Corporation Finance has a settled policy of declining to state a position on "affiliate or control status" because it is "an area involving factual questions which the staff is not in a position to resolve." Procedures Utilized by the Division of Corporation Finance for Rendering Informal Advice, Securities Act Release No. 33-6253, 1980

---

[7] A definition of "control" materially identical to the Indenture's is used in the regulations applicable to the control person liability provisions of the Securities Act and Securities Exchange Act. *See* 17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2.

WL 25632 (Oct. 28, 1980).  And the SEC routinely declines to provide no-action letters on issues

of control or affiliation.  *See, e.g.*, Am. Tel. & Tel. Co., SEC Staff No-Action Letter, 1984 WL

47286 (Feb. 10, 1984) ("[T]he staff of this Division will not express a view on affiliate or control

questions because such questions involve factual issues which the staff is not in a position to

resolve.  The company and its counsel are in the best position to make determinations as to affiliate

or control status.").

  This dearth of SEC guidance is compounded by the fact that case law is similarly lacking

in objective and definitive standards.  As Latham & Watkins put it in a May 2005 letter submitted

to the SEC:

> The Staff has consistently taken the position that the determination of "control"
> status is dependent in large part on the facts and circumstances involved and,
> therefore, has declined to state definitively what circumstances will result in a
> person being deemed to be in "control" of an issuer.  There is little beyond the
> above-described provisions that provides any guidance as to whether a person will
> be considered in "control" in a particular case.  *The governing case law similarly
> fails to provide any definitive legal standards that may be applied to determine
> whether a person is in "control."*  As a result, resolution of this issue necessarily
> turns on a consideration of the specific facts and circumstances surrounding each
> case.

May 2, 2005 Letter from Latham & Watkins LLP to the SEC, available at https://www.sec.gov/A

rchives/edgar/data/1011835/000119312505092261/filename9.htm  (citations omitted)  (emphasis

added); *see also* September 12, 2017 Letter from Reed Smith LLP to the SEC, available at https://

www.sec.gov/Archives/edgar/data/1585608/000110465917056773/filename1.htm  ("The  Staff

has consistently taken the position that the determination of "control" status is dependent in large

part on the facts and circumstances involved and, therefore, has declined to state definitively what

circumstances will result in a person being deemed to be in 'control' of an issuer.").

  The notion that a company is unlikely to get any comfort or pre-clearance from the SEC

(and a survey of case law is unlikely to be particularly fruitful) because the "control" determination

is too fact-bound, but that Mr. Small can be criminally prosecuted for purportedly failing to recognize that Beechwood was "otherwise" under Mr. Nordlicht's control, is deeply troubling and puts into stark relief the danger of allowing this conviction to stand.  In short, premising a criminal conviction on such an amorphous standard—one on which even a civil regulatory body like the SEC refuses to provide clear guidance—is plainly unconstitutional.  Indeed, counsel is unaware of any other criminal case which turned on the satisfaction (or a defendant's knowledge of the satisfaction) of the "otherwise" prong of a "control" definition identical (or similar) to the one found in the Indenture.

Mr. Small's conviction also has broader implications.  Allowing the Government to prosecute individuals based on their understanding of whether a given entity is an affiliate of another under hazy definitions identical, or similar, to the definition in the Indenture will likely open the floodgates on criminal prosecutions and throw the bond market into upheaval.  (*See* Tr. 1400:9–19 (the Court's observation that failing to recognize a distinction between friendlies and affiliates would "destroy the bond market").)

Additionally, the Government's efforts to use elastic fraud statutes as a method to police any type of conduct it finds troubling is precisely the reason behind the Supreme Court's recent trend reigning in the Government's baser urges to expand its power.  *See Kelly v. United States*, 140 S. Ct. 1565, 1568 (2020) ("The evidence the jury heard no doubt shows wrongdoing— deception, corruption, abuse of power.  But the federal fraud statutes at issue do not criminalize all such conduct."); *Skilling v. United States*, 561 U.S. 358, 368 (2010) ("Construing the honest-services statute to extend beyond that core meaning, we conclude, would encounter a vagueness shoal.").  Although those cases dealt with wire fraud and honest services fraud, they stand for the

general proposition that the Government cannot use criminal law to enforce its view of integrity, whether in the corporate or governmental context, or, as here, in the bond market.

*     *     *

Against this backdrop, Mr. Small's convictions must be set aside on due process grounds for the following two reasons.

### 1.   The Indenture's Definition of "Affiliate" Is Impermissibly Vague

Where a criminal fraud conviction is based on a rule not contained in a specific criminal statute—here § 2.09 of the Indenture and the Indenture's definition of "affiliate"—the Due Process Clause necessitates that the underlying rule be sufficiently clear so as to provide fair warning to the defendant regarding the meaning of the rule. *Bryant*, 556 F. Supp. 2d at 442 (noting that where an indictment is based on a purported violation of an external rule or standard, the terms of that rule or standard "must not be 'so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application'" (quoting *Lanier*, 520 U.S. at 266)).  This rule is a logical extension of the vagueness doctrine, which "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also United States v. Williams*, 553 U.S. 285, 304 (2008) ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."); *Copeland v. Vance*, 893 F.3d 101, 110 (2d Cir. 2018) ("In any vagueness case, then, the challenger can prevail by showing that the statute either 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits' or 'authorizes or even encourages arbitrary and discriminatory enforcement.'" (quoting *Hill v. Colorado*, 530 U.S. 703, 732 (2000))).   "The

41

'void-for-vagueness doctrine addresses [two] concerns . . . (1) fair notice and (2) arbitrary and discriminatory prosecutions.'" *United States v. Scott*, 979 F.3d 986, 993 (2d Cir. 2020) (quoting *Skilling* 561 U.S. at 412). "Under the fair notice prong, a court must determine whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Halloran*, 821 F.3d 321, 338 (2d Cir. 2016) (citations and internal quotation marks omitted). With respect to arbitrary and discriminatory prosecution, the vagueness doctrine is designed to prevent "a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections." *Kolender*, 461 U.S. at 358 (alteration in original) (quoting *Smith v. Goguen*, 415 U.S. 566, 575 (1974)). The stakes of a criminal case require a "stringent [vagueness] analysis . . . because the consequences of imprecision are qualitatively more severe." *Thibodeau v. Portuondo*, 486 F.3d 61, 66 (2d Cir. 2007) (citing *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498–99 (1982)).

As noted above, the Government's prosecution rests on the Indenture's definition of "affiliate" (and the definition of "control" embedded within it). The Supreme Court has found numerous criminal statutes with similarly amorphous language unconstitutionally vague. *See, e.g.*, *Kolender*, 461 U.S. 353–61 (finding statute unconstitutionally vague where it required "persons who loiter or wander on the streets to provide a 'credible and reliable' identification" but "contain[ed] no standard for determining what a suspect has to do in order to satisfy the requirement to provide a 'credible and reliable' identification"); *Smith*, 415 U.S. at 578 (finding Massachusetts flag-misuse statute unconstitutionally vague because it lacked objective criteria for assessing whether purported offender "treat[ed] [the flag] contemptuously" and therefore "subjected [defendant] to criminal liability under a standard so indefinite that police, court, and

jury were free to react to nothing more than their own preferences for treatment of the flag"); *see also Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 274–77 (4th Cir. 2019) (*en banc*) (finding Virginia's "habitual drunkard" statute unconstitutionally vague where the statute did not include any "meaningful guidance," so the assessment of whether an individual qualified as an 'habitual drunkard' was highly fact dependent, such that the determination would necessarily be "left to the subjective view of judges and law enforcement officials," who would likely "have differing perceptions regarding what frequency of drunkenness exceeds the necessary threshold for a person to be considered an 'habitual drunkard'").   Just like a determination whether (1) identification is "credible and reliable" (*Kolender*), (2) an individual has treated a flag "contemptuously" (*Smith*), or (3) an individual is an "habitual drunkard" (*Manning*), a determination whether one individual or entity "otherwise" has "control" over another lacks objective evaluative criteria and lends itself to arbitrary and discriminatory prosecution.   *Cf. Johnson*, 576 U.S. at 594 (finding sentencing enhancement statute unconstitutionally vague where it required courts to determine whether a crime "otherwise involves conduct that presents a serious potential risk of physical injury to another").

Notably, the definition of "control" at issue lacks many of the attributes that courts have pointed to in rejecting vagueness challenges.   *See, e.g.*, *Thibodeau*, 486 F.3d at 68 ("Far from granting the police and prosecutors the unfettered discretion to use any amount of time that a person is missing to create a presumption of death, these two factors severely limit the application of the presumption.   They provide instead objective criteria, ensuring that the statute's presumption does not apply only at the whim of any police officer.   And it is precisely the objectivity and clarity of [the statute's] criteria that convince us that the statute is not unconstitutionally vague." (citations and internal quotation marks omitted)); *United States v. Nadi*, 996 F.2d 548, 552 (2d Cir. 1993)

(rejecting vagueness challenge where statute "sets forth clear requirements to guide prosecutors" in the form of limitations on the type of contracts at issue and the threshold contract values); *United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir. 1992) (rejecting vagueness argument concerning drug paraphernalia statute where it "offer[ed] 15 examples of targeted paraphernalia and . . . list[ed] eight factors to consider among 'all other logically relevant factors' in determining whether a defendant had the requisite scienter to violate the statute"), *abrogated on other grounds by Posters 'N' Things, Ltd. v. United States*, 511 U.S. 513 (1994).  Here, there were no "criteria" providing "objectivity and clarity," *Thibodeau*, 486 F.3d at 68, "clear requirements," *Nadi*, 996 F.2d at 552, or listed "examples" or "factors," *Schneiderman*, 968 F.2d at 1568, to either guide Mr. Small or curtail arbitrary and discriminatory prosecution.

In sum, Mr. Small's criminality simply cannot depend on the result of a nebulous facts-and-circumstances test concerning whether Mr. Nordlicht "otherwise" controlled Beechwood via his power to direct its management or policies.  The fact that the Government was unable to provide any workable framework to the jury to inform its application of that test (other than cherry-picking favorable facts and, in essence, telling the jury, "you'll know it when you see it") underscores the impermissibly vague nature of this definition.  *See Halloran*, 821 F.3d at 338 ("Under the 'fair notice' prong, a court must determine 'whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" (citation omitted)).  When an individual's liberty is at stake, there must be clear, discernible guidelines differentiating lawful conduct from unlawful conduct.  *See Williams*, 553 U.S. at 304 ("A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited . . . .").  Because it hinges on an amorphous definition of "control," the Indenture's affiliate rule fails to provide

such guidelines.  And given the nebulous "otherwise" standard set forth in the Indenture's definition of "control," such criminal prosecution would inevitably devolve into precisely the sort of "standardless sweep"—whereby "policemen, prosecutors, and juries . . . pursue their personal predilections"—that the vagueness doctrine is designed to avoid.  *Kolender*, 461 U.S. at 358.

> 2.     *The Government Failed to Negate a Reasonable Interpretation of the Indenture's Definition of "Affiliate" that Renders Mr. Small's Conduct Lawful*

Even if the Court were to reject the argument that the "otherwise" prong of the Indenture's definition of "control" is too vague to be the basis for any prosecution, Mr. Small's conviction runs afoul of the Due Process Clause for a second, independent reason.  As noted above, under *Lanier* and the Second Circuit's recent decision in *Connolly*, the Due Process Clause's fair warning requirement mandates that the Government negate all reasonable interpretations of the Indenture's "affiliate rule" (and, therefore, the Indenture's definition of "affiliate") that would make Mr. Small's conduct lawful.  *Connolly*, 24 F.4th at 834 (holding that to avoid a due process violation inherent in a fraud prosecution based on an unclear standard, the Government must negate any reasonable interpretation of the standard that would make the alleged criminal conduct permissible).[8]

The *Connolly* court reversed a conviction for insufficient evidence where the Government's fraud prosecution was based on the alleged violation of the BBA's Instruction governing Deutsche Bank's LIBOR submissions.  24 F.4th at 834.  The Second Circuit endorsed the trial court's instruction that "where, as here a[n alleged] scheme to defraud *is premised on an instruction* . . . the government has the burden to *negate any reasonable interpretation of the instruction* that would make Deutsche Bank's [LIBOR] submission responsive."  *Id.* (emphasis

---

[8] *Connolly* post-dates the *Landesman* decision.  As such, the Second Circuit did not address in *Landesman* whether the Government had negated all reasonable interpretations of the Indenture.

and first alteration in original); *see also Bryant*, 556 F. Supp. at 446 ("[T]o the extent that a fraudulent misrepresentation turns on the Government's interpretation of a legal standard, the government 'must negative any reasonable interpretation of the legal standard under which the alleged 'misrepresentation' is not false or misleading."); *United States v. Whiteside*, 285 F.3d 1345, 1351 (11th Cir. 2002) ("In a case where the truth or falsity of a statement centers on an interpretative question of law, the government bears the burden of proving beyond a reasonable doubt that the defendant's statement is not true under a reasonable interpretation of the law.").

Here, the Due Process Clause and *Connolly* required the Government to demonstrate that Mr. Nordlicht controlled Beechwood within the meaning of the Indenture (rendering it an "affiliate") under ***all*** reasonable interpretations of the Indenture.   As noted above, courts interpreting definitions of "control" materially identical to the Indenture's have repeatedly held that the ability to "influence" a person or entity is insufficient to demonstrate "control," even if such influence is "substantial," and control over ***both*** the entity ***and*** the transaction in question is required.  (*See supra* at II.A.1.)

This case law is consistent with Mr. Shearer's testimony that influence and control are discrete concepts, and that there was nothing unlawful about friendlies voting in the Consent Solicitation.  (Tr. 367:6–17; Tr. 362:24–363:3.)   Mr. Shearer's testimony combined with the documentary trail showing Mr. Nordlicht's proposed plan to flip bonds to friendlies in order to change covenants in the Indenture, and the evidence that there was an ongoing understanding among key players, including non-conspirators Mr. Hoffman, Ms. Piché, and Mr. Shearer, that Platinum planned to use "friendlies" in connection with the Consent Solicitation, made it incumbent on the Government to negate the interpretation of the "affiliate rule" that Beechwood was merely a "friendly" and therefore permitted to vote in the Consent Solicitation.  But the

Government failed to present any evidence that this interpretation of the Indenture's "affiliate rule" was unreasonable.  To the contrary, the evidence demonstrated clearly that there are distinctions between "control" and "influence" and "affiliates" and "friendlies."

Accordingly, to obtain a conviction, the Government was required to demonstrate that Mr. Nordlicht had the power to "control" Beechwood's management or policies—thereby rendering it an "affiliate" under the Indenture—as opposed to merely demonstrating that Mr. Nordlicht had "influence" over particular aspects of Beechwood's business—thereby rendering it a "friendly."  Further, the Government had to show that Mr. Small understood that Beechwood was more than a friendly bondholder or that Mr. Nordlicht had more than mere influence over Beechwood.  As discussed in greater detail above (*see supra* at II.A.1), it failed to do so, and this failure amounted to a due process violation.

## THE COURT SHOULD GRANT MR. SMALL A NEW TRIAL IN THE INTEREST OF JUSTICE

Regardless of how the Court resolves Mr. Small's Rule 29 motion, it should grant him a new trial under Federal Rule of Criminal Procedure 33.[9]  For the reasons stated herein in connection with Mr. Small's Rule 29 motion, the trial evidence should leave the Court with a "real concern that an innocent person may have been convicted," *Landesman*, 17 F.4th at 330 (quoting *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009)), and that letting Mr. Small's convictions stand would therefore be a "manifest injustice."  *United States v. Alston*, 899 F.3d 135, 146 (2d Cir. 2018) (quoting *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013)).  The Court should also grant Mr. Small a new trial based on the Government's repeated prosecutorial misconduct during its rebuttal summation.  While each of these grounds constitutes an independent

---

[9] *See* Fed. R. Crim. P. 29(d)(1) ("If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment of acquittal is later vacated or reversed.").

basis for granting Mr. Small a new trial, their combined effect presents a clear manifest injustice in letting the partial guilty verdicts against Mr. Small stand.  In addition, the Court should grant Mr. Small a new trial based on the Government's constructive amendment of, or its prejudicial variance from, the Indictment.

## I.      **Letting the Partial Guilty Verdict Stand Would Be a Manifest Injustice**

### A.      Legal Standard

Under Federal Rule of Criminal Procedure 33, the Court "may vacate any judgment and grant a new trial if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Although it "should be exercised sparingly," the Court "has broader discretion to grant a new trial pursuant to Rule 33 than to grant a motion for a judgment of acquittal pursuant to Fed. R. Crim. P. 29, where the truth of the prosecution's evidence must be assumed."  *Landesman*, 17 F.4th at 330 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  "In evaluating a Rule 33 motion, the court must 'examine the entire case, take into account all facts and circumstances, and make an objective evaluation,' keeping in mind that the 'ultimate test' for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'"  *Alston*, 899 F.3d at 146 (quoting *Aguiar*, 737 F.3d at 264).

The Court has "a duty to assure that competent, satisfactory and sufficient evidence in the record supports the jury verdict" and may "grant a new trial if the evidence does not support the verdict."  *Landesman*, 17 F.4th at 330 (citations and internal quotation marks omitted).  Although the Court "should 'generally . . . defer to the jury's resolution of conflicting evidence and assessment of witness credibility,'" *id.* (quoting *United States v. Ferguson*, 246 F.3d 129, 133 (2d Cir. 2001)), the Court "'may intrude upon the jury function of credibility assessment' and grant a Rule 33 motion," if "there is 'a real concern that an innocent person may have been convicted'" *id.* (quoting *McCourty*, 562 F.3d at 475–76).  The Second Circuit has provided guidance on what

may constitute an "extraordinary circumstance" warranting a new trial under Rule 33, finding that a court may grant a Rule 33 motion "based on the weight of the evidence alone" where "the evidence preponderates heavily against the verdict to such an extent that it would be manifest injustice to let the verdict stand." *Id.* (quoting *Archer*, 977 F.3d at 188).[10]

B.    Argument

The Court should exercise its discretion to correct a manifest injustice that has resulted in Mr. Small's conviction.

For the following reasons, among others, the evidence here clearly preponderates heavily against the guilty verdicts on Counts Six and Eight:

- Mr. Shearer testified that there is a distinction between "influence" and "control" and between "friendlies" and "affiliates." He added that there was nothing wrong with a "friendly" bondholder voting in a situation like the Consent Solicitation.

- There is no evidence that Mr. Small understood that Mr. Nordlicht controlled Beechwood within the meaning of the Indenture. There is evidence that he was aware that Mr. Nordlicht intended to "flip bonds to friendlies," and there is an absence of evidence that Mr. Small considered Beechwood to be anything other than a "friendly," as distinguished from an "affiliate."

- The witnesses who testified about Beechwood, Mr. Wallach and Mr. Poteat, offered no evidence to suggest that Mr. Small understood that Mr. Nordlicht "controlled" Beechwood as that term is defined in the Indenture. To the contrary, Mr. Wallach did not even know Mr. Small and confirmed that Mr. Small was not involved in the email traffic relating to Beechwood's purchase of Black Elk bonds. None of the

---

[10] Messrs. Nordlicht and Levy have filed a petition for writ of certiorari to the Supreme Court regarding the Second Circuit's standard in *Archer*, seeking to clarify the difference between the Rule 29 and Rule 33 governing legal standards. *See* Petition for Writ of Certiorari, *Nordlicht v. United States*, No. 21-1319, 2022 WL 1018700 (Mar. 29, 2022). The section of *Archer* identifying the situations in which a court might consider a case extraordinary are merely illustrative and not the only situations in which a defendant may obtain relief under Rule 33. *See Landesman*, 17 F.4th at 331 ("Of course, in *Archer* we provided the clearest examples of when it would be appropriate to grant a Rule 33 motion, but they were merely examples, and not an exhaustive list."). Moreover, it is clear that the Rule 33 standard presents a lower hurdle to a defendant than the Rule 29 standard. *See id.* ("[A] Rule 33 motion may properly be granted [on the basis insufficient evidence] even where a Rule 29 motion is denied."). To the extent *Archer* nevertheless can be viewed as restrictive and inconsistent with the law in other circuits, Mr. Small simply notes his objection here to the standard in *Archer* in order to preserve it for further review.

Government's other evidence bridged the gap in its proof of Mr. Small's knowledge concerning Mr. Nordlicht's alleged "control."

- The Government's case failed at even the most basic levels.  There was no evidence that Mr. Small knew about, or understood the application of, the Indenture's definition of "control."   Similarly, the Government failed to show that Mr. Nordlicht had actual control of Beechwood through control of both the Black Elk bond purchases and through control of the enterprise.

- The other main players involved in the process, including non-conspirators Mr. Hoffman, Ms. Piché, and Mr. Shearer, all knew the amount of Platinum's bond holdings, and yet none of them raised any red flags or tried to stop the transaction. It makes no sense that the conspirators would hatch an allegedly secret plan to defraud the bondholders by secretly voting bonds they controlled, and to accomplish that end, would hire the very attorney whom they knew already was aware of the extent of their bond holdings and then assume that Mr. Hoffman and Ms. Piché, non-conspirators, would bless the transaction notwithstanding the fact that they, too, knew about Platinum's holdings.

- Other participants in the Consent Solicitation reflected views of the "affiliate rule" that were inconsistent with the Government's theory of the case.  Notably, bonds held by Platinum entities were permitted to vote in both consent solicitations.

- Mr. Shearer's actions in connection with the Consent Solicitation statement and the disclosure of an additional $43 million in Black Elk bonds undermine the inference of materiality and the inference of criminal intent to circumvent Black Elk's disclosure obligations regarding its "affiliates."

- The evidence plainly preponderates heavily against any finding that the goal of Mr. Small and his alleged co-conspirators was to steal money from the bondholders.  As the trial evidence—including, but not limited to, the Milbank and MSD bond purchases, the sources and uses email, and Mr. Shearer's testimony concerning Mr. Small's goal—demonstrated, without question, Mr. Small was doing everything he could to pay the bondholders, and nothing about the alleged scheme was designed to harm the bondholders.

Because of this dearth of inculpatory evidence, the Government sought to save its flagging case at the last minute—when Mr. Small had no ability to respond—by making knowingly false and misleading statements in its rebuttal summation as described in more detail *infra*.  The rebuttal summation was so riddled with falsehoods and unsupported assertions that it led to an unprecedented five curative instructions to the jury.  The prejudice from the rebuttal summation

was devastating to Mr. Small on several key fronts and not something that could be cured by the

Court's instructions.  In many ways, the Government changed its entire case.

As the Supreme Court made clear more than eighty-five years ago, federal prosecutors are

not mere advocates, but stand in a privileged position and must therefore exercise proper restraint

to ensure that justice is done:

> The United States Attorney is the representative not of an ordinary party to a
> controversy, but of a sovereignty whose obligation to govern impartially is as
> compelling as its obligation to govern at all; and whose interest, therefore, in a
> criminal prosecution is not that it shall win a case, but that justice shall be done.  As
> such, he is in a peculiar and very definite sense the servant of the law, the twofold
> aim of which is that guilt shall not escape or innocence suffer.  He may prosecute
> with earnestness and vigor—indeed, he should do so.  But, while he may strike hard
> blows, he is not at liberty to strike foul ones.  It is as much his duty to refrain from
> improper methods calculated to produce a wrongful conviction as it is to use every
> legitimate means to bring about a just one.

*Berger v. United States*, 295 U.S. 78, 88 (1935).

Here, the Government failed to live up to these high standards.  When combined with the

paucity of evidence, this misconduct plainly supports the grant of a new trial.

In sum, this is an extraordinary case where a manifest injustice has taken place, and the

Court should exercise its authority to grant a new trial.  The Court can and should do so simply

because the evidence plainly preponderates heavily against the verdict.  That alone is sufficient

reason to grant a new trial under Rule 33.  This conclusion is buttressed by the Government's

misconduct during its rebuttal summation and throughout the trial.  The Court deferred on the

defense's motion for a mistrial during the trial, but it should now act and grant Mr. Small a new

trial.

II.      **The Government's Misconduct Warrants a New Trial**

   A.      Legal Standard

Prosecutorial misconduct is a ground for reversal and a new trial when it "causes the defendant substantial prejudice . . . by so infect[ing] the trial with unfairness as to make the resulting conviction a denial of due process."  *United States v. Shareef*, 190 F.3d 71, 78 (2d Cir. 1999) (alteration in original) (citations and internal quotation marks omitted).

The Second Circuit has long observed that "[a]lthough the inherent controversial nature of litigation permits substantial latitude in the closing arguments of counsel, the prosecutor in a criminal case has a special duty not to mislead, and should not deliberately misstate the evidence." *United States v. Richter*, 826 F.2d 206, 209 (2d Cir. 1987) (citations and internal quotation marks omitted); *see also United States v. Universita*, 298 F.2d 365, 367 (2d Cir. 1962) ("[T]he government should, of course, never make affirmative statements contrary to what it knows to be the truth.").  Accordingly, when the Government's closing arguments cause a defendant substantial prejudice, the Court may reverse the defendant's conviction and grant a new trial.  *Compare Floyd v. Meachum*, 907 F.2d 347, 348 (2d Cir. 1990) (finding that district court erred by denying habeas relief where prosecutor's improper remarks "were so numerous and, in combination, so prejudicial that a new trial [was] required"), *with United States v. Modica*, 663 F.2d 1173, 1181–82 (2d Cir. 1981) (noting that a new trial was not warranted, notwithstanding prosecutor's improper remarks, because they "did not result in substantial prejudice"), *cert. denied*, 456 U.S. 989 (1982); *see also United States v. Drummond*, 481 F.2d 62, 62 (2d Cir. 1973) (reversing conviction due to prosecutorial misconduct, including improper statements during summation).

In considering whether an argument creates substantial prejudice, courts examine a number of factors, including the severity of the misconduct; the measures adopted to cure the misconduct; and the strength of the government's case apart from the misconduct.  *United States v. Thomas*,

377 F.3d 232, 245 (2d Cir. 2004); *United States v. Millar*, 79 F.3d 338, 343 (2d Cir. 1996).  While

the "severity of the misconduct is mitigated if the misconduct is an aberration in an otherwise fair

proceeding," *United States v. Elias*, 285 F.3d 183, 191 (2d Cir. 2002), *cert. denied*, 537 U.S. 988

(2002), courts may order a new trial where the government made repeated misstatements, the effect

of which was not cured, and which "related to the most important issue at trial," *United States v.

Forlorma*, 94 F.3d 91, 95–96 (2d Cir. 1996).  When confronted with multiple alleged instances of

misconduct, the question is "whether the cumulative effect of the totality of the challenged

statements, when viewed in context, affected the fundamental fairness of the trial."  *Floyd*, 907

F.2d at 355.

> B.     The Government's Knowing Mischaracterization of the Record Has Substantially
>        Prejudiced Mr. Small

As set forth below, the Government made multiple false and misleading statements to the

jury during its rebuttal summation, including: (1) grossly mischaracterizing the evidence

concerning "friendly" bondholders (and, in so doing, repudiating the Indictment); (2) baselessly

impugning the auditor's letter from Mr. Feit to CohnReznick; (3) falsely contending, without any

evidentiary support, that the alleged co-conspirators had an incentive to keep their bonds based on

the order of priority in bankruptcy; and (4) mischaracterizing the evidence concerning the Sterling

Valuation Report, which plainly showed that Black Elk was able to pay off its debts as of

September 2014.  These misstatements resulted in an unprecedented five curative instructions

given by the Court to the jury.  (*See* Tr. 1746:10–1748:13.)  Notwithstanding these instructions,

Mr. Small was substantially prejudiced and is entitled to a new trial.  *See Koufakis v. Carvel*, 425

F.2d 892, 904 (2d Cir. 1970) (noting that where "the number and gravity of counsel's

improprieties" reach a certain threshold, "the admonitions by the trial judge in the charge and in

response to specific objections cannot possibly serve to cure all the prejudice").

1.   *The Government Misled the Jury About "Friendly" Bondholders*

During the Government's rebuttal summation, the Government falsely told the jury that

Mr. Small's counsel had invented the concept of "friendly" bondholders as a distraction:

> There is no evidence, especially during the public process that Dan Small thought
> these were friendlies.  It was all about affiliates . . . [F]riendlies is an insertion
> designed to confuse you.  It's one e-mail in March and no references whatsoever to
> that.  –[T]here is not one e-mail among the co-conspirators, Mark Nordlicht, Dan
> Small, David Levy where they are talking about friendlies.  Not one.  But now
> you're supposed to think that friendlies is what he's thinking about, when every e-
> mail says affiliates and they are hiding them.

(Tr. 1666:5–16; *see also* Tr. 1684:9–13 (characterizing the notion that Beechwood was a friendly

as "an invention").)

The Government's statements were simply untrue.  The Government's own Indictment

addressed Mr. Nordlicht's use, on multiple occasions, of the term "friendly" bondholders in his

discussions with Mr. Small and others in reference to his plan to change covenants in the Indenture

as part of the alleged conspiracy.  (*See* Indictment ¶¶ 75, 78, 79 (quoting DX-6799).)  The evidence

at trial also made clear that the use of "friendly" bondholders was a concept that was well known

to the alleged co-conspirators.  (*See, e.g.*, DX1-271; DX1-272; DX1-533, DX-6799.)

Indeed, at every stage of this case, the Government was fully aware of the evidence

showing that Mr. Small and his alleged co-conspirators planned to flip their Black Elk bonds to

"friendlies" to change covenants in the Indenture and proceeded under a theory that voting

"friendly" bonds was part of the alleged conspiracy here.  (*See, e.g.*, DX1-271; DX1-272;

DX1-533; DX-6799; GX-519 (not in evidence); GX-544 (not in evidence)); GX-534 (not in

evidence); DX-6800 (not in evidence); Indictment ¶¶ 75, 78, 79.)  It was only when the defense

was able to elicit testimony indicating that there was nothing improper about "friendly"

bondholders voting, so long as they were not "affiliates," (Tr. 362:24–363:3), which was highly

damaging to the Government's case, that the Government changed its theory in its rebuttal

summation, denying the existence of "friendly" bondholders altogether (Tr. 1666:3–16; *see also* Tr. 1684:9–13).

The Government's misrepresentations concerning "friendlies" are all the more concerning in light of the fact that it was fully aware of BakerHostetler's July 1, 2014 Memo to Mr. Hoffman and Ms. Piché, which *directly refutes* the Government's rebuttal summation argument and which was, over Mr. Small's objection, kept from the jury.  In pertinent part, the memo, which was sent by Mr. Francis to Mr. Hoffman and Ms. Piché, provides: "Platinum as [sic] stated that it intends to pay $60 Million of the funds to redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, ***which will leave $90 Million in bond debt in the hands of so-called "friendly" bond holders, most of which is held by Platinum itself***."  (DX-6163 (not in evidence) (emphasis added).)  The fact that the memo was not received into evidence does not give the Government leave to make representations it knows to be false, and this memo demonstrates that the Government had no good faith basis for its misrepresentations concerning "friendlies."

> ### 2.   *The Government Misled the Jury About Critical Exculpatory Evidence*

The Government, without any evidentiary basis, told the jury in its rebuttal summation that the representation by Beechwood's finance director, Mr. Feit, to Beechwood's auditors, CohnReznick, that Beechwood did not consider Platinum to be an affiliate (DX-2102-B) was false.  In relevant part, the Government stated:

> Now the only argument, I submit to you, that defense counsel made to rebut [the Government's contention that Mr. Nordlicht controlled Beechwood] is the letter from Eliot [sic] Feit.  Remember, this is Defense Exhibit 2102[-B].  Just think a little bit about what that letter means and what it says.  Eliot [sic] Feit, who's a finance director, who had no involvement in the consent solicitation, sends a letter to their auditors in April of 2015 that says they're not an affiliate.  This is more than a year that has passed.  After Mark Nordlicht put all those Black Elk bonds on Beechwood's portfolio.  All of them.  More than a year.  *And in one* [sic] *he's saying it because they can't admit it.  Mr. Levine alleged that they can't have related party transactions.  He told you that.  If they tell their auditors that there's control here, they're going to be in trouble.  So they don't.  They tell them that they're not*

*affiliates.  So they have to deny it* . . . So I submit to you, there's no argument that Mark Nordlicht is not controlling Beechwood, that they are not an affiliate.

(Tr. 1682:25–1683:22 (emphasis added).)

The Government's remarks contained numerous false and misleading statements.  Most prejudicial to Mr. Small was the suggestion that Mr. Feit was a member of the alleged conspiracy under Mr. Nordlicht's control and, as a proxy for Mr. Nordlicht, falsely denied that Beechwood was a Platinum affiliate.  There was no evidentiary basis for this suggestion, and the Government subsequently conceded that it had "no idea" whether Mr. Feit believed the certification and "[didn't] know" whether Mr. Feit was a member of the alleged conspiracy.  (*See* Tr. 1724:25– 1725:16.)  Although the Court issued a curative instruction, the prejudice inherent in the Government's suggestion that Mr. Nordlicht engineered the issuance of a false certification, because Beechwood would be "in trouble" if it admitted to being an affiliate (Tr. 1683:8–15), could not be undone.

The Government's statement also suggested that (1) Mr. Feit was a senior executive at Platinum that helped found Beechwood (*see* Tr. 1680:25–1681:2 (stating that Mr. Feit was a "senior executive[] at the facilities at Platinum" who founded Beechwood with Mr. Nordlicht and Murray Huberfeld)); (2) DX-2102-B was the only evidence rebutting Mr. Nordlicht's control over Beechwood; and (3) Mr. Feit's certification was irrelevant because it was sent in April 2015.  None of these statements is supported by the record.  Indeed, the Government later acknowledged, outside the presence of the jury, that it was "*an absolute misstatement*" to group Mr. Feit with Messrs. Nordlicht and Huberfeld (Tr. 1727:12–13 (emphasis added)).

These false statements are even more problematic in view of the entire evidentiary record.  The Government stipulated to the admissibility of DX-2102-B without objection (*see* Tr. 1237:13– 25), and it made no effort to impeach Mr. Feit's credibility during trial, or otherwise establish that

his statement was fraudulent, prior to its rebuttal summation.  Meanwhile, when defense counsel cross-examined Special Agent ("SA") Amato, the lead FBI agent on the Government's investigation, regarding DX-2102-B, she testified that she had "not looked at it recently" and couldn't "remember if [she] read it." (Tr. 1241:2–5.)  When asked whether the Government ever interviewed Mr. Feit in connection with this case, SA Amato responded, "I don't know if we have or have not." (Tr. 1243:23–25.)  SA Amato further testified that she did not "have a specific memory of [Mr. Feit's] title." (Tr. 1244:1–4.)  Given SA Amato's role as case agent and the fact that the document was admitted at the 2019 trial (*see* 2019 Trial Tr. 6341:23–6342:5), her testimony is incredible.[11]

The prejudice to Mr. Small was magnified by the fact that, at every turn, the Government called the least informed witnesses who knew little, if anything, of relevance.  Tellingly, on the key issue of Beechwood, the Government called two witnesses, who either knew nothing or almost nothing about Mr. Small.  One of them, Israel Wallach, did not know him, and the other, Paul Poteat, offered nothing about any connection to Beechwood.  (Tr. 885:7–11 (Wallach's testimony that he never met or spoke with Mr. Small); Tr. 813:22–24 (Poteat's testimony that he never spoke with Mr. Small about Beechwood).)  These were the witnesses through which the Government tried to prove Mr. Nordlicht's control of Beechwood, rather than through the actual witnesses who knew about the control issue.  Thus, the Government called ill-informed Beechwood witnesses and then baselessly maligned Mr. Feit, a witness that the Government failed to call or even interview (*see* Tr. 1520:2–7 (stipulation that Mr. Feit was not interviewed)), because DX-2102-B

---

[11] Beyond Mr. Wallach's cursory testimony regarding Mr. Feit's title at Beechwood (*see* Tr. 831:1–9), no other witness testified about Mr. Feit or DX-2102-B.

undermined the Government's theory.  In so doing, the Government failed to live up to the standards set forth in *Berger*.

3.   <em>The Government Misled the Jury About Mr. Small's Alleged Motive</em>

The Government also told the jury in its rebuttal summation that Mr. Small and his alleged co-conspirators were motivated to hold their Black Elk bonds (and amend the Indenture in order to pay out the preferred equity instead) because the bonds would get priority in the event of Black Elk's bankruptcy.  (Tr. 1670:1–10.)  Not only were the Government's statements false and not tethered to any evidence in this case, but the Government's misstatements were particularly egregious because the Court advised the Government, a day before its jury address, that its contention about priority in bankruptcy was without merit.  (*See* Tr. 1410:20–1411:14.)  As such, the Government cannot attribute these false statements to negligence or innocent misapprehensions on its part; rather, the record makes clear that the Government deliberately attempted to mislead the jury.

Specifically, the Court had the following colloquy with the Government the day before summations:

> THE GOVERNMENT: . . . And the other benefit of doing this the way that they did it, Your Honor, is they're able to pay out the Series E with the 70 million and still hold their bonds and so they kind of get the opportunity to potentially double dip, right? Like, they take out this money to pay the preferred. When it goes into bankruptcy, they'll still have a controlling bondholder position, they'll maybe be able to recover some proportion on the dollar via the bonds, which means Mr. Small represented there was enough value in the company to pay off everybody.
>
> THE COURT:  I will tell you, if your theory is even half right, the odds of them getting paid on the bonds in a bankruptcy proceeding are small.
>
> THE GOVERNMENT: I believe Mr. Levine said he thought the common equity was going to get paid off in a bankruptcy based on the Sterling Valuation reports.
>
> THE COURT: Anything in theory could happen, but if there was the kind of manipulation you are talking about, the manipulators that you paid in a bankruptcy is going to be subordinated.

58

(Tr. 1410:20–1411:14.)  Notably, in response to the Court's statement, the Government did not point to any evidence bearing on this issue in the record (because there is none) or otherwise attempt to justify its baseless position.  (*See* Tr. 1411:15–21.)

Even setting aside the Court's admonition, the Government's false rebuttal statements were entirely unsupported by the record.  The Government failed to present any evidence at trial about who would have been paid in bankruptcy under what circumstances.  And, as the Court aptly noted, the Government simply could not know who would be paid out in the Black Elk bankruptcy, who would not, and under what circumstances.   (*See* Tr. 1693:16–25 (noting that the Government did "not know that the equity wouldn't have gotten something, let alone the preferred" equity holders); *see also* Tr. 1694:3–5 (the Court's observation that the jury was not "qualified to make" "an inference" regarding bankruptcy distributions based on the evidence in the record).)  Moreover, Jeff Shulse, an alleged co-conspirator, explained to Mr. Small and the other alleged co-conspirators that if their conduct led to Black Elk's bankruptcy, they were going to get subordinated anyway. (*See* Tr. 1730:4–15.)   Despite the lack of evidence, the Government pressed ahead with its unsupported bankruptcy priority theory in its rebuttal summation, attributing criminal intent to Mr. Small based on a motive without a scintilla of evidentiary support.

### 4.   The Government Misled the Jury About the Value of Black Elk

Lastly, during its rebuttal summation, without any basis in the trial record, the Government argued that the Sterling Valuation Report reflecting the value of Black Elk's assets as of September 2014 (1DX-5215-E) was not the proper measure of the company's financial condition (*see* Tr. 1677:6–21.), misleading the jury by unfairly casting doubt on the company's financial condition and ability to repay its outstanding debt, knowing that the report showed that there were more than sufficient assets after the Renaissance sale to pay Black Elk's high-yield bonds.  Rather than confront the facts stated in the report, including that Black Elk's equity value (i.e., assets less

liabilities) was between $49,024,000 and $74,024,000 (*see* 1DX-5215-E at EDNY-PP-SW1-002398880 (report); Tr. 1287:14–1288:16 (SA Amato's testimony concerning the report)), the Government improperly sought to discredit those numbers.  The Government's last-minute attempt to discredit the Sterling Valuation Report's analysis of Black Elk's post-Consent Solicitation value was particularly egregious because the Court had already rejected any argument that Platinum misstated Black Elk's value or inflated the value of its own investment in the company in connection with the 2019 trial of Messrs. Nordlicht and Levy.  (*See* 2019 Trial Tr. 7101:9–14 (the Court's instruction that "the valuation of Platinum's assets was proper").)  The Government nevertheless made this argument to the jury, knowing it was misleading.

> 5.   *In Combination, the Government's Rebuttal Summation Misstatements Substantially Prejudiced Mr. Small and Violated his Right to a Fair Trial*

The Government's false statements during its rebuttal summation substantially prejudiced Mr. Small and violated Mr. Small's Fifth Amendment right to a fair trial.  The Government's rebuttal summation consisted of a steady stream of material misstatements that contradicted the trial record, resulting in what Mr. Small understands to be an unprecedented five curative instructions and re-opening of the evidentiary record.

The Government repeatedly abused its advantage of getting the last word by making incorrect and misleading statements, thereby distorting the record and injecting false information into the jurors' minds at the very close of the case.  And it did so in a way that inoculated it from the otherwise salutary effects of a curative instruction—that is, the Government changed its entire theory in the course of its false and misleading rebuttal summation.

The rebuttal summation not only injected false information "related to the most important issue[s] at trial," *Forlorma*, 94 F.3d at 96, but it resulted in the Government's wholesale change in the theory of its otherwise weak case.  Even though the Court attempted to mitigate the harm done

by each of the Government's misstatements in its rebuttal summation, "[c]urative measures constitute only one part of the analysis," *United States v. Espinal*, 981 F.2d 664, 667 (2d Cir. 1992), and, in any event, the Court's efforts to clarify the "extremely confusing" issues, *see Forlorma* 94 F.3d at 95, could not plausibly unring the bell of the Government's prejudicial statements.

The Government's misstatements here were substantially prejudicial, in part, because the Government was on notice of their falsity but asserted them anyway. *See Modica*, 663 F.2d at 1181 ("Among the elements weighed in this inquiry are the extent to which the misconduct was intentional[.]"). Most notably, with respect to the Government's statement in rebuttal summation that Mr. Small was motivated by a belief that the bonds would get priority over preferred equity in any bankruptcy proceeding, the Government raised the exact argument, and the Court noted the fallacy of it, before summations. (*See, e.g.*, Tr. 1411:5–7; 1411:11–14; 1493:8–9.)

The Government also knew that its statements about the lack of evidence in the record concerning "friendlies" were not supported by the facts, and specifically knew of multiple emails among Mr. Small and the alleged coconspirators discussing "friendlies" in both the Indictment and in the record at trial. (*See, e.g.*, DX1-533; DX-6799; Indictment ¶¶ 75, 78, 79.) The Government therefore had no good-faith basis to make these arguments—which diverged from the Government's own Indictment—in its rebuttal summation.

The Government's misconduct in its rebuttal summation also substantially prejudiced Mr. Small because it denied him the right to put on a complete defense. For instance, had Mr. Small known that the Government was going to impeach the credibility of Mr. Feit's certification, which unequivocally stated that Beechwood and Platinum were not affiliates, Mr. Small would have organized his defense differently. Mr. Small would have offered additional

documents into evidence, cross-examined the Government's witnesses on additional subjects, and perhaps presented a defense case of his own, potentially even calling Mr. Feit as a witness. Likewise, had Mr. Small had any idea that the Government would suggest the notion of "friendlies" to be a contrivance, he would have offered additional documents directly contradicting that suggestion. There was no reason to do so during the trial, however, because the Government's last-minute fabrications came completely out of left field. *See Forlorma*, 94 F.3d at 95 (reasoning that a misstatement concerning an "extremely confusing" issue had not been cured because a "crucial missing piece" of evidence "was not explained to the jury").

Furthermore, and for all of the reasons outlined in support of Mr. Small's Rule 29 motion above, there is a strong likelihood Mr. Small would have been acquitted of all charges absent the Government's misconduct in its rebuttal summation. *See Espinal*, 981 F.2d at 667 (describing "the certainty of conviction absent the misconduct" as a "significant" factor in weighing prejudice). After the Government's rebuttal summation, however, Mr. Small had no meaningful chance to defend himself against the onslaught of inaccuracies. Accordingly, "the cumulative effect of the totality of the [Government's] statements, when viewed in context, affected the fundamental fairness of [Mr. Small's] trial," and due process demands a new trial. *Floyd*, 907 F.2d at 355.

Significantly, the misstatements in the Government's rebuttal summation were not "an isolated incident of misconduct in an otherwise wholly fair trial." *United States v. Burns*, 104 F.3d 529, 537 (2d Cir. 1997). Rather, during trial, the Government knowingly elicited false testimony from purported "victims," Messrs. Pulvino (CNH) and Yee (Phoenix), that misled the jury concerning the Consent Solicitation's effect on Black Elk bondholders' rights. For example, the Government elicited false testimony from Mr. Pulvino that the Consent Solicitation removed all

of the liens from Black Elk's assets (*see* Tr. 687:4–13; Tr. 689:7–22; 689:23–690:9; 691:18–692:9; 706:22–707:5), and from Mr. Yee that the bondholders would have been entitled to the proceeds from any Black Elk asset sale under the Indenture (*see* Tr. 924:4-14).  Having investigated these precise issues for years, and having examined Messrs. Pulvino and Yee about the same subjects during the previous trial, the Government was obligated to proceed with "great caution."  *United States v. Wallach*, 935 F.2d 445, 457 (2d Cir. 1991).  Instead, the Government knowingly elicited false testimony and failed to correct it.  *See Napue v. Illinois*, 360 U.S. 264, 269 (1959) (noting the longstanding principle, "implicit in any concept of ordered liberty," that the government "may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"); *United States v. Glover*, 588 F.2d 876, 879 (2d Cir. 1978) ("Of course, even if [witness's] testimony were not perjurious, but simply mistaken, and the government had not been aware of the inaccuracies until after the testimony was given, the government still would have a duty under the Fourteenth Amendment not knowingly to allow false testimony to go uncorrected.").

**III.    The Government's Rebuttal Summation Amounted to a Constructive Amendment of the Indictment Warranting a New Trial**

In addition to the fact that the Government's rebuttal summation arguments described above constituted prosecutorial misconduct, certain arguments also warrant a new trial because they amounted to a constructive amendment, or, at minimum, a prejudicial variance.

A.    Legal Standard

An indictment is constructively amended "[w]hen the trial evidence . . . operates to 'broaden [] the possible bases for conviction from that which appeared in the indictment.'"  *United States v. Milstein*, 401 F.3d 53, 65 (2d Cir. 2005) (second alteration in original) (quoting *United States v. Miller,* 471 U.S. 130, 138 (1985)).  This standard is met where the indictment fails to give a defendant notice of the "core of criminality" or the government's proof at trial "modif[ies]

essential elements of the offense charged to the point that there is a substantial likelihood that the defendant may have been convicted of an offense other than the one charged by the grand jury." *United States v. Rigas*, 490 F.3d 208, 228 (2d Cir. 2007) (first quoting *United States v. Patino*, 962 F.2d 263, 266 (2d Cir. 1992); then quoting *United States v. Clemente*, 22 F.3d 477, 482 (2d Cir. 1994)).   A constructive amendment "is a *per se* violation of the grand jury clause of the Fifth Amendment where such amendment affects 'an essential element of the offense.'"   *United States v. Roshko*, 969 F.2d 1, 5 (2d Cir. 1992) (quoting *United States v. Patino*, 962 F.2d 263, 265–66 (2d Cir. 1992)).

Increased scrutiny is required to ensure that the Government adheres to these standards in fraud prosecutions.   The Second Circuit has stated:

> In light of the current broad range of conduct covered by the federal fraud statutes, it is critical that courts vigilantly enforce the Fifth Amendment requirement that a person be tried only on the charges contained in the indictment returned by the grand jury.   In order to avoid amending the indictment in violation of the Fifth Amendment, the government in fraud cases should think through the nature of the crime it wishes to allege and then spell out the offense in a carefully drafted indictment, instead of confronting the defendant with its theory of criminality for the first time at trial.

*United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) (citations and internal quotation marks omitted); *see also Roshko*, 969 F.2d at 4–5 ("[B]ecause the fraud statutes target a broad range of conduct, it is even more critical that reviewing courts be vigilant to ensure that the government does not attempt to broaden the already pervasive and widesweeping nets of conspiracy prosecutions." (citation and internal quotation marks omitted)).   The Government did not meet these standards in this case.

B.      The Government's Constructive Amendment Warrants a New Trial

The Government constructively amended the Indictment because it proceeded on theories of criminality at trial that were different from those alleged in the Indictment.   Specifically, the

64

Government's legal theories as articulated in its rebuttal summation deviated from the Indictment in two important respects.

*First*, the Indictment brought charges based on the legal theory that Mr. Small made misrepresentations to bondholders with the intent to steal "the proceeds of the sale of the vast majority of Black Elk's most lucrative assets." (Indictment ¶ 73.) Mr. Small thoroughly debunked this theory at trial, however, leading the Court to ask the Government at the charge conference whether "Black Elk or bondholders were the victim" in the alleged scheme. (Tr. 1499:1–5.) Realizing that the indicted theory of harm had been discredited, the Government proceeded in its rebuttal summation on an alternative theory, namely, that the bonds' purported priority over preferred equity in bankruptcy established motive. (Tr. 1670:1–10.) As discussed above, that alternative theory was baseless as a matter of fact and highly prejudicial. Likewise, the Government's last-minute suggestion that the Sterling Valuation Report was unreliable (Tr. 1677:6–13), upended the foundations of Mr. Small's defense that Black Elk had sufficient assets to satisfy its obligations to the bondholders. By suggesting that cash flow was the key issue, the Government unfairly focused the jury on the alleged harm to vendors and employees, rather than on the bondholders.

*Second*, the Government brought charges based on the premise that the concept of "friendlies" was one with which Mr. Small and his alleged co-conspirators, Mr. Nordlicht and Mr. Levy, were very familiar. The Indictment references a number of emails and statements by Mr. Nordlicht to Mr. Small and others where it is apparent that Mr. Nordlicht wants to pursue a strategy of transferring Black Elk bonds to "friendly" bondholders. (*See, e.g.*, Indictment ¶ 75 ("NORDLICHT sent an email to LEVY, SMALL [and others] that stated:  . . . Seems like there are bond[s] to be had out there . . . I'm sure we can get them in friendly hands if the covenants are

going to be an obstacle."); *id.* ¶ 78 ("NORDLICHT sent an email to LEVY, SMALL [and others] . . . that stated, in part: "the move is going to be to inform bondholders that we have sales lined up but we are going to use the proceeds for working capital and for drilling.  That will lead to friendlies getting control of bonds at decent prices.  Once friendlies have control of bonds, we can then execute with flexibility according to what we would like to do."); *id.* ¶ 79 ("NORDLICHT sent an email to the defendants [LEVY, SMALL, and others] . . . that stated, in part:  "Hold for a little. We have friendly buying 20 million."); *id.* ("NORDLICHT replied, copying LEVY, SMALL, [and others], and stated: "[The Bondholders'] group is falling apart.  [A bondholder] just sold their position.  They still have 25 percent but likely we will have 50 percent in friendly hands relatively quickly in which case this is all academic."); *id.* ("NORDLICHT sent an email to LEVY, SMALL [and others] that stated, in part: "We are likely to have friendlies buy the bonds as of tomorrow.").

At trial, the Government saw that the use of "friendlies" was not part of the manner and means of the alleged conspiracy, but instead was the centerpiece of Mr. Small's defense.  As a result, it shifted its theory without warning and abused its opportunity to get the last word by contending that the defense that distinguished friendlies from affiliates was effectively a contrivance of the defendant and his counsel.  (Tr. 1666:5–16; Tr. 1684:9–13.)

The Government's changing positions on both of these issues failed to give Mr. Small notice of the "core of criminality" on which the Government relied at trial, *see Rigas*, 490 F.3d at 228, leaving him in the impossible position of not knowing the theory or theories on which the Government intended to proceed until the very end of the trial, at which point it was too late to defend himself.  The Government's gamesmanship further eroded the basic constitutional protections guaranteed to Mr. Small under the Fifth Amendment's Grand Jury Clause.  These include the right to be charged in an indictment that "fairly informs a defendant of the charge

against which he must defend," *Rigas*, 490 F.3d at 228 (quoting *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007)), and the right to be protected from the Government "fill[ing] in elements of its case with facts other than those considered by the grand jury," *United States v. Davis*, 2017 WL 3328240, at *27 (S.D.N.Y. Aug. 3, 2017) (quoting *United States v. Pirro*, 212 F.3d 86, 92 (2d Cir. 2000)).

Accordingly, the Indictment was constructively amended because it failed to notify Mr. Small that the "core of criminality" with which he was charged encompassed both (1) Mr. Small's intent to deceive bondholders in order to get priority in a Black Elk bankruptcy; and (2) Mr. Small's lack of knowledge of the concept that "friendly" bondholders could influence voting.

## IV.    The Government's Rebuttal Summation Amounted to a Prejudicial Variance to the Indictment

### A.    Legal Standard

"A variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese*, 352 F.3d 608, 621 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 n.5 (2d Cir. 1998)).  "[T]o warrant reversal on a variance claim," a variance must be prejudicial.  *United States v. Pierce*, 785 F.3d 832, 845 (2d Cir. 2015).  A variance is prejudicial when, among other things, the pleading and proof do not substantially correspond or when the variance could have misled the defendant at trial.  *Salmonese*, 352 F.3d at 621–22.

### B.    The Rebuttal Summation Varied from the Indictment and Prejudiced Mr. Small

Even if the Court were to conclude that the rebuttal summation did not amount to a constructive amendment, the Government's evidence and argument at trial proved materially different facts from those alleged in the Indictment, a variance that substantially prejudiced

67

Mr. Small.  As discussed above, the Government's rebuttal summation changed the factual predicate for the charges in the Indictment and was prejudicial because it came at a time when Mr. Small had no opportunity to rebut the changed theory.

The Government's fundamental theories of how the charged conspiracy operated, as well as the nature of the alleged harm contemplated by the scheme, were shifted radically at the very end of the trial.  The use of "friendlies" was no longer part of the conspiracy, but instead became a contrivance of the defense.  Moreover, the motive for the crimes shifted away from the debunked theory that the conspirators wanted to steal money from the bondholders to one relating to their preference rights in bankruptcy.  The Government even cast doubt on the fact that there were ample assets remaining in Black Elk to pay the bondholders, falsely suggesting instead that it was the cash flow that mattered.  Coming at the end of the case without any opportunity for Mr. Small to address them in his defense, these variances plainly prejudiced Mr. Small.  Accordingly, the Court should vacate his convictions and grant him a new trial.

### IF THE COURT IS NOT PREPARED TO GRANT HIS MOTIONS ON THIS RECORD, MR. SMALL IS ENTITLED TO AN EVIDENTIARY HEARING

If the Court is not prepared to grant Mr. Small's motion for acquittal or motion for a new trial on this record, the Court should, at minimum, hold an evidentiary hearing concerning the Government's pattern of investigative and prosecutorial misconduct (both prior to and at Mr. Small's trial).  Indeed, during SA Amato's testimony, the Court acknowledged that "there are anomalies in this case."  (Tr. 1335:5–9.)  Unfortunately, the "anomalies" began long before SA Amato took the stand, and the Court should not deny Mr. Small's motions without the benefit of a full record on these "anomalies."

In addition to the misconduct described above, before the 2019 trial even began, the Government violated its discovery obligations in connection with cooperating witnesses.  (*See*

ECF 458-1 (Defendants' brief in support of their motion to dismiss for prosecutorial misconduct).)
While the Government contended that the cooperators would be "subject to ostracism and
harassment in their community if their cooperation with the Government was revealed," the Court
observed that "the Government ha[d] not provided *any* evidence to th[at] effect." (ECF 485 at 5
(emphasis added).)   The Court further noted that "the Government's failure to memorialize"
statements was "not a best practice," and ultimately gave the Government the benefit of the doubt
and declined to grant Defendants' motion for relief, noting it would not "presume that the
Government acted in bad faith . . . without further evidence." (*Id.* at 6.)

As to the Government's failure to satisfy its obligations under Federal Rule of Criminal
Procedure 16, the Court found that prior to trial, the Government "repeatedly misrepresented the
scope of its outstanding discovery to the Court and to defendants." (ECF 485 at 6.)   The Court
further noted that it did "not appreciate the Government's lack of candor," and "strongly
cautioned" the Government "to be candid in all representations it makes to the Court in the future."
(*Id*. at 7.)

In view of the Government's pattern of misconduct in this case, the Court should allow for
a factual record to be developed on the open questions surrounding the Government's investigation
into, and prosecution of, Mr. Small.   For instance, like potential grand jury improprieties (*see
generally* ECF 129 (Mr. Small's 2017 letter motion regarding potential leaks of grand jury
information); ECF 870 (Mr. Small's 2022 letter motion to inspect the grand jury minutes)), SA
Amato's testimony raises questions regarding open factual issues that can be answered only with
a more developed factual record.   In particular, despite the fact that the Government put SA
Amato—the lead FBI agent on the case who has been on the prosecution team since 2016—on the
witness stand as a fact witness to testify about law enforcement techniques, the Government never

produced any 3500 material for SA Amato except the notes and memoranda of witness interviews in which she participated. (*See* Tr. 1332:20–1333:15.) The Government represented to the Court that "[o]ther than scheduling appointments, [the trial team has] not" communicated with SA Amato. (Tr. 1339:9–10.) However, even assuming for the sake of argument that the prosecution team did not communicate with SA Amato over email, it strains credulity that there are no internal FBI agency records relating to a case of this duration and complexity. Similarly, it is hard to accept that SA Amato did not write one word, whether in a report, email, or text message sent to a supervisor, other investigator, or a witness that was within the scope of her testimony—which included the entire investigation.

While Mr. Small appreciates that the Court did not wish to stall his trial with a mini-trial into the Government's investigation and discovery practices, he respectfully submits that against the backdrop of the Government's years-long pattern of misdeeds in this case, the Court should address these "anomalies" once and for all. The Court should therefore hold an evidentiary hearing to develop a factual record concerning the Government's pattern of investigative and prosecutorial misconduct (both prior to and during Mr. Small's trial).

## **CONCLUSION**

For the foregoing reasons, Mr. Small respectfully requests that the Court grant his motion

for a judgment of acquittal and for a new trial, and grant such further and other relief as may be

just and proper.

Dated:  New York, New York
          September 23, 2022

By:    /s/ Seth L. Levine
        Seth L. Levine
        Paul A. Murphy
        Alison M. Bonelli

        **LEVINE LEE LLP**

        1500 Broadway, Suite 2501
        New York, New York 10036
        Telephone: (212) 223-4400
        slevine@levinelee.com
        pmurphy@levinelee.com
        abonelli@levinelee.com