UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------- X
                                                      :

UNITED STATES OF AMERICA,          :
                                                       :

             - against –           :     **MEMORANDUM DECISION AND ORDER**

                                                   :

DANIEL SMALL,                 :     16-cr-00640 (BMC)

                                                     :

                            Defendant.    :
---------------------------------------------------------- X

**COGAN,** District Judge.

Before the Court is defendant Daniel Small's [967] motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, or in the alternative, for a new trial under Rule 33. For the reasons that follow, Small's motion is denied.

## BACKGROUND

### I.    Procedural

The indictment in this case charged Daniel Small, Mark Nordlicht, and David Levy, inter alia, with participating in a scheme to defraud bondholders of an oil and gas company, Black Elk Energy Offshore Operations, LLC ("Black Elk"). The indictment alleges that, between November 2011 and December 2016, Nordlicht, Levy, and Small engaged in a scheme to defraud Black Elk bondholders and "deprive [them] of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, Platinum's ownership and control over the [Black Elk] bonds."

Nordlicht and Levy were tried before a jury in 2019 and convicted of securities fraud, conspiracy to commit securities fraud, aiding and abetting securities fraud, and conspiracy to

commit wire fraud.[1]  Small's trial was severed from that of his co-defendants due to the

unavailability of his counsel.  After the verdict in the Nordlicht-Levy trial, both filed motions

under Federal Rules of Criminal Procedure 29 and 33.  This Court granted Nordlicht's Rule 33

motion for a new trial and granted Levy's Rule 29 motion for judgment of acquittal.  United

States v. Nordlicht, No. 16-cr-00640, 2019 WL 4736957 (E.D.N.Y. Sept. 27, 2019).  This Court

also conditionally granted Levy a new trial under Rule 33 in the event the judgment of acquittal

was later vacated or reversed.  The Second Circuit reversed.  United States v. Landesman, 17

F.4th 298 (2d Cir. 2021).  On remand, Nordlicht and Levy renewed those portions of their Rule

29 and Rule 33 motions that I had not addressed before the remand.  Those renewed motions

were denied.  See United States v. Nordlicht, No. 16-cr-640, 2022 WL 1469393 (E.D.N.Y. May

10, 2022).

Small's trial was held in August 2022.  The jury found him guilty of securities fraud and

conspiracy to commit securities fraud but not guilty of conspiracy to commit wire fraud.  Small

now moves under Rule 29 for a judgment of acquittal or, in the alternative, under Rule 33 for a

new trial.

## II.    Small's Trial

### A.    Government's Theory

In August 2014, Black Elk bondholders voted on amendments to the bond indenture that,

among other things, permitted preferred equity holders to be paid from the proceeds of an asset

sale (the "Renaissance Sale").  The Government's theory at trial was that Small, together with

Nordlicht and Levy, rigged the bondholder vote by voting millions of dollars in bonds that they

secretly controlled, despite representing to the other bondholders that no affiliates were voting on

---

[1] A summary of the facts relevant to the Nordlicht-Levy trial can be found at United States v. Landesman, 17 F.4th 298, 304 (2d Cir. 2021).

the amendments.  Because Platinum, defendants, and defendants' friends and family owned much of the preferred equity, the Government claimed that defendants rigged the bondholder vote to ensure the amendment would pass and preferred equity holders could be paid millions of dollars in proceeds of the Renaissance Sale.  The Government argued that Small was the "lynchpin" of the scheme by virtue of his dual role as an employee at Platinum and a board member at Black Elk, which allowed him to oversee the entire indenture process and facilitate the misrepresentations at issue.

### B.   Relevant Entities and Parties

Platinum Partners was a New York hedge fund founded by Nordlicht, who served as Platinum's CIO during the relevant period.  Platinum consisted of various investment funds, including Platinum Partners Value Arbitrage Fund, L.P. ("PPVA"), Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO"), and Platinum Partners Liquid Opportunity Master Fund, L.P. ("PPLO").  Beechwood was a reinsurance company founded in early 2014 by Nordlicht and others.  It consisted of several entities, including Beechwood Bermuda International Ltd. ("BBIL") and B Asset Management ("BAM").  Daniel Small worked at Platinum as a portfolio manager.  David Levy worked at Platinum until early 2014, when he moved to Beechwood to serve as its CIO.

One of PPVA's major investments was in Black Elk, an oil and gas company that held and managed oil and gas assets in the Gulf of Mexico.  PPVA owned 85% of Black Elk, and Small served on Black Elk's board as Platinum's representative.  Black Elk was primarily run by John Hoffman (CEO) and Jeff Shulse (CFO).

### C.     The Bond Indenture

In 2010, Black Elk issued $150 million in publicly traded senior secured bonds, on which Black Elk had to pay bondholders 13.75% in annual interest.  BNY Mellon served as the bond trustee.  The bonds were governed by an indenture (i.e., a contract between Black Elk and its bondholders setting forth their rights and obligations).  The indenture could be amended or supplemented with the consent of a majority of the bondholders.  However, when determining the number of votes needed for a majority, the indenture stated that certain bond votes would not be counted.  Specifically, bonds held by Black Elk, its members, and its "affiliates" had to be excluded from the vote.

The indenture defined an "affiliate" of Black Elk as "any other [entity] directly or indirectly controlling or controlled by or under direct or indirect common control with" Black Elk.  It defined "control" as "the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such [entity], whether through the ownership of voting securities, by agreement or otherwise; *provided* that beneficial ownership of 10% or more of the Voting Stock of a[n] [entity] will be deemed to be control."  Per the "affiliate rule," entities under common control with Black Elk were conflicted out of voting on changes to the indenture.  So, if Black Elk affiliates owned 50 million Black Elk bonds, only the remaining 100 million bonds could vote, and thus over 50 million "yes" votes were needed to pass an amendment by majority vote.

The indenture further provided that within 360 days of Black Elk selling any property, Black Elk had to use the proceeds of that sale for one of four purposes.  In early 2014, defendants sought to amend the bond indenture to expand these categories so it could use the

proceeds of the Renaissance Sale to pay off Black Elk's preferred equity.  The Government

alleged that defendants rigged the vote by concealing their control over a majority of the bonds

to ensure that the amendment would pass so they could defraud bondholders of the proceeds of

the Renaissance Sale.

      **D.**      **Black Elk and Platinum's Financial Difficulties**

An explosion at one of Black Elk's drilling platforms in the Gulf of Mexico in 2012

resulted in injuries and fatalities and led to cumbersome and costly regulatory oversight of Black

Elk's operations.  The Bureau of Safety and Environmental Enforcement began "shutting [Black

Elk] in" and mandating costly updates to its facilities and operations.  As a result, Black Elk was

struggling financially, so in 2013, it decided to raise money by issuing some preferred equity, on

which it had to pay 20% in annual interest.  Among the preferred equity holders were defendants,

their friends and families, and other Platinum investors.

In early 2014, Black Elk was still cash-strapped and struggling to pay its vendors.  Art

Garza, the former Chief Technical Officer at Black Elk, testified that he attended various Black

Elk senior management meetings where management floated the possibility of declaring

bankruptcy.  To raise cash, Black Elk began selling some of its most valuable assets, including

its oil fields.  One of the buyers was a company called Renaissance Offshore, LLC, to which

Black Elk would eventually sell nine oil fields in August 2014 (the "Renaissance Sale").

On March 16, 2014, Small emailed Nordlicht regarding the state of Black Elk, recounting

how "two major wells watered-out and the company had an explosion . . . which exposed its

underperforming properties, bloated cost structure, poorly negotiated escrow agreements and

lack of financial planning and controls."  He noted that, rather than fix these fundamental

problems, Black Elk management "raised fresh capital . . . sold assets and ran-up payables."

Nordlicht responded: "Happy to discuss . . . [t]his is also the week I need to figure out how to restructure and raise money to pay back 110 million of preferred [equity in Black Elk] which if unsuccessful, w[oul]d be the end of [PPVA].  This 'liquidity' crunch [at PPVA] was caused by our mismanagement – yours, David [Levy] and I – of the black elk position. . . . I have been up until 3am for the last two weeks working through this issue."

On April 16, Nordlicht forwarded to Small, Levy, and others an email reporting that there was a "shut in" at one of Black Elk's wells, so it was not producing oil.  Nordlicht wrote back: "This is starting to become a major issue."  On May 20, Shulse, Black Elk's CFO, wrote to Nordlicht, Small, Levy, and others that Black Elk had a $6 million shortfall it "c[ould]n't make up" and had "royalties, hedges, payroll, insurance, rent, and other 'have' to pays that w[ould] not be covered by the current or future oil."  Shulse wrote back, lamenting: "[I]t is not fun laying awake at night worrying about whether or not we can make payroll."

On June 16, Nordlicht emailed Uri Landesman, Platinum's President, writing: "[W]e need to revamp the strategy on PPVA and figure out what to do.  It can't go on like this or practically, [PPVA] will need to wind down.  This is not a rhetoric thing, it's just not possible to manage net outflows of this magnitude . . . we can't go on with status quo.  We need to be very aggressive if we want to stay open."  On July 2, Shulse forwarded a summary of Black Elk's cash balance to Nordlicht, Levy, and Small, adding: "We are officially out of money next week."

### E.    The Consent Solicitation

Rob Shearer was a corporate and securities law partner at BakerHostetler and outside counsel to Black Elk during the relevant time period.  Small was the Platinum employee with whom Shearer worked most closely during the public consent solicitation process.  Shearer and Small discussed how to structure the Black Elk consent solicitation to (1) ensure that every

bondholder who wanted their money back could have it and (2) amend the indenture to give Black Elk more flexibility in how it could spend its money.

The first consent solicitation attempt began in March 2014.  Black Elk planned for a "private solicitation process," meaning that Black Elk would reach out to some of the bondholders privately and ask them to agree to the amendment without publicizing the vote for all bondholders.  BakerHostetler and two other law firms were tasked with preparing certain documents in connection with that process.  None of the many lawyers involved in the private process ever flagged the affiliate rule, and Shearer testified that they had "made a mistake" in not catching it.  The bond trustee, BNY Mellon, was ultimately uncomfortable with doing a private process, so a second consent solicitation was attempted in mid-2014, this time a "public" consent solicitation.

In a public process, a company will usually issue a press release and send each bondholder proposed amendments on which to vote.  Black Elk opted to pursue a "tender offer" to repurchase the bonds from the bondholders in exchange for a "yes" vote on the indenture amendments.  The way the tender offer worked was as follows: Black Elk would propose amendments to the indenture that included an offer to buy the bonds back from bondholders at "par" or 100 cents on the dollar; if a bondholder agreed to sell the bonds back to Black Elk, that counted as a vote in favor of the proposed amendments; but if a bondholder did not agree to sell the bonds back, that bondholder could still choose to vote either "yes" or "no" on the amendments.

Shearer was tasked with overseeing the public process and preparing all necessary documentation.  In June 2014, he sent Marizza Piché (GC of Black Elk) and Jeff Shulse (CFO of Black Elk) a draft of the public consent solicitation statement that would be sent to bondholders.

This document explained to bondholders why Black Elk was proposing to amend the indenture, gave details about the amendments, and explained the process by which bondholders could go about voting on the amendments and/or selling their bonds back to Black Elk per the tender offer.  The consent solicitation proposed amending the indenture to add a fifth permissible use of asset proceeds (beyond the four originally outlined in the indenture).  That fifth permissible use allowed Black Elk to use the proceeds from asset sales to make an offer at par for all outstanding bonds, which would be open for ten business days, after which the remaining asset sale proceeds could be used to repurchase preferred equity.  Shearer thought that all the bondholders would tender their bonds because if "somebody offers all your money back and interest and you've got a lot of risk, it's a good deal for you, you should take that."

In early June, Shearer's team sent Small and others a draft of the consent solicitation statement and asked Small to supply the number of Black Elk bonds that Platinum and its affiliates owned – i.e., the number of bonds that had to be excluded from the vote per the affiliate rule.  On July 7, Small forwarded Nordlicht the email from Shearer, attaching the draft consent solicitation statement.  Small wrote: "The company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority.  We also need to set a record date.  Let's discuss asap in order to finalize and launch by Thursday."  Small then emailed Shearer and BakerHostetler on July 9, writing: "$18,321,000 [of] bonds are controlled by PPVA and should be disclosed and excluded from the calculation.  I believe this implies that $65,840,000 [of] bonds are required to obtain a majority consent."  Small emailed Shearer and others again on July 13, writing: "[P]er the attached email $18,321,000 [of] bonds are controlled by [Platinum] and should be disclosed and excluded from the calculation.  Please update the last paragraph [of the consent solicitation statement] accordingly."

Although Shulse had previously informed Shearer that Platinum owned about $100 million of the $150 million Black Elk bonds, Shearer relied on Small's representations as to the number of Platinum-controlled bonds and included the $18 million number in the consent solicitation statement circulated to bondholders on July 16.  Black Elk's consent solicitation statement represented that there were $150 million in Black Elk bonds outstanding, and of those, PPVA "and its affiliates . . . own[ed] approximately $18,321,000."  The consent solicitation added that "[o]therwise, neither we [Black Elk], nor any person directly or indirectly controlled by or under direct or indirect common control with us, nor, to our knowledge, any person directly or indirectly controlling us, held any" Black Elk bonds.

On July 28, Shearer wrote to Small that BakerHostetler would need an officer's certificate from Platinum certifying the number of bonds owned.  Small did not get back to him, so Shearer sent another email on August 1, this time attaching a draft officer's certificate for Platinum to complete.  Shearer testified that he felt comfortable not appending an officer's certificate to the consent solicitation statement sent to investors but felt he needed a "precise and official" affiliate count for the public SEC filings (and a related "opinion letter").  The draft he sent on August 1 was based on Small's prior representations regarding the number of bonds owned by PPVA and thus said that PPVA "and its Affiliates beneficially own exactly $18,321,000 in principal amount of Black Elk's 13.75% Senior Secured Notes."  Small had still not responded by August 13, the day the tender offer was set to expire, so Shearer followed up, asking Small to complete the certificate and send it back first thing in the morning.

Shearer testified that in his discussions with Small, Small never asked what constituted "control" for purposes of the indenture or asked Shearer to analyze whether Beechwood was an "affiliate" of Black Elk within the meaning of the indenture.  Shearer also testified that he did not

recall learning that Beechwood owned Black Elk bonds during the consent solicitation process, but he recalled that Levy was affiliated with Beechwood.

Yet, throughout the public consent solicitation process, Small asked Shearer and others at BakerHostetler various questions about how the ban on Black Elk "affiliates" voting would affect the public solicitation process.  For example, on July 3, Shearer and Small had a conversation about the Trust Indenture Act and how it worked. [2]  Later that day, Small followed up, writing: "Please confirm that under the TIA, if $5MM of the bonds were owned by an affiliate then in order for the consent to be approved, a majority of $145MM (greater than $72.5MM) would need to consent rather than greater of $75MM."  Shearer's associate responded: "Correct.  Securities owned by the obligor or by any person directly or indirectly controlling or controlled by or under direct or indirect common control with the obligor must be disregarded for purposes of calculating the vote required to approve the proposal."  And on July 28, Small emailed Shulse and Shearer, writing: "[P]lease confirm that since PPVA owns $18.3MM notes that in order for the consent to be approved[,] a majority of the non-affiliated notes must consent or $65.9MM (150 – 18.3 *.501).  The attached activity report seems to be using $150MM rather than $131.7MM as the denominator in calculating the percentage."  Shearer responded: "You are correct."

The tender offer expired at 5:00 p.m. on August 13, at which time BakerHostetler circulated a draft press release announcing the results of the consent solicitation.  It stated: "$11,433,000 principal amount of the Notes had been validly tendered and not withdrawn, and

---

[2] The Court determined before trial that the Trust Indenture Act ("TIA"), 15 U.S.C. 77, did not apply to the public consent solicitation process but still allowed the Government to introduce some evidence related to the TIA because the language in the indenture paralleled that in the TIA.  The jury was instructed that Small did not violate the TIA but that such evidence was being introduced on the theory that Small thought the TIA applied and took actions he believed violated it, which could be probative of criminal intent as to the crimes charged.

holders of $110,565,000 principal amount of the Notes, or 73.71% of the Notes, had validly

consented to the Consent Solicitation and not revoked such consent.  Excluding Notes held by

affiliates of the Company, $92,244,000 principal amount of the Notes, or approximately 61.5%

of the Notes, validly consented to the Consent Solicitation."  In other words, it said that $11.4

million in bonds were tendered (or sold back) to Black Elk and thus counted as automatic "yes"

votes and that $110.6 million in bonds had voted "yes" but not tendered.

Small returned the draft officer's certificate to Shearer on August 14.  This draft was

updated such that in addition to the language about the $18.32 million in bonds owned by PPVA,

it added the following sentence: "In addition, $43,293,000 Notes (sic) are beneficially owned by

entities which may be deemed affiliates of [Black Elk]."  In the body of the email attaching the

officer's certificate, Small directed Shearer to "see [the] below analysis."  Small was referring to

the following tables:

| Consent/ Tender Analysis | |
| --- | --- |
| PPVA & Affiliates | 18,321,000 |
| Not Deemed Affiliates | 43,293,000 |
| Remaining Bondholders | 88,386,000 |
| Total Bonds Outstanding | 150,000,000 |

| | Total | PPVA & Affil | PPVA & Not Deemed Affil |
|---|---|---|---|
| Bonds Outstanding For Calculation of Vote | 150,000,000 | 131,679,000 | 88,386,000 |
| PPVA & Affiliates | 18,321,000 | 0 | 0 |
| Not Deemed Affiliates | 43,293,000 | 43,293,000 | 0 |
| Other | 37,618,000 | 37,618,000 | 37,618,000 |
| Total Consents | 99,232,000 | 80,911,000 | 37,618,000 |
| Total Tenders | 11,433,000 | 11,433,000 | 11,433,000 |
| Total Consents and Tenders | 110,665,000 | 92,344,000 | 49,051,000 |
| Percent | 74% | 70% | 55% |

The second table represents various ways of calculating the vote tally.  The first column (74%) is the result if you count all the tenders and consents and do not exclude the bonds owned by PPVA, PPCO, and PPLO.[3]  The second column (70%) is the tally if one excludes the bonds owned by PPVA from the vote.  And the third column (55%) is the tally if one excludes the bonds owned by PPVA, PPCO, and PPLO.  The "other" row refers to bonds – other than those owned by PPVA, PPCO, and PPLO – that voted "yes" to the indenture amendments but did not tender their bonds.  Excluded from this chart are the roughly $40 million in bonds that voted "no" to the amendments and did not tender their bonds.

---

[3] The $110,665,000 number provided by Small is not exactly right; it should have been $110,565,000.

This was the first time Shearer heard that PPCO and PPLO might own affiliated bonds. After receiving this email, Shearer set up a call with Small and Shulse to discuss this "new category of bonds and why they hadn't been brought up before."  On the call, Small told Shearer that $43 million in bonds were "held by certain entities, but [Small] didn't think that Platinum beneficially owned them" or "had control over" them.  Shearer concluded this information was "sufficiently unclear" that the $43 million in bonds should be treated as "affiliated" with Black Elk for purposes of the officer's certificate.  Later that day, Small sent the officer's certificate back to Shearer, this time signed by Nordlicht.

Despite this new information regarding potential affiliates, Shearer did not stop the consent solicitation process or reissue the consent solicitation statement, which only disclosed the $18.3 million in PPVA bonds.  Shearer testified that he did not see an issue with not disclosing the PPLO- and PPCO-held bonds in the solicitation statement because even excluding those bonds, the amendments still passed with a majority vote.

The BakerHostetler team then issued a press release announcing that the amendments had passed.  The final press release was identical to the draft excerpted above, except that Shearer's team deleted any reference to bonds owned by affiliates.  Shearer said he did not feel comfortable including that language given Small's ambiguous explanation regarding affiliated bonds.

The public consent solicitation process resulted in the approval of the "second supplemental indenture."  BakerHostetler later filed documents with the SEC in connection with the second supplemental indenture, including a legal opinion, which relied on the officer's certificate signed by Nordlicht and Hoffman (Black Elk's CEO).

### F.    "Friendlies"

In early 2014, Shearer was aware that Platinum was buying up Black Elk bonds from hedge funds and other investors with an eye toward "flipping [them] to friendlies who w[ould] [d]o right by the company" in the event Black Elk later sought to amend the indenture.  Shearer was copied on various emails in which Nordlicht referred to buying bonds to sell to "friendlies." Shearer also received purchase agreements related to these bond sales.

Shearer testified that he understood "friendlies" and "affiliates" to be separate concepts, such that it would not necessarily be improper for a friendly bondholder to vote on an amendment to the indenture.  Shearer agreed that "control" – as used in the indenture's definition of "affiliate" – meant more than "the right to ask somebody for something."  Shearer also testified that he "never told anyone at Black Elk or Platinum that there was anything improper about Platinum flipping bonds to friendly companies in order to change the terms of the indenture."

### G.    Evidence Relevant to Common Control

Paul Poteat was the Chief Technology Officer ("CTO") at Platinum during the relevant time period.  He testified that he provided IT functions for roughly a dozen Platinum-related entities, including PPVA, PPCO, and PPLO.  Nordlicht was Poteat's boss.  Poteat knew Levy but did not know precisely which fund Levy worked for.  At some point, Levy asked Poteat to set up the IT systems and a data center for Beechwood.  Poteat said that Beechwood was initially operating out of the Platinum office but later moved two blocks away.

Around 2013 or 2014, Poteat became the CTO of Beechwood but kept his role as CTO at Platinum and did not receive a salary increase despite the additional title.  Poteat worked for

Platinum and Beechwood simultaneously for approximately six months but was later told that there needed to be a different CTO for Beechwood, so Beechwood hired a separate CTO.

Poteat testified that when he needed approval for anything Beechwood-related, he asked Nordlicht or Levy. He also testified that Nordlicht and Levy worked at Platinum and Beechwood simultaneously and maintained offices, email addresses, and calendars at both companies. The documentary evidence supported this. For example, on April 1, 2014, Nordlicht wrote an email to Richard Sands at Casimir Capital, inviting him to meet at the Beechwood offices. Sands wrote back, asking: "Who is Beechwood?" Nordlicht replied: "Beechwood is just a different office. Insurance mandate we have."

Israel Wallach was a portfolio manager at BAM, the asset management arm of Beechwood, from January 2014 until March 2016. Wallach joined Beechwood shortly after it was founded. Nordlicht offered Wallach the job and told him what his duties and compensation would be. Wallach testified that he sometimes saw Nordlicht use an office at Beechwood but that Nordlicht did not "play a role in his [(Wallach's)] work at BAM." Wallach testified that he did not "know what Mark [Nordlicht]'s exact role was at Beechwood."

Wallach was one of two high-yield analysts at BAM during the relevant period. The other was David Shirreffs, whom Wallach hired with Nordlicht's sign-off. At some point during Wallach's time at BAM, roughly 5.36 million Black Elk bonds were transferred from Platinum to BAM, at which point they were kept on BAM's books. Wallach testified that he did not know who made the decision to transfer them but knew that it was not Shirreffs.[4] Wallach and Shirreffs never did any research or analysis related to Black Elk. Yet Wallach – at Nordlicht's instruction – asked BAM's pricing service to add a line for these Black Elk bonds.

---

[4] Wallach later testified that it was "[l]ikely" Nordlicht who transferred these bonds to Beechwood.

On April 8, 2014, Nordlicht wrote to Wallach and asked if BAM had any "space" available for additional Black Elk bonds.  Black Elk bonds qualified as high-risk assets, and since insurance funds are limited in how many high-risk assets they are allowed to own, Nordlicht was essentially asking how many more high-risk assets BAM could buy before hitting that limit.  Wallach responded that BAM had space for "$517,716.18" worth of Black Elk bonds. On April 10, Nordlicht told Wallach that BAM should "[f]eel free" to buy any available Black Elk bonds at up to $0.95 per bond.  Wallach replied that he would "track it down."  Nordlicht then followed up on April 14, asking whether Wallach had a "bid" for Black Elk bonds.  Wallach responded that he had tried to buy some, but no one was selling.

On May 8, Nordlicht emailed Wallach asking whether BAM was looking to add any investments to its portfolio.  Wallach responded that BAM was waiting on Nordlicht "for some direction w[ith] regard to buying safe term loans that yield around 5%."  Wallach also informed Nordlicht that BAM had the capacity for 8 million Black Elk bonds but still had not seen any up for sale.  Nordlicht then told Wallach that BAM should not pay more than $0.93 for them, should any become available.  Wallach wrote back, explaining that the market was above that, to which Nordlicht responded: "I know but [B]lack [E]lk never ceases to disappoint so who knows?" Wallach wrote back that there was no "need to bid at all if it only disappoints," to which Nordlicht replied: "No, I want to bid.  Thx."  Later in the exchange, Nordlicht told Wallach: "I think we have another 200 coming in, supposedly with lesser restrictions.  Sh[oul]d be able to play high yield.  Also, any thought to selling in to strength on the Puerto [R]ico zero coupons? I'm not interfering, just asking.  I still like the wrappers/floater one better for our mandate."  The reference to "another 200 coming in" meant Nordlicht expected there would be additional assets for BAM to invest.  And by "our mandate," Nordlicht was referring to BAM's mandate.

16

Indeed, throughout these exchanges and others, Nordlicht used "we" or "our" to refer to BAM, suggesting he saw himself as part of the team.  He also alternated between his Beechwood email address and his Platinum email address.  And yet, Wallach testified that although he took advice from Nordlicht because he respected his opinion, Nordlicht did not have the authority to direct him to take any action in his portfolio at BAM.  Rather, according to Wallach, Feuer and Taylor ran Beechwood for the entire period that Wallach worked there.

On May 13, Nordlicht again reached out to Wallach to ask about BAM's capacity to buy more Black Elk bonds.  Wallach told Nordlicht there was $8.1 million available to invest in additional Black Elk bonds.  Nordlicht later wrote to Wallach: "Let's buy 8 million [bonds] at 96 [cents on the dollar].  I can get funds to sell."  BAM ended up buying the 8 million bonds, bringing its total Black Elk bond holdings to roughly 13.36 million.  On June 23, BAM bought another 10 million Black Elk bonds from PPVA, bringing its total holdings to roughly 23.36 million.  On July 1, BAM bought another 7 million in Black Elk bonds from PPVA, bringing the total to roughly 30.36 million.  On July 7, BAM bought another 6.7 million Black Elk bonds (3.35 million from PPCO and 3.35 million from PPLO) at $0.99 per bond, bringing the total to roughly 37.06 million.

On July 22, Wallach received the Black Elk public consent solicitation.  Wallach sent multiple emails to Nordlicht asking what to do, but Nordlicht never got back to him with an answer.  As far as Wallach knew, BAM did not take any action on the consent solicitation and just let the tender offer expire.  But in fact, on July 28, Samuel Adler, another Beechwood employee, consented to the indenture amendments without tendering.

On July 29, Nordlicht wrote to Small and Levy: "I have Beechwood at 36,422,400.  In terms of ownership of [Black Elk] bonds.  Dan, do you know respective funds?"  Small responded: "See attached that Nick sent to me last week."  Attached was the following chart:

| BlackElk Bond Holders | | | | | |
|---|---|---|---|---|---|
| | Nomura | Credit Suisse | Wilmington Trust | Total | |
| PPCO | 29,582,000 | | | 29,582,000 | |
| PPVA | | 18,321,000 | | 18,321,000 | |
| PPLO | | 13,711,000 | | 13,711,000 | |
| BAM | | | 13,360,000 | 13,360,000 | |
| BBIL | | | 23,657,000 | 23,657,000 | |
| Total | | | | 98,631,000 | |
| | | | | | |
| | | | | 80,310,000 | 150,000,000 |
| | | | | | 131,679,000 |
| | | | | | 65,839,500.0 |

This chart reflects the Black Elk bonds held by the three uncontested "affiliate" entities (PPCO, PPVA, and PPLO) and also includes bond totals for two Beechwood entities (BAM and BBIL). The 131,679,000 number in the bottom right reflects the total number of bonds less the 18,321,000 owned by PPVA.  The 65,839,4500 number reflects half of 131,679,000 or the threshold Black Elk would need to cross for a majority vote if only the PPVA bonds were excluded from the vote.  In other words, Nordlicht, Levy, and Small were tracking whether Black Elk had a majority vote on the assumption that only the PPVA-owned bonds needed to be excluded from the vote.  There are various other communications between Nordlicht, Levy, and Small during the consent solicitation process reflecting that they were tracking these bond totals in real time and also speaking on the phone regarding these tallies.

On August 10, Small emailed Nordlicht informing him that the consent solicitation would expire at 5 p.m. on August 13.  Nordlicht wrote back: "So at that point we will know how much needs to go to bonds."  In other words, at that point, they would know how much of the

Renaissance Sale proceeds would have to be used to pay out bondholders and how much would be left over to pay off the preferred equity.

### H.    Evidence Relevant to Materiality

The Government relied principally on two witnesses to show that the failure to accurately disclose affiliates was material to investors.

Todd Pulvino was the principal and co-founder at CNH Partners, an investment fund that invested in Black Elk bonds and preferred equity.  Pulvino had final investment authority on CNH's Black Elk investment.

In 2010, CNH bought $7.5 million of Black Elk bonds for 99 cents on the dollar.  The annual interest rate of $13.75 meant that for every $100 of bonds CNH owned, it got back $3.75 per year in interest.  In July 2014, CNH still owned $7.1 million in Black Elk bonds, which, at that time, were trading for about 100 cents on the dollar or "par" – close to what CNH paid for them.  The bond indenture said that if Black Elk wanted to buy the bonds back from CNH at any time between December 1, 2013, and November 30, 2014, Black Elk would have to pay $1.069 per $1 bond.  Then, starting on December 1, 2014, if Black Elk wanted to buy the bonds back from CNH, it only had to pay par or $1 per bond.  Although the tender offer was before December 1, 2014, the consent solicitation statement only offered to pay par plus accrued interest, that is, less than the $1.069 per bond that bondholders were entitled to under the indenture terms.

During the public consent solicitation period, Platinum reached out to CNH and said something to the effect of: "[We] really think it would be a good idea for you to tender."  But Pulvino, along with his team, evaluated the consent solicitation statement and opted not to tender or consent to the amendments.  In his view, it did not make sense to sell the bonds back at par in

August when CNH was entitled to $1.069 until December.  Because CNH would be paid a high interest rate on the bonds during the three and a half months between the consent solicitation and December 1, Pulvino saw "no reason for [CNH] to sell the [bonds] at a discount three and a half months earl[y]" given that "the bonds were trading in the marketplace near par [which] implie[d] they were not in imminent risk of default."  Pulvino explained that "given the situation of Black Elk and the oil prices . . . at the time, we thought it would be better to retain the bonds and continue to earn that high interest rate and not sell the bonds for 100 cents."

Nor did CNH consent to the amendments.  Pulvino saw "no reason . . . to give up . . . the protections for bondholders" in exchange for nothing and did not think the other bondholders would consent either.  Pulvino testified that the consent solicitation's representation that there were only 18 million affiliated bonds was significant because that meant only 132 million of the 150 million bonds could vote, and CNH thought the bonds were "dispersed enough" that "it would be unlikely that you could get $66 million worth of bonds to vote for" the proposed amendments.  Of course, if enough of the non-Platinum bondholders tendered, the amendments would have passed regardless of whether any bondholders approved of the merits of the amendments, but Pulvino testified that he thought "more people would hold on [to] the bonds" than ended up doing so.  When he learned the amendments had passed, Pulvino was "surprised" and "puzzled."

But Pulvino's testimony revealed a misunderstanding of the indenture amendments.  He was under the impression that the amendments removed the liens on all assets securing the bonds such that bondholders "would not be protected specifically by those assets anymore."  Indeed, on direct, he referred to the removal of these liens at least five times, explaining there was "no reason to give those up unless [bondholders were] being compensated to do so."  On cross,

defense counsel went through the indenture with Pulvino to clarify that there was no lien removal.

Pulvino also misunderstood the effect of the amendment permitting preferred equity holders to be paid out of asset sale proceeds.  Specifically, he thought the amendments would require bondholders to "give up [their] seniority" in those assets.  Thus, he voted against the amendments to "maintain the seniority" of the bonds and noted his "surprise" that 99 million bonds voted to "get rid of the seniority" of the bonds.  On cross, defense counsel clarified that, per the relevant amendment, bondholders still had to be paid first in the event of any asset sale, but Pulvino responded that he was "not sure [he] recall[ed] that" fact.  Pulvino later corrected himself, saying what he meant was that CNH shouldn't have been required to tender for par plus accrued interest when, under the contract, he was entitled to 1.068 cents on the dollar.

After the consent passed, the bonds continued to trade near par.  Pulvino testified that he was "a little surprised that they traded as close to par as they did."  But even then, CNH chose not to sell the bonds.  Pulvino's explanation for this was inconsistent.  At one point, he said that CNH thought it was better to "take the interest rather than to liquidate the position."  Yet he later claimed that CNH "looked at the market periodically, but there was not necessarily liquidity in the market to sell."

Dixon Yee was a portfolio manager at Phoenix Investment Adviser, a fund that invested in Black Elk bonds.  In January 2014, Phoenix purchased roughly 10 million Black Elk bonds on the secondary market for $0.85 on the dollar.  Phoenix also bought additional bonds in June 2014 and paid around par.  Yee testified that the par value of the bonds reflected the "market's perception . . . that they were low risk" and "people['s] expect[ation] that these bonds [would] be paid back."

Yee testified that it was important to him as a bondholder that affiliates not vote in the consent solicitation because affiliated bondholders might "do something that's in favor of the company and against the wishes of the bondholders."  He said it was "important to know" how many votes were needed to amend the indenture "so you can sit down and figure out whether [its] likely or unlikely" that the proposed amendments would pass.

At the time of the consent solicitation, Yee decided not to consent to the amendments or tender the Black Elk bonds held by Phoenix.  He said that by taking par "when the agreement was that they would pay you $106.875 . . . you're basically leaving money on the table . . . [s]o that didn't make sense to us that you would just, just agree not to take the $6.87."  Yee said he was "shocked" and "irate" when he learned that many bondholders had consented to the amendment to the bond indenture without tendering since "it was not a good economic decision for the bondholders."

There was a lot of inconsistent testimony about when Phoenix bought and sold Black Elk bonds, the number of bonds bought and sold, and whether there was a market for the bonds after the vote passed.  Yee testified that after the vote passed in August 2014, Phoenix decided it made sense to "reduce [its] exposure," and by the end of the year, had sold $3 million of the $3.5 million in Black Elk bonds in Yee's portfolio.  But when pressed, Yee admitted that he actually bought 529,000 more Black Elk bonds five days after the vote passed and purchased them for above par.  He claimed that this was because Phoenix "needed to establish a market value" for the bonds.  He also conceded, when pressed, that Phoenix sold 500,000 bonds during the consent period for above par and also bought another ten or eleven million bonds near par in 2015.

Yee claimed Phoenix had trouble selling the bonds "given the lack of liquidity in the market."  But when pressed on cross, he admitted that of the $3 million worth of Black Elk

bonds he sold between August and the end of 2014, 2 million of the bonds were sold to a broker that approached him and offered to take the bonds off his hands for 90 cents on the dollar.  And then later, when pressed on cross, Yee admitted that he sold a bunch of bonds right after the vote at 98.75 and 99.25 cents on the dollar.

It was clear from Yee's testimony that he, like Pulvino, did not understand how the consent solicitation affected the rights of the bondholders, nor did he understand what constituted an "affiliate" within the meaning of the indenture.  Yee was under the impression that the amendments meant preferred equity could be paid out directly from an asset sale.  In reality, the indenture said that after an asset sale, bondholders had to be paid first, and if there were excess proceeds after the bondholders were paid, then those could be used to pay off preferred equity. Yee was also under the impression that "affiliate," per the terms of the bond indenture, meant equity control.  Even after reviewing the relevant language in the indenture while on the stand, Yee testified that an "affiliate" was anyone that owned "10 percent [or more] of the voting stock of" Black Elk.

## I.      Evidence Relevant to Alleged Government Misconduct

### 1.      The Sterling Report

The defense introduced a report by a third-party valuation company, Sterling Valuation Group, which estimated that as of September 2014, Black Elk had over $200 million in assets. Thus, excluding Black Elk's debt (outstanding bonds and preferred equity), Black Elk's common equity value was somewhere between $49 and $75 million in September 2014.

### 2.      Distribution Priority

One of the Government's theories at trial was that Small and his co-conspirators were purchasing Black Elk bonds to pay out the preferred equity because they believed the bonds

would be prioritized over the preferred equity in the event of a bankruptcy filing.  The

Government argued in summation:

> One of the reasons why they bought bonds was, as Todd Pulvino and Dixon Yee told
> you, bonds are senior in the capital structure.  So if Black Elk goes into bankruptcy and
> there are assets left, as Mr. Levine just argued, they get priority.  They are the top
> bondholders, like Dixon Yee and Todd Pulvino's bonds.  But if they go bankrupt and
> they don't pay off the preferreds, there is nothing left for the preferreds, the senior
> secures are going to get everything.  Their friends and family.
>
> . . .
>
> And moreover, as I told [you] before, if they get into bankruptcy, those Platinum -- those
> preferred equities are going to be at the bottom.  They're worthless.  That's why they had
> to pay them, and that's why they needed tender.

The defense objected that the Government had misstated the law, and the Court gave the

following instruction to the jury:

> [T]here was some argument about what happens to Black Elk if it goes into bankruptcy,
> the suggestion being that the alleged coconspirators wanted to change Platinum's position
> to bonds instead of preferred stock because they would have been treated better in a
> bankruptcy.  Maybe they thought that, maybe they didn't; that is for you to decide.  But I
> will tell you, as a matter of bankruptcy law, it is extremely unlikely that Platinum, as a
> bondholder of Black Elk, would have been paid according to its level of priority.  That is
> because there is a rule in bankruptcy that says insiders, people who control the company,
> which Platinum did, they cannot – they have to be subordinated to other creditors; they
> do not get paid first.  So just so you know that rule of bankruptcy law.

### 3.      Elliot Feit

Elliot Feit was Beechwood's finance director during the relevant period.  On April 27,

2015 – roughly eight months after the consent solicitation – Feit sent a letter to Beechwood's

auditors (CohnReznick) representing that Beechwood did not "characterize any Beechwood

Investor . . . as a related party or an affiliate of any Platinum Entity."  Feit did not testify at trial,

but the defense relied on Feit's letter to refute the Government's claim that Small knew

Beechwood was an affiliate.  The Government argued in its rebuttal summation:

24

Nordlicht . . . [is] a founder of Beechwood, with other senior executives at the facilities at Platinum. Huberfeld and Bodner[5]. . . .

Now the only argument, I submit to you, that defense counsel made to rebut [the Government's contention that Nordlicht controlled Beechwood] is the letter from Elliot Feit. Remember, this is Defense Exhibit 2102[-B]. Just think a little bit about what that letter means and what it says. Elliot Feit, who's a finance director, who had no involvement in the consent solicitation, sends a letter to their auditors in April of 2015 that says they're not an affiliate. This is more than a year that has passed. After Mark Nordlicht put all those Black Elk bonds on Beechwood's portfolio. All of them. More than a year. And in one he's saying it because they can't admit it. Mr. Levine alleged that they can't have related party transactions. He told you that. If they tell their auditors that there's control here, they're going to be in trouble. So they don't. They tell them that they're not affiliates. So they have to deny it. And you know what else that document tells you is that if you total it up, there's over a hundred million dollars in just PPCO funds from Beechwood at that point in time. So I submit to you there's no argument that Mark Nordlicht is not controlling Beechwood, that they are not an affiliate.

After summation, the defense objected to the Government's suggestion that Feit was a co-conspirator. The Court provided the following instruction to the jury: "[T]here was a reference to Eliot Feit, who sent a letter to CohnReznick, the auditors, representing that Beechwood was not an affiliate. There is no evidence in the record that Mr. Feit knew that was false or that he had been lied to by any of the alleged coconspirators."

### J.    Jury Verdict

The jury deliberated for about a day and returned their verdict on August 12, 2022. Small was found guilty on Count 1 (conspiracy to commit securities fraud), not guilty on Count 2 (conspiracy to commit wire fraud), and guilty on Count 3 (securities fraud).[6]

---

[5] The trial transcript originally read: "Huberfeld and Feit," but the court reporter confirmed in a revised transcript that the Government said "Huberfeld and Bodner."

[6] These are numbered Counts 6, 7, and 8 in the indictment, but Small was not charged in the scheme alleged in Counts 1-5.

**DISCUSSION**

**I.**   **Small's Motion for a Judgment of Acquittal**

Small argues the jury verdict must be set aside because the evidence at trial was insufficient to establish criminal intent or materiality, both of which are essential elements of securities fraud.  He also contends a judgment of acquittal is warranted because his conviction violates the fair warning requirement of the Due Process Clause in that the Government premised its securities fraud prosecution on an extrinsic standard (the indenture's definition of "affiliate") that was unconstitutionally vague.

**A.**   **Legal Standard**

Under Rule 29(c), "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  "When a defendant moves for a judgment of acquittal, the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt."  United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984).

"A reasonable mind must be able to conclude guilt on each and every element of the charged offense."  Id.  "However, all reasonable inferences are to be resolved in favor of the prosecution[,] and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense."  Id.  "The evidence is to be viewed not in isolation but in conjunction," id., "as each fact may gain color from others," United States v. Landesman, 17 F.4th 298, 319 (2d Cir. 2021).  Moreover, "the Government need not negate every theory of innocence."  Id.

As a result, "a defendant challenging the sufficiency of the evidence bears a heavy burden." Id. This "high degree of deference afforded to a jury verdict is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." Id. at 320. However, a conviction based on speculation alone cannot stand. Specious inferences should not be indulged "because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting Sullivan v. Louisiana, 508 U.S. 275, 278 (1993)).

### B. Nordlicht's Control over Beechwood

Many of Small's arguments regarding criminal intent relate to whether Small knew that Nordlicht controlled Beechwood at the time of the public consent solicitation. To decide those questions, the Court must first determine whether the jury could reasonably conclude that Nordlicht did, in fact, control Beechwood during the relevant period. Small claims that Nordlicht merely had influence at Beechwood and that only Feuer and Taylor had actual control of the company.

Under the terms of the bond indenture, Nordlicht had control over Beechwood if he "possess[ed], directly or indirectly, of the power to direct or cause the direction of the management or policies of [Beechwood], whether through the ownership of voting securities, by agreement or otherwise." Small claims the evidence merely established that Nordlicht had the ability to influence Beechwood's purchase of the Black Elk bonds. He argues that control over one discrete aspect of Beechwood's business is not control over Beechwood's "management or policies" generally. The Government responds that the evidence it relied on to show that Black

27

Elk and Beechwood were under common control was the same evidence the Second Circuit already deemed sufficient in Landesman.  I agree with the Government.

As in the first trial, the Government introduced evidence that Nordlicht co-founded Beechwood with some of the same partners with whom he founded Platinum.  Nordlicht hired key Beechwood staff, many of whom had previously worked at Platinum or worked at Beechwood and Platinum simultaneously.  Indeed, Beechwood initially operated out of the Platinum offices, and when Beechwood later moved down the block, Nordlicht and Levy kept offices at both Platinum and Beechwood.  Nordlicht also alternated between a Beechwood email address and a Platinum email address, often using the two interchangeably.

Nordlicht expressly acknowledged that he controlled Beechwood during the relevant time period.  In May 2014, during the public consent solicitation, Nordlicht wrote to a potential business partner: "[Yo]u mind if I have my [portfolio manager] who handles specifics on these kind of trades [] call [yo]u? . . . The issue is besides Platinum we have [a] reinsurance mandate and I'd like to split it among entities, *though all controlled by us*."  (emphasis added).  Later in that chain, he again mentioned wanting to "spread [the funds] out among houses."  Nordlicht then forwarded the chain to the portfolio manager, writing "we sh[oul]d be b asset manager[7] as opposed to platinum on these things."  Likewise, on April 1, 2014, as noted above, Nordlicht moved a meeting from Platinum's offices to Beechwood's offices, stating: "Beechwood is just a different office.  Insurance mandate we have."

Testimony by Wallach, one of Beechwood's portfolio managers, recounted how millions of Black Elk bonds were transferred to Beechwood's asset management arm (BAM) at Nordlicht's direction.  Emails revealed that Wallach and Shirreffs took direction from Nordlicht

---

[7] This is ostensibly referring to B Asset Management, Beechwood's asset management arm.

on Beechwood's investment decisions.  As noted above, for example, Wallach wrote to

Nordlicht, copying Shirreffs, that "[w]e are still waiting on you for some direction w[ith] regard

to buying safe term loans that yield around 5%."  And Nordlicht knew about incoming

Beechwood assets before Wallach and Shirreffs did, even though Wallach and Shirreffs were in

charge of investing those assets.  Nordlicht wrote to Wallach and Shirreffs: "I think we have

another 200 coming in, supposedly with lesser restrictions."

It is true that Wallach gave somewhat inconsistent testimony regarding Nordlicht's

authority to direct investments at Beechwood.  Small points to some of these statements as

disproving common control.  For example, regarding the 5.36 million in Black Elk bonds that

Wallach was asked to price in March, Wallach initially testified that he did not know who

decided to transfer Black Elk bonds to Beechwood (although he testified that it wasn't him or

Shirreffs, the only other high yield analyst, and later admitted the bonds were "[l]ikely"

transferred by Nordlicht).  But even if we don't know who transferred the initial 5.36 million, the

same is not true for the roughly 32 million in Black Elk bonds that were purchased throughout

May, June, and July.  The documentary evidence reveals that Nordlicht was behind all these

purchases.  Likewise, Wallach testified that Nordlicht "did not have authority to direct [him] to

take action in [his] portfolio at Beechwood" but also testified that Nordlicht "directed the

purchase of [Black Elk bonds] to [his] portfolio," even though Wallach and Shirreffs did not "do

any sort of investment analysis before those bonds were put on [his] portfolio.  As in Landesman,

"[i]n light of the documentary evidence and testimony suggesting that Nordlicht exercised

significant control over Wallach and Beechwood, the jury was entitled to weigh Wallach's

testimony and discount Wallach's statements that contradicted the documentary and other

evidence presented at trial."  17 F.4th at 335 n.5.

Small next argues that to the extent Nordlicht exercised control over Beechwood, he only controlled one discrete aspect of Beechwood's business – i.e., trading in Black Elk bonds.  But the affiliate rule does not require control over every aspect of a business, and the jury reasonably concluded that Nordlicht had "the power to direct" investment decisions at BAM.  Besides, control over the Black Elk bonds is precisely what the affiliate rule was targeting: if Nordlicht was in charge of drafting Beechwood's HR policies but stayed out of Beechwood's investing decisions, that might technically constitute "control" under the indenture, but the Government would not have a case because any corresponding misstatement would not have been material to bondholders.

Small argues that the drafters of the affiliate rule intended to adopt the meaning of "control" as it is used in the Securities Act and the Securities Exchange Act.  This is reasonable enough; the indenture's definition of control is vague, and sophisticated securities investors and lawyers would assume that provision was adopting a familiar term of art.  Small thus invites the Court to look at how courts have defined control in the context of control person liability and argues that Nordlicht's "influence" over Beechwood does not satisfy that standard.

For control person liability to attach under Section 20(a) of the Exchange Act, an individual must have "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise."  In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3d 167, 185 (2d Cir. 2011).  This obviously tracks the language in the indenture's affiliate rule.  But in the control person context, courts are defining the circumstances under which fraud by a principal violator is fairly attributable to their superior or principal, such that the control person "knew or should have known" that the primary violator, over whom that person had control, was engaging in fraudulent conduct.  In re Tenaris

S.A. Sec. Litig., 493 F. Supp. 3d 143, 166 (E.D.N.Y. 2020).  That test requires "[a]ctual control

over both the primary violator and the transaction in question."[8]  In re CINAR Corp. Sec. Litig.,

186 F. Supp. 2d 279, 319 (E.D.N.Y. 2002).  It makes sense to require this high degree of control

before imputing culpable knowledge to an individual just by virtue of their position in a

company.

      In contrast, to prove that Small committed the primary violations charged, the

Government had to establish that Small acted willfully, knowingly, and with the intent to

defraud.  Unlike control person liability – which relies on a high degree of "control" to infer

wrongdoing – here, the Government had to offer sufficient evidence to allow a rational jury to

find that Small acted with scienter beyond a reasonable doubt.  It makes little sense to apply the

heightened "control person" standard when the mens rea attendant to the crimes charged

safeguards against good faith mistakes.

      More apt is the "control" standard the Second Circuit applied in Vickers v. SEC, 383

F.2d 343 (2d Cir. 1967).  There, the SEC had revoked the plaintiff's broker-dealer registration

for his firm, Vickers Brothers, for various violations of the Exchange Act.  Shortly thereafter, an

application for broker-dealer registration was granted to a new firm, Merritt & Co.  The

organizers of Merritt & Co included the plaintiff's brother and other individuals who had worked

at Vickers Brothers.  The SEC later revoked Merritt & Co's broker-dealer registration, claiming

Merritt & Co had made false statements on the broker-dealer application – i.e., that no

"controlling person" of Merritt & Co had ever been found by the Commission to have willfully

violated the Exchange Act.  In re M. J. Merritt & Co., Inc., 42 S.E.C. 1021 (May 2, 1966).  The

---

[8] Small reads this to mean that, in order to establish control, the Government needed to show that Nordlicht had actual control over Beechwood and the Black Elk bond purchases.  But in the control person context, the primary violator is the entity or individual that "actually make[s] a false or misleading statement [or omission]," Shapiro v. Cantor, 123 F.3d 717, 720 (2d Cir. 1997) – here, Black Elk.

plaintiff challenged the determination that he was a "controlling person" of Merritt & Co, noting

that he had not invested money in Merritt & Co, did not own any of its stock, did not give

instructions to its traders or principals, and had not interacted with customers.

The Commission disagreed, concluding Vickers was a "controlling person" within the

meaning of 17 C.F.R. 240.12b-2, which familiarly defines control as "the possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise."  The Second

Circuit affirmed, noting the strong "family and business ties" between Vickers and Merritt &

Co., and that "Merritt & Co. consisted almost entirely of people formerly associated with

Vickers Brothers and made use of Vickers Brothers' office and records."  Vickers, 383 F.2d at

344.  It also noted that Vickers "frequented the Merritt & Co office" and "did little to

disassociate himself from the new firm," participating in sales meetings and giving a stock quote

to one of the traders.  Id.

The Government here has more.  In addition to the strong business ties, use of the same

office, and personnel overlap, the evidence revealed that Nordlicht "ran a core part of the alleged

affiliate company's business, controlled the alleged affiliate company's investment decisions,

and controlled the way in which the alleged affiliate company voted in connection with its

investments."  Landesman, 17 F.4th at 336 n.6.  From this, a jury could fairly conclude that

Black Elk and Beechwood were under "common control" within the meaning of the bond

indenture.

Ultimately, the affiliate rule's purpose is to ensure bondholders do not have a conflict of

interest that would cause them to vote contrary to the interests of the bondholders.  Cf. William

W. Bratton & Adam J. Levitin, The New Bond Workouts, 166 U. PA. L. REV. 1597, 1615 (2018)

("Section 316 of the TIA . . . is a limited prohibition against self-interested voting, requiring that votes of the issuer and anyone controlling, controlled by, or under common control with the issuer be disregarded.").[9]  Thus, "common control" ought to encompass, at the very least, control sufficient to compromise the integrity of the vote – i.e., the power to direct how a bondholder votes.  A reasonable jury could readily find that Nordlicht exercised such control over Beechwood.

### C.      Criminal Intent

As the jury was instructed in this case, to find Small guilty of securities fraud and conspiracy to commit securities fraud, the Government had to prove that Small acted "willfully and knowingly and with the intent to defraud."  See Landesman, 17 F.4th at 321 (quoting United States v. Rosen, 409 F.3d 535, 549 (2d Cir. 2005)).  In other words, the Government had to prove that Small knew Beechwood was voting in the consent solicitation when it should not have been and that the solicitation statement failed to apprise bondholders of that fact.  Small claims the Government did not do so.  As a factual matter, I harbor doubts that Small knew the indenture contained a material misstatement and view the evidence as pointing towards a mistake.  But the Court cannot find on this record that *no* reasonable trier of fact could have found criminal intent beyond a reasonable doubt.

Small argues the Government did not present enough evidence for a rational jury to conclude that he knew Nordlicht controlled Beechwood.  A lot of the evidence relevant to this issue is circumstantial, and although it's certainly possible that Small did not know the *extent* of Nordlicht's control over Beechwood, Small was not completely in the dark.  Thus, the Court

---

[9] The Court is not suggesting that the TIA applies but merely references it as a corollary to the indenture's affiliate rule.

must "defer to the jury's determination of the weight of the evidence" on this point.  Landesman, 17 F.4th at 320.

Small, Levy, and Nordlicht were in frequent contact throughout the relevant period.  In early 2014, Small and Levy were both portfolio managers at Platinum who worked under Nordlicht and co-managed Platinum's position in Black Elk, among others.  The two shared an office until early 2014, when Levy left to become CIO at Beechwood.  While at Beechwood, Levy continued to work with Small on legacy Platinum positions, including Platinum's investment in Black Elk.  Throughout the spring and summer of 2014, Small, Levy, and Nordlicht were meeting in person, talking by phone, and exchanging emails regarding Black Elk's management, financial situation, and consent solicitation.  A jury could reasonably find that, through these interactions, Small had some sense of what his boss and Levy were up to.

It's reasonable to infer that Small would have noticed Beechwood operating out of the Platinum offices (where Small also worked).  And once Beechwood got its own offices, a jury could reasonably infer that Small knew Nordlicht, his boss, maintained an office at Beechwood. In fact, in August 2014, right before the consent solicitation closed, Small was involved in setting up various meetings between Nordlicht and other investors relating to joint investments across Platinum and Beechwood.  In one instance, Small reached out to Nordlicht's assistant and asked her to confirm with Nordlicht whether a meeting should be at Beechwood or Platinum's offices: "[Can you c]onfirm with Mark if he wants to . . . order lunch in and which offices (PPVA or BAM)?"  Small would also have seen Nordlicht alternating between using a Platinum email address and a Beechwood email address.  And a jury could reasonably infer that Small knew that a number of his Platinum colleagues, beyond Nordlicht and Levy, were working at Platinum and Beechwood simultaneously (e.g., Manela, Poteat, Slota, and Kim).

Small also coordinated with Nordlicht and Levy as Nordlicht transferred Black Elk bonds to Beechwood in advance of the consent solicitation.  The jury could easily find that Small knew Nordlicht was behind these transfers.  It could also reasonably find that Small knew Nordlicht was transferring these bonds because Beechwood was going to vote in favor of the amendments. In the days leading up to the consent solicitation closing, Small, along with Nordlicht and Levy, was "keeping tabs on how many Black Elk bonds were owned by Beechwood, was kept aware of Beechwood's purchases of Black Elk bonds from Platinum, and was actively monitoring the number of Beechwood-, PPVA-, PPCO-, and PPLO-held bonds to ensure Platinum had enough votes to pass the amendments."  Landesman, 17 F.4th at 329.  The Government points out that the number of bonds owned by Beechwood was not publicly available, so the fact that Nordlicht received regular updates to Beechwood's bond total would have signaled to Small that Nordlicht exercised some degree of control.  It's also obvious from these exchanges that Small, Levy, and Nordlicht all knew that Beechwood would vote in favor of the amendments, which could only be the case if Small knew Nordlicht exercised control over Beechwood's investment decisions. Based on the foregoing, a jury could reasonably find that Small knew Nordlicht exercised control over Beechwood.

Small also claims, relatedly, that the Government failed to elicit enough evidence that Small knew Beechwood qualified as an "affiliate" within the meaning of the indenture.  Without such knowledge, Small could not have known that the consent solicitation contained a misstatement.

Small relies heavily on the notion that Beechwood was merely a "friendly" bondholder, as distinct from an affiliate.  Small claims a "friendly" is a third party willing to do Platinum's bidding, as separate from a Platinum-controlled "affiliate."  Stated differently, in his view,

entities are "affiliated" if one entity has no choice but to follow the orders of the other.  In contrast, "friendly" entities are willing to coordinate their actions, but neither party can be compelled to do so.  This concept of "friendlies" came up a lot at trial, but really, it's just a thing defendants made up.[10]  It has no legal meaning and, per Westlaw searches, does not appear to be a term of art in the industry.  The closest corollary is a "friendly loan."  Those are legal, but an individual cannot duck criminal liability by rebranding illegal conduct.  If you trade securities based on "friendly advice" that consists of material nonpublic information, that's still insider trading.  Of course, had Nordlicht just called in a favor with a friend, such that the friend voted in favor of the consent solicitation, that would fall short of "common control" within the meaning of the indenture.  But most people don't keep an office at their friend's company, order around their friend's employees, or conduct business from their friend's corporate email domain.  Besides, and above all, there is no evidence in the record that Small ever used the words "friendly" or "friendlies."

Friendlies aside, the Government still had to prove beyond a reasonable doubt that Small knew Beechwood was likely an "affiliate" within the meaning of the indenture.  The Government's case on this point is undermined by the extensive correspondence between Small and the lawyers advising on the consent solicitation.  Small repeatedly discussed the affiliate rule with the attorneys, who, though not charged as co-conspirators, failed to probe any of the information the Government now claims is critical evidence of the fraud.  It is also troubling that

---

[10] Shearer's testimony reflected some understanding of what defendants meant by "friendlies," but he never said that a "friendly" could not qualify as an affiliate.  It could be that Shearer understood what defendants meant based on the colloquial meaning of "friendly" plus context clues, i.e., Shearer understood it to mean that the entities would vote in favor of the indenture amendments.  That doesn't mean those entities couldn't also be under common control with Black Elk or that "friendlies" is some definite concept that is mutually exclusive from the bond indenture's definition of "affiliate."  Significant for our purposes is that although Shearer and Small discussed the affiliate rule extensively, Small never asked Shearer whether having certain "friendlies" vote on the amendments would run afoul of the affiliate rule.

many third-party bondholders did not understand how the affiliate rule worked, as was revealed during the testimony of Yee and Pulvino, both of whom are sophisticated and experienced investors.  If the lawyers did not spot a potential issue, and sophisticated bondholders did not understand how the affiliate rule worked, it's hard to see why we should hold Small to a higher standard.

But viewing the evidence in the light most favorable to the Government, as I must, and given that Small repeatedly discussed the affiliate rule and its application with Shearer's team, I cannot say that no rational trier of fact could have concluded that Small knew the affiliate rule precluded Beechwood-owned bonds from voting.  On July 3, 2014, Small and Shearer spoke by phone regarding the application of the affiliate rule.  Later that day, Small reached out to Shearer by email to confirm his understanding of how the affiliate rule would operate for the purpose of calculating a majority vote.  Shearer's associate responded to Small, supplying the definition of "affiliate" and confirming Small's understanding of how the rule would affect the majority vote count.  Shearer then forwarded this email to Levy and Nordlicht, writing: "See below regarding the majority consent calculation."  Likewise, on July 7, 2014, Small sent an email to Nordlicht and Levy, writing: "The company must disclose how many bonds are owned by affiliates in order to establish the requisite number to constitute a majority. . . . Let's discuss asap."  Given that Small was often consulting with outside counsel about the affiliate rule and fastidiously tracking the bond holdings of PPCO, PPLO, and Beechwood, it's curious that he never once asked Shearer whether the affiliate rule applied to these entities.  A jury could reasonably infer that he didn't want to know the answer.

Even if Small did not know for sure that Beechwood, PPCO, and PPLO would qualify as affiliates, the evidence suggests that he waited until he knew the final vote tally before deciding which affiliates to tell Shearer about.  As the Second Circuit explained:

> Shearer asked Small on several occasions to verify Platinum's and its affiliates' ownership of Black Elk bonds, and – after consulting with Nordlicht and Levy – Small repeatedly told Shearer that only PPVA's $18.3 million bonds should be disclosed and excluded from the calculation.  Nordlicht was aware of how many Black Elk bonds PPCO and PPLO owned, and Small's email disclosure of the PPCO- and PPLO-owned bonds to Shearer only after the Consent Solicitation had passed – when they knew they had enough votes to secure the passage of the amendments based on the Beechwood-held bonds – supports an inference that Nordlicht understood that PPCO and PPLO would likely be deemed affiliates and chose not to disclose them.

Landesman, 17 F.4th at 338.  Note that although Small later disclosed PPCO and PPLO as potential affiliates, he never disclosed Beechwood.  It was reasonable for the jury to infer that Small disclosed PPCO and PPLO once he knew their votes were not essential to the consent passing yet chose not to disclose Beechwood because, without Beechwood's votes, the consent would not have passed.

Small's August 13, 2014 email to Levy and Nordlicht – sent after the consent solicitation had passed – supports this version of events.  In it, Small included a chart of total vote counts that refers to the PPCO- and PPLO-held bonds as "Possible Affil" and "asked for Levy and Nordlicht's permission to disclose these bonds to Shearer now that they knew they had acquired sufficient votes to pass the amendments using solely the Beechwood-held bonds."  Id. at 328-29.  Shortly thereafter, he sent a similar chart to Shearer, but the description of PPCO- and PPLO-held bonds is changed from "Possible Affil" to "Not Deemed Affiliates."  All of this amounts to evidence from which a jury could reasonably conclude that Small thought the affiliate rule would foreclose these entities from voting and so withheld information about their ownership to ensure the indenture amendments would pass.

Small argues next that the actions of "non-conspirators" Shearer, Hoffman, Piché, and Yee render unreasonable the inference that Small understood the affiliate rule and willfully violated it.  To be sure, Shearer had the puzzle pieces necessary to deduce what was going on: he was repeatedly informed about Platinum's extensive Black Elk bond holdings and was told that Nordlicht intended to use "friendlies" to ensure the indenture amendments would pass.  But this information was disclosed piecemeal over the course of a few months, and many of the relevant emails are from the private consent solicitation process, i.e., before Shearer caught the affiliate issue.  A jury could reasonably find that once the public consent process was underway, Small curated the information he shared with Shearer so that Shearer wouldn't catch on.  Indeed, after Shearer received the "Not Deemed Affiliates" email from Small, he called Small and Shulse and "inquired about this new category of bonds and why they hadn't been brought up before and asked [Small] to explain what the relationship between those bonds and Platinum was."  A reasonable jury could find that Small deliberately withheld relevant information from Shearer. He cannot now argue that Shearer's failure to do a better job of due diligence absolves him.

Small also argues that Hoffman and Piché's conduct renders unreasonable a finding of criminal intent because Hoffman signed an officer's certificate approving the transaction, and both were aware that defendants were using "friendlies" to secure the indenture amendments. But Hoffman and Piché had concerns about the legality of Nordlicht buying up Black Elk bonds and flipping them to "friendlies" who would vote in favor of amendments to the indenture.  In fact, in February 2014, Piché asked Shearer if what Nordlicht was doing was "legal," but Shearer didn't spot the affiliate rule issue, instead telling Hoffman that Platinum had to "be sensitive to insider trading rules."  Piché raised the issue with Shearer again in March 2014.  Likewise, around July 1, 2014, Hoffman and Piché raised this issue with members of BakerHostetler's

litigation team, but that team apparently failed to flag these issues for Shearer.  Cf. Landesman, 17 F.4th at 339 (fact that "BakerHostetler attorneys could have communicated better internally and externally and that Shearer could have been more proactive in spotting and exploring a significant legal issue" did not "preponderate[] heavily against a finding [of] criminal intent.") (cleaned up).  In contrast, Small – who was far more intimately involved in the consent solicitation process – never flagged these issues with Shearer's team or sought legal advice about Beechwood's status.  Rather than disproving criminal intent, Hoffman and Piché's conduct allowed the jury to infer that a reasonable person in Small's shoes would have had concerns about the legality of the Black Elk Scheme and would have raised those concerns with the lawyers.  That he failed to do so, and instead concealed pertinent information from Shearer's team, supports the jury's finding of criminal intent.

Finally, Small argues that because Yee did not understand the affiliate rule, it was not reasonable for the jury to conclude that Small understood the affiliate rule.  But as detailed above, there is enough evidence to defer to the jury's finding on that issue.

### D.    Materiality

Small also argues that the Government did not meet its burden of proving beyond a reasonable doubt that the disclosures in the consent solicitation were material.  As the jury was instructed, a "material fact is one that would have been significant to a reasonable investor's investment decision," meaning it "would have been viewed by [a] reasonable investor as having significantly altered the total mix of information available."  Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir. 2000) (citing Basic v. Levinson, 485 U.S. 224, 231 (1988)).  In deciding whether an alleged misrepresentation is material, courts must ask: "[W]ould the

misrepresentation actually *matter* in a *meaningful* way to a rational decisionmaker?" United States v. Gramins, No. 21-5, 2022 WL 6853273, at *2 (2d Cir. Oct. 12, 2022).

The defense first points to testimony regarding Shearer's failure to formally certify the number of bonds held by Black Elk affiliates. That a lawyer may have been sloppy in confirming compliance with the affiliate rule does not mean that Black Elk's noncompliance with the affiliate rule was immaterial to a reasonable investor.

Far more persuasive is Small's argument regarding the market for Black Elk bonds after the consent vote was announced. The Government's entire theory of materiality was that bondholders "felt comfortable holding onto [their] bonds" because they thought it was "unlikely" the consent solicitation would pass, given it was "not economic" and "would not be in the [bondholders] self-interest." Fair enough in theory, except that once the result of the vote was announced, nothing happened. The price of Black Elk bonds did not go down; in fact, it went up. Pulvino and Yee's firms did not turn around and sell all their Black Elk bonds. Rather, Pulvino's firm held onto the bonds, and Yee's firm bought millions more and at a higher price than it paid *before* the vote was announced. Pulvino and Yee claimed they were "shocked" and "irate" when they learned the consent solicitation passed, but that was clearly not "within the parameters of the thinking of reasonable investors in the particular market at issue" – a market that was notably populated by highly sophisticated investors. United States v. Litvak, 889 F.3d 56, 65 (2d Cir. 2018).

The Government's only evidence of materiality consists of the conclusory claims by two self-interested (and possibly embarrassed) witnesses that the misstatement was "important" to them, but their firms' conduct during the relevant period points decidedly against a finding of materiality. The defense is right that "[i]f the reason that Messrs. Pulvino and Yee elected to

hold their bonds instead of tendering was because the $18.3 million disclosure made it ***unlikely*** that the vote ***would*** pass, it is nonsensical that Messrs. Pulvino and Yee would not sell when the August 14 press release made it ***certain*** that the vote ***had*** passed."  For this and other reasons, the Court did not find much of Yee and Pulvino's testimony credible.  What's more, neither Yee nor Pulvino understood the amendments to the indenture.  Yee thought "affiliated" meant equity control, and if that were the rule, there would've been no misstatement.  It's also not clear reasonable investors, as a general matter, read consent solicitation statements closely enough that this misstatement would have been noticed.[11]

The problem with all this, however, is that materiality "need not be outcome-determinative."  Folger Adam Co. v. PMI Indus., Inc., 938 F.2d 1529, 1533 (2d Cir. 1991).  The Supreme Court has explained in the securities context that materiality "does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote, but contemplates a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the reasonable shareholder's deliberations."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 439 (1976); see also United States v. Brettschneider, 832 F. App'x 14, 16 (2d Cir. 2020) (Materiality "does not require proof of actual reliance. . . . Rather, the test is the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.").  In other words, it is enough that bondholders might have felt less comfortable hanging onto their bonds had they known that affiliates were voting.

If this seems inconsistent with the fraud on the market theory, that's because it is.  It seems the fraud on the market theory is a one-way ratchet: it can get you convicted, but it can't

---

[11] In the Nordlicht-Levy trial, Pulvino admitted that he did not read consent solicitation statements "in detail."

get you acquitted.  Perhaps Congress should require more in criminal prosecutions under 10b-5 than is required in civil 10b-5 actions, but until then, Congress chose not to include "harm" among the elements of a 10b-5 claim, and the Court cannot say that no reasonable jury could have found materiality beyond a reasonable doubt.

As the preceding discussion shows, materiality is "broadly construed," United States v. Regan, 103 F.3d 1072, 1084 (2d Cir. 1997), and even without the testimony from Yee and Pulvino, a jury could fairly conclude that an investor would want to know the "outcome of the public consent solicitation process would [not] be a product of a legitimate vote" and was "predetermined," Landesman, 17 F.4th at 341.

### E.     Due Process

Small also argues that he is entitled to a judgment of acquittal because his conviction violates the Due Process Clause of the Fifth Amendment in that the indenture's definition of affiliate was unconstitutionally vague.  Generally, a "statute is unconstitutionally vague if it fails to provide a person of ordinary intelligence fair notice of what is prohibited or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  United States v. Tagliaferri, 820 F.3d 568, 575 (2d Cir. 2016).  Small does not claim that the statutes under which he was convicted are unconstitutionally vague.  Rather, he brings an as-applied challenge, correctly noting that in order to have committed securities fraud under the Government's theory, he must have made a material misstatement about the number of affiliates, which necessarily requires a judgment about what "affiliates" means.  He argues that because the indenture's definition of "affiliates" is subject to various interpretations, it is too vague to serve as the basis for a criminal conviction, especially where, as here, the Government "failed to negate a reasonable interpretation of that definition that renders Small's conduct lawful."  In other words,

43

Small is not saying that the Exchange Act and Rule 10b-5 are unconstitutionally vague, but that his conviction under those statutes incorporated the indenture's definition of "control," which *was* unconstitutionally vague.

I disagree.  Even assuming, for the sake of argument, that the void for vagueness doctrine can apply to private contracts indirectly, a "person of ordinary intelligence" would know if they had the "power to direct . . . management or policies" of a company.  This has a common-sense meaning and is wholly unlike statutes that courts have struck down for being "subjective" and "standardless."  See, e.g., Kolender v. Lawson, 461 U.S. 352, 357 (1983) ("credible and reliable," with no definition of those terms); Smith v. Goguen, 415 U.S. 566 (1974) (ban on acting "contemptuously," with no definition of that term).  The jurors were asked to look at the plain language of the "control" definition, look at the relationship between Nordlicht and Beechwood, and decide whether Nordlicht had the power to direct "management or policies" at Beechwood.  There is no reason to think the jury applied an overbroad definition of "control" or failed to heed the Court's instructions that "Small could not be convicted based on a misunderstanding of the definition of 'affiliate.'"

## II.    Small's Motion for a New Trial

Small argues that he is entitled to a new trial because (1) letting the partial guilty verdict stand would be manifest injustice, (2) prosecutorial misconduct infected the trial with unfairness, (3) the Government's rebuttal summation amounted to a constructive amendment of the indictment, and (4) the Government's rebuttal summation amounted to a prejudicial variance from the indictment.

### A. Legal Standard

Federal Rule of Criminal Procedure 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The Second Circuit has recently narrowed the circumstances under which a district court may grant a Rule 33 motion for a new trial to those in which the "evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand." United States v. Archer, 977 F.3d 181, 187 (2d Cir. 2020).  Granting a Rule 33 motion is now an abuse of discretion unless "the evidence was patently incredible," the evidence "defied physical realities," "an evidentiary or instructional error compromised the reliability of the verdict," or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony."  Landesman, 17 F.4th at 331.  Although "this is not an exhaustive list," the Second Circuit has cautioned that granting Rule 33 motions is only appropriate "in the most extraordinary circumstances."  Id. at 330-31.

### B. Manifest Injustice

Small argues that he should be granted a new trial to avoid manifest injustice.  He offers roughly eight reasons: (1) Shearer acknowledged the distinction between friendlies and affiliates and testified that friendlies could lawfully vote in the consent solicitation; (2) there was no evidence that Nordlicht controlled Beechwood; (3) there was no evidence that Small understood the operative definition of control or affiliate; (4) there was no evidence that Small knew Nordlicht controlled Beechwood; (5) key non-conspirators knew the essential facts of the alleged "scheme," but none intervened; (6) Shearer instructed and permitted Platinum to vote all of its bonds in the consent solicitation; (7) Shearer did not issue a corrected consent solicitation

statement after learning about the $43 million Black Elk bonds held by PPCO and PPLO; and (8) Small wanted to pay back bondholders as part of Platinum's legitimate business strategy for Black Elk.

Most of these are addressed above.  The Court is admittedly uncomfortable with the fact that the star witness against Small was also the person whose job it was to prevent this whole mess.  The evidence against Small is not so different from that against Shearer, and Small, who did not go to law school, may have been relying on Shearer to advise him on the consent solicitation.  Not one of the (many) lawyers involved in either of the consent solicitations thought to ask Platinum about possible affiliates.  It's also curious that Shearer never reissued the consent solicitation statement after he learned about the PPCO and PPLO-owned bonds because, at that point, Shearer knew Black Elk had misstated the number of affiliated bonds.

But the jury knew all these facts and concluded that Shearer's potential culpability did not negate Small's.  This Court may not "usurp the role of the jury" absent "extraordinary circumstances" not present here.  Landesman, 17 F.4th at 330-31.

**C.  Prosecutorial Misconduct**

Small also claims he is entitled to a new trial because the Government's rebuttal summation contained false and misleading statements about critical aspects of the case and necessitated five curative instructions.

His first argument relates to the Government's representation that "friendlies" were a contrivance manufactured by defense counsel.  That isn't true; defendants used this term back in 2014.  But as discussed above, the friendlies concept is a red herring, Small never used that term, and Small had no reason to think that "affiliates" – a term explicitly defined in the indenture – and "friendlies" – a term Nordlicht made up – were mutually exclusive.  The Court's decision to

reopen the record and give instructions on this point was, if anything, an indulgence and should not be perceived to support a claim for prosecutorial misconduct.[12]

Next, Small challenges the Government's implication that Feit was a co-conspirator.  The Court does not find Feit's representation to auditors particularly probative, given the lapse in time and Feit's lack of involvement in the consent solicitation process.  It could be that things changed between August 2014 and April 2015; it could be that Feit just assumed Shearer's team vetted the affiliate issue and was relying on BakerHostetler's work; it could be that he was relying on misrepresentations by Nordlicht and others; it could be that he just didn't know the extent of Nordlicht's involvement in the investment side of the business; or it could be that Nordlicht distanced Platinum from Beechwood after bondholders started asking questions in the wake of the consent solicitation.[13]  Thus, even if the Government misrepresented Feit's role, any prejudice to Small was minimal and adequately mitigated by the Court's instruction to the jury.

Small also contends that the Government misled the jury when it argued in summation that Small and his co-conspirators were motivated to buy up Black Elk bonds and pay off preferred equity because the bonds would have priority over the equity in the event of Black Elk's bankruptcy.  The Government's statement of the law was misleading because, under Section 502 of the Bankruptcy Code, insiders and manipulators are often subordinated to everyone else.

---

[12] The Court, in colloquy with counsel during the trial, overstated the potential significance of the "friendlies" distinction.  Upon reflection, the Court concludes that distinction is of little probative value because a "friendly" can also be an "affiliate" and vice versa.

[13] Yee testified that after the consent solicitation result was announced, Phoenix "tried reaching Black Elk "for the next two weeks" so it could "give us a little more insight into what the bondholders were thinking" and later "got our in-house lawyer involved."  And Poteat testified: "At some point, I was told there needed to be a different CTO for Beechwood[,] so we hired a different CTO."

The Government still claims there is evidence in the record suggesting that Small and others were motivated by a concern that the bondholders would have priority over preferred equity holders in a bankruptcy.  The exhibits the Government cites do not support that claim. Small doesn't say anything about it.  And the email from Shulse, an alleged co-conspirator, actually supports Small's argument.  In it, he writes: "I can't see any possible scenario where a default is good for Platinum as with equitable subordination issues (since they now own 85% of the equity, 70% of the bonds and 100% of the Series E), they have a serious risk of going to the back of the line and being the last to get paid . . . I can't imagine why they would want to risk that for a moment."

The Government also highlights testimony from Pulvino and Yee regarding the seniority of bonds in the capital structure.  The Court agrees with the defense that Yee and Pulvino's testimony on this point is irrelevant; they are not experts in bankruptcy law.  The Government may not misrepresent the law to a jury based on testimony by witnesses that don't know what they're talking about.

Nevertheless, these misrepresentations did little to prejudice Small because it does not matter whether Small, Nordlicht, and Levy had a good-hearted desire to pay off bondholders or were trying to get priority in bankruptcy.  It is enough that defendants intended to deceive bondholders regarding the number of affiliates voting in the consent solicitation.  See Litvak, 808 F.3d at 178.  Besides, there was plenty of evidence of motive not related to concerns about bonds being prioritized in bankruptcy.  Defendants were heavily invested in Black Elk, so they naturally wanted it to succeed, which couldn't happen while Black Elk was paying an inordinate amount of interest on the preferred equity and bonds.  Given that the preferred equity had a far higher interest rate, it made sense to pay off the preferred before paying off the bonds.  Indeed, in

January 2014, long before the public consent solicitation process, the CEO of Black Elk said on an investor call: "[O]ur strategy in 2014 [] calls for reducing debt."  There was also ample evidence of a liquidity crunch at Platinum, and a reasonable jury could have found that defendants wanted to cash in the preferred equity in order to give Platinum a cash infusion.  For example, on June 23, 2014, Nordlicht emailed Levy and Small, writing: "[G]et preferred paid off as quickly as possible.  We want all cash reducing debt . . . I need liquidity ASAP."  Any reasonable juror would have found motive on either of these theories regardless of the Government's misleading summation statements.

Next, Small argues that the Government misled the jury about the financial condition of Black Elk when it discredited the Sterling report.  That's not what happened.  The Government said the Sterling report spoke to the "value of the oil in the ground" and noted that "[m]aybe there's value there, but it doesn't mean they [(Black Elk)] were in a good financial situation."  This is entirely consistent with the evidence at trial that Black Elk had no cash and that the wells were getting "shut-in" and thus could not produce oil.

Finally, Small argues that even if one of these misrepresentations, in isolation, does not warrant a new trial, the cumulative effect of them violates Due Process because these misstatements "related to the most important issues at trial."  In the Court's view, the close issues in this case are materiality and whether Small knew that Beechwood qualified as an affiliate.  Although the Feit and "friendlies" issues arguably bear on the affiliate question – as explained above – the Feit letter was of little probative value, and the fact that Small may have understood Beechwood to be "friendly" to Platinum is largely irrelevant to determining whether Small knew Beechwood qualified as an "affiliate" within the meaning of the indenture.

### D.  Constructive Amendment/Prejudicial Variance

Small claims the Government's rebuttal summation amounted to a constructive amendment of the indictment or at least a prejudicial variance.  An indictment is constructively amended "[w]hen the trial evidence . . . operates to broaden [] the possible bases for conviction from that which appeared in the indictment."  United States v. Milstein, 401 F.3d 53, 65 (2d Cir. 2005).  Once an indictment has been returned, "its charges may not be broadened through amendment except by the grand jury itself."  United States v. Miller, 471 U.S. 130, 143 (1985).

In contrast to a constructive amendment, a "variance occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment."  United States v. Spoor, 904 F.3d 141, 152 (2d Cir. 2018).  Because it is a Due Process concept, "to warrant reversal on a variance claim," the variance must be prejudicial.  United States v. Pierce, 785 F.3d 832, 845 (2d Cir. 2015).  A variance is prejudicial when, among other things, the pleading and proof do not substantially correspond or when the variance could have misled defendants at trial.  See United States v. Salmonese, 352 F.3d 608, 621-22 (2d Cir. 2003).

Small maintains that the Government's theory of motive has shifted significantly such that the indictment was constructively amended.  The indictment described the motive as the intent to "steal the proceeds of the sale of the vast majority of Black Elk's most lucrative assets." In Small's view, the Government proceeded in summation on the alternative theory that the bonds' priority over preferred equity established motive.  As discussed above, the Government offered several possible motives, many of which were amply supported by the evidence.  The fact that the prosecutors made a few comments about priority in bankruptcy during summation

(that were later corrected by the Court) did not "so alter an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." United States v. Klein, 216 F. App'x. 84, 86 (2d Cir. 2007). Besides, intent to harm is not "an element of the charge." Id. Where the "Government prove[s] the essential elements of the crime charged . . . albeit with different proof . . . the indictment [is] not constructively amended." See United States v. Kaplan, 490 F.3d 110, 129 (2d Cir. 2007).

Small also contends that although the indictment assumed defendants' familiarity with the concept of "friendlies," the Government changed its tune during rebuttal. Again, Small overweights the "friendlies" issue. The concept of "friendlies" has no legal significance; it is not a term of art in the industry and has no verifiable meaning. The fact that the indictment quoted emails in which defendants used the term "friendlies" does not mean that the Government's failure to give quasi-legal effect to this amorphous, made-up concept amounts to a constructive amendment of the indictment. To prove a constructive amendment, a defendant "must show that the evidence and jury instructions at trial completely shifted the core of criminality," such that the Government "tied [Small's] conviction to behavior entirely separate from that identified in the indictment." United States v. Bastian, 770 F.3d 212, 223 (2d Cir. 2014). That is not what happened here.

Small also argues that the Government's summation and rebuttal arguments amounted to a prejudicial variance. Argument is not evidence, so the Court is skeptical that deviations in closing arguments can amount to a variance, which occurs when "*evidence* offered at trial proves facts materially different from those alleged in the indictment." Spoor, 904 F.3d at 152 (emphasis added); see also United States v. Heimann, 705 F.2d 662, 667 (2d Cir. 1983) ("[I]n determining whether to vacate a conviction due to a variance, the relevant inquiry is whether the

*evidence* adduced at trial established facts different from those alleged in an indictment . . . and an advocate's arguments to a jury surely do not qualify as 'evidence.'" (cleaned up)).  The jury was instructed that they should only consider "the exhibits" and "witness's answers" and were cautioned that the "attorneys' questions, their comments and statements and arguments, those are not evidence."

To be sure, the Government's case evolved from the indictment to the first trial to the second trial, as did the parties' understanding of the facts.  But that sometimes happens, especially when the facts are this complex.  To the extent the Government made new arguments for the first time in rebuttal at Small's trial, they were on minor points, and any prejudice to Small was mitigated by the Court's curative instructions.

### E.  Small's Request for an Evidentiary Hearing

Finally, Small contends he is entitled to an evidentiary hearing on the Government's pattern of investigative and prosecutorial misconduct both prior to and at Small's trial.  The Government's prior misconduct was dealt with contemporaneously, and comments from the bench should not be overweighted.[14]

The fact that Special Agent Amato worked on this case for six years and did not have a single email, report, or non-interview-related note pertinent to this case is passing strange.  But the defense was permitted to attack the investigator's credibility by bringing it out and arguing it.

---

[14] Small refers to the Court's statement at trial that there were "anomalies in this case."  The Court made no secret of its view that, in the realm of potential fraud cases to prosecute, it was peculiar to choose to prosecute the Black Elk scheme, especially given, among other things, the lack of any victims.  It suggested to the Government that a civil prosecution might be preferable to saddling these defendants with felony convictions.  Cf. Ciminelli v. United States, 143 S. Ct. 1121, 1128 (2023) ("Because the [Government's] theory treats mere information as the protected interest, almost any deceptive act could be criminal. . . . The theory thus makes a federal crime of an almost limitless variety of deception actions traditionally left to state contract and tort law.").  Nevertheless, whatever misgivings the Court had about the Government's decision to prosecute, the Court also made clear that it was within the Government's power to make that decision.

As to the Government's failure to memorialize witness interviews, this has come up in many of my recent trials, and suffice it to say that all smartphones have audio recording capabilities.[15] The Government may have an intentional policy of not creating paper trails on the theory that such documents could hinder later prosecutions, and whatever the Court might think of that policy, there is no reason to believe that an evidentiary hearing is likely to unearth any new documents helpful to Small.  For that reason, this request is denied.

## CONCLUSION

For the foregoing reasons, Small's [967] motion is denied.

**SO ORDERED.**

*Brian M. Cogan*

_____
U.S.D.J.

Dated: Brooklyn, New York
          July 6, 2023

---

[15] See also James M. Cole, Deputy Attorney General, Policy Concerning Electronic Recording of Statements (May 12, 2014); Dep't of Justice, New Department Policy Concerning Electronic Recording of Statements, 128 HARV. L. REV. 1552 (2015); Alejandro N. Mayorkas, Deputy Secretary, Policy Statement 047-03, Policy Concerning Electronic Recording of Statements in Federal Criminal Investigations (DHS March 31, 2016).