# LEVINE LEE LLP

1500 Broadway, Suite 2501
New York, New York 10036
212 223 4400 main
www.levinelee.com

**Seth L. Levine**
212 257 4040 direct
slevine@levinelee.com

September 22, 2023

**Via ECF**

The Honorable Brian M. Cogan
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

**Re:**   *United States v. Nordlicht, et al.*, **16-cr-640**

Dear Judge Cogan:

We represent Daniel Small in the above-captioned action. Pursuant to Federal Rule of Criminal Procedure 32(f) and the Court's September 7, 2023 Order, we hereby respectfully submit the following objections to Mr. Small's presentence report (the "PSR"):

- PSR pg. 1:   Mr. Small's sentencing is scheduled for November 15, 2023 at 10:00 a.m. (*See* September 5, 2023 text-only Order.) Accordingly, "September 15, 2023 9:00 AM" should be replaced with "November 15, 2023 at 10:00 AM."

- PSR pg. 3:   Mr. Hein and Ms. Cruz Melendez are in private practice. Accordingly, they should not be listed as Assistant U.S. Attorneys.

- PSR ¶ 2:   Mr. Small's first name is incorrectly listed as "David" in the final sentence of paragraph 2. Additionally, Mr. Small's acquittal on Count 7 (Conspiracy to Commit Wire Fraud) completely undermines the Government's theory of the case (i.e., that Mr. Small rigged the Consent Solicitation vote to steal money or property from the Black Elk bondholders). As the Court has observed, "the evidence at [Mr.] Small's trial made clear that defendants intended to use the proceeds of the Renaissance sale to *pay out all non-affiliated bondholders* before using the remaining proceeds to pay off the high[er]-interest preferred equity." (ECF No. 1004 at 8 (emphasis added) (alteration in original).) Accordingly, the final sentence of paragraph 2 should be revised as follows: "Daniel Small was found not guilty of Count 7—demonstrating that Mr. Small did not intend to deprive Black Elk's bondholders of money or property—and was not named in Counts 1 through 5 of the Indictment."

- PSR ¶ 6:   The principal founders of Beechwood were Mark Feuer and Scott Taylor, and they ran the company. (*See* Tr. 889:3–8.) Accordingly, the first sentence of paragraph 6 should be

revised as follows: "Beechwood was a reinsurance company founded by Mark Feuer, Scott Taylor, Mark Nordlicht, David Bodner, and Murray Huberfeld in approximately 2014, and Beechwood was run by Mark Feuer and Scott Taylor."

- PSR ¶ 7: Mr. Nordlicht was the Chief Investment Officer (not Chief Investment Office) of Platinum's various hedge funds. Additionally, Mr. Nordlicht was not responsible for Beechwood's investment strategy. (*See* Tr. 884:1–4.) Accordingly, "Office" should be replaced with "Officer" in the first sentence of paragraph 7, and the phrase "and responsible for its investment strategy" should be struck from the second sentence of paragraph 7.

- PSR ¶ 12: In 2014, various of Black Elk's oil properties were cash flow positive. (*See* Tr. 90:1–17.) Accordingly, the first sentence of paragraph 12 should be revised as follows: "Black Elk increasingly struggled from late 2012 through early 2014, though various of Black Elk's oil properties were cash flow positive in 2014."

- PSR ¶ 13: Non-Platinum entities owned tens of millions of dollars in Black Elk preferred equity. (*See, e.g.*, Tr. 732:11–20.) As such, use of the term "primarily" is misleading. Additionally, as the Court has observed, because the preferred equity carried a high interest rate, paying it off made financial sense for Black Elk. (*See* ECF No. 1004 at 8 ("Getting rid of preferred equity was obviously a priority, given the higher interest rate and that the rate was going to increase."); ECF No. 1005 ¶ 10 ("Prioritizing the repurchase of a tranche of securities that required Black Elk to pay 20% interest – rather than the bonds that demanded 13.75% interest – was a reasonable decision that would successfully offload the firm's heaviest debt burden.").) Accordingly, the first sentence of paragraph 13 should be revised as follows: "In early 2014, the defendants—anxious about Black Elk's struggles and PPVA's related liquidity problems and recognizing that continuing to pay interest on preferred equity was a financial drain on Black Elk—were eager to sell certain of Black Elk's best assets and pay the Black Elk preferred equity holders, which consisted of Platinum entities and insiders and third parties."

- PSR pg. 6: As the Court has observed, "the evidence at Small's trial made clear that defendants intended to use the proceeds of the Renaissance sale to pay out all non-affiliated bondholders before using the remaining proceeds to pay off the higher[er]-interest preferred equity." (ECF No. 1004 at 8 (alteration in original).) Accordingly, the heading before paragraph 14 should be revised as follows: "The Defendants' Plan to Use the Renaissance Proceeds to Pay Off Black Elk Bondholders and Preferred Equity Holders."

- PSR ¶ 14: The proposed amendments to the Indenture at issue in the Consent Solicitation did not permit Black Elk preferred equity holders to be paid before Black Elk bondholders. Preferred equity holders could be paid only if there was money left over after all bondholders who tendered their bonds had been paid. (*See, e.g.*, Tr. 464:19–23.) Additionally, of the $150 million in Black Elk bonds issued and outstanding at the time of the Consent Solicitation, holders of $11,433,000 in bonds consented and tendered their bonds, and holders of another approximately $600,000 in bonds consented without tendering. (*See* GX-761; Tr. 1677:2–3.) Neither group includes bonds held by Platinum or Beechwood entities. What is more, Platinum entities bought more than $65 million in Black Elk bonds, at par or just below par, from various bondholders in March 2014. (*See* DX-6701; DX1-8134-2.) Further, as the Court has observed, "[p]rioritizing the repurchase of a tranche of securities that required Black Elk to pay 20% interest – rather than the bonds that demanded 13.75% interest – was a

reasonable decision that would successfully offload the firm's heaviest debt burden." (ECF No. 1005 ¶ 10.) As such, it is misleading to state that tendering or consenting in the Consent Solicitation "made no sense financially" for Black Elk bondholders. Accordingly, the phrase "that would permit Black Elk sale proceeds to be used to pay BE Preferred Equity holders before BE Bondholders" should be replaced with "that would permit Renaissance sale proceeds to be used to pay BE preferred equity holders after tendering BE bondholders had been paid" in the third sentence of paragraph 14, and the fourth sentence of paragraph 14 should be struck.

- PSR ¶ 15:   The Trust Indenture Act of 1939 ("TIA") did not govern the Consent Solicitation (*see* Tr. 242:23–243:14), and that fact should be noted in paragraph 15.

- PSR ¶ 17:   Mr. Shearer represented Black Elk during the private consent solicitation process, which took place earlier in 2014, in addition to the public consent solicitation process. (*See, e.g.*, Tr. 396:15–20.) Additionally, Mr. Shearer did not provide the cited testimony (i.e., "looking out for the best interests of the bondholders") during Mr. Small's trial. Accordingly, the phrase "an attorney who represented Black Elk during the July 2014 consent solicitation process" should be replaced with "an attorney who represented Black Elk during both the private and public consent solicitation processes in 2014" in the first sentence of paragraph 17, and the second sentence of paragraph 17 should be struck.

- PSR ¶ 19:   The private consent solicitation process was overseen by multiple lawyers—from BakerHostetler, Blank Rome, and Emmet, Marvin & Martin—and none took issue with Platinum voting its bonds in favor of the proposed Indenture amendment. (*See* Tr. 417:6–24.) As such, the phrase "lip service" is misleading. Additionally, the March 5, 2014 email referenced was not admitted into evidence during Mr. Small's trial. Accordingly, paragraph 19 should be struck. In the alternative, the first sentence of paragraph 19 should be revised as follows: "During this private consent process, overseen by multiple lawyers from multiple law firms, Nordlicht assured Levy, Small and Black Elk executives that any default declaration would be overridden by a majority of bondholders."

- PSR ¶ 20:   The Trustee did not approve of the private consent solicitation process for reasons unrelated to Platinum entities having voted their bonds in favor of the proposed Indenture amendment. (*See* Tr. 416:11–13.) Accordingly, paragraph 20 should be struck. In the alternative, the first sentence of paragraph 20 should be revised as follows: "A few months later, Nordlicht, Levy and others learned that the private consent process, which was overseen by multiple lawyers—from BakerHostetler, Blank Rome, and Emmet, Marvin & Martin—would be terminated because the trustee for the Black Elk bonds, Bank of New York (BNY), believed that there needed to be a record date."

- PSR ¶ 21:   Although Mr. Small was involved, the Consent Solicitation was a Black Elk endeavor, which it pursued with guidance from its counsel at BakerHostetler. Additionally, Black Elk offered to buy back its bonds at par plus accrued interest, not just par. (*See* Tr. 687:14–19.) Moreover, under the proposed Indenture amendments, Black Elk preferred equity holders could be paid only if there was money left over after all tendering bondholders had been paid. (*See, e.g.*, Tr. 464:19–23.) Indeed, like any other investor, a Platinum or Beechwood entity holding Black Elk bonds was entitled to tender its bonds for cash. Accordingly, the first sentence of paragraph 21 should be revised as follows: "After the

Indenture was not amended through the private process, on June 23, 2014, the defendants took the lead on the Black Elk public Consent Solicitation process, which was overseen by lawyers from BakerHostetler." Additionally, the phrase "at par" should be replaced with "at par plus accrued interest" in the second sentence of paragraph 21. Further, the final sentence of paragraph 21 should be revised as follows: "The proposed amendments at issue in the solicitation would permit Black Elk – which Platinum was actively involved in managing – to repay Platinum and other BE preferred equity holders with funds from the Renaissance sale if there was money left over after all tendering bondholders had been paid." Finally, the following sentence should be added to the end of paragraph 21: "Like any other investor, a Platinum or Beechwood entity holding Black Elk bonds would be entitled to tender its bonds for cash as part of the consent solicitation."

- PSR pg. 7:   Mr. Small did not, and is not alleged to have, controlled Beechwood. Additionally, as the Court has observed, the evidence "point[s] towards [Mr. Small having made] a mistake," not rigging a vote. (*See* ECF No. 1003 at 33.) Accordingly, the heading before paragraph 23 should be revised as follows: "One of Mr. Small's Alleged Co-Conspirators Used a Company He Controlled, Beechwood, to Vote in the Consent Solicitation."

- PSR ¶ 23:   Mr. Small was not involved in "moving" Black Elk bonds to Beechwood. (*See, e.g.*, Tr. 884:5–885:6.) Nor did he control Beechwood. Accordingly, the second sentence in paragraph 23 is inaccurate in multiple respects and should be revised as follows: "A significant portion of the BE bonds was moved to Beechwood, and these bonds voted to pass the Consent Solicitation." In addition, the following sentence should be added to the end of paragraph 23: "Mr. Small was not personally involved in moving Black Elk bonds to Beechwood, and he did not personally control Beechwood or any Black Elk bonds."

- PSR ¶ 24:   Mr. Small did not, and is not alleged to have, controlled Beechwood. Additionally, the principal founders of Beechwood were Mark Feuer and Scott Taylor, and they ran the company. (*See* Tr. 889:3–8.) Accordingly, paragraph 24 should be revised as follows: "The investigation revealed that one of Mr. Small's alleged co-conspirators controlled Beechwood. Around early 2014, Mark Feuer, Scott Taylor, Mark Nordlicht, Murray Huberfeld and David Bodner created a reinsurance company, Beechwood, which was run by Mark Feuer and Scott Taylor."

- PSR ¶ 27:   Mr. Wallach had discretionary authority over his own trading at Beechwood. (*See* Tr. 884:1–4.) Accordingly, the third sentence of paragraph 27 should be revised as follows: "Nordlicht told Israel Wallach, a portfolio manager at Beechwood, how much money Wallach and Wallach's partner would have to invest on behalf of BAM, but Wallach and his partner maintained discretionary authority over their own trading."

- PSR ¶ 28:   Mr. Small did not, and is not alleged to have, controlled Beechwood, and there is no evidence that PPVA controlled Beechwood. Additionally, the March 20, 2023 email referenced in paragraph 28, GX-476, was not admitted into evidence during Mr. Small's trial. (*See* Tr. 1165:15–16.) Accordingly, the phrase "the defendants and PPVA" should be replaced with "one of Mr. Small's alleged co-conspirators" in the first sentence of paragraph 28, and the second sentence of paragraph 28 should be struck.

- PSR ¶ 29: Mr. Small did not receive the May 28, 2014 email referenced in paragraph 29. (*See* GX-625.) Accordingly, paragraph 29 should be struck. In the alternative, the following sentence should be added to the end of paragraph 29: "Mr. Small did not receive the email referenced in this paragraph, and the word 'us' in the phrase 'controlled by us' does not refer to him."

- PSR pg. 8: Mr. Small was not involved in "moving" Black Elk bonds to Beechwood. (*See, e.g.*, Tr. 884:5–885:6.) Accordingly, the heading before paragraph 30 should be revised as follows: "Mr. Small's Alleged Co-Conspirators Moved BE Bonds from Platinum to Beechwood."

- PSR ¶ 30: Mr. Small did not control any Black Elk bonds. Accordingly, the phrase "that they controlled at Platinum's hedge funds" should be replaced with "that one of Mr. Small's alleged co-conspirators controlled at Platinum's hedge funds" in the first sentence of paragraph 30.

- PSR ¶ 31: Mr. Small was not involved in "moving" Black Elk bonds to Beechwood. (*See, e.g.*, Tr. 884:5–885:6.) Accordingly, the following sentence should be added to the end of paragraph 31: "Mr. Small was not involved in moving bonds to Beechwood."

- PSR ¶ 32: Mr. Small did not receive the June 23, 2014 emails from Mr. Nordlicht to Mr. Wallach and Mr. Marzella referenced in paragraph 32. (GX-659; GX-660.) Accordingly, the second, third, and fourth sentences of paragraph 32 should be struck. In the alternative, the following sentence should be added to the end of paragraph 32: "Mr. Small did not receive the June 23, 2014 emails from Mr. Nordlicht to Mr. Wallach and Mr. Marzella referenced in this paragraph, and he was not involved in moving bonds to Beechwood."

- PSR pg. 9: As the Court has observed, the evidence "point[s] towards [Mr. Small having made] a mistake," not making a false representation to Black Elk bondholders. (*See* ECF No. 1003 at 33.) Additionally, Mr. Small did not control any Black Elk bonds. Accordingly, the heading before paragraph 34 should be revised as follows: "The Number of Affiliated Bonds Disclosed in the Consent Solicitation Statement Was Incorrect."

- PSR ¶ 34: As the Court has observed, the evidence "point[s] towards [Mr. Small having made] a mistake," not making a false representation to Black Elk bondholders. (*See* ECF No. 1003 at 33.) Additionally, prior to disseminating the Consent Solicitation Statement, Mr. Shearer did not verify the $18.3 million figure (or even seek to do so). (*See* Tr. 625:24–626:6.) Further, prior to closing, Mr. Shearer believed that $43 million votes were owned by affiliated bondholders yet did not believe this was material to bondholders' decision to tender. (Tr. 664:25–665:12.) Moreover, the proposed Indenture amendments would permit asset sale proceeds to be paid to preferred equity holders only after tendering bondholders were paid. (*See, e.g.*, Tr. 464:19–23.) Accordingly, the first sentence of paragraph 34 should be revised as follows: "The Consent Solicitation statement stated that PPVA and its affiliates owned approximately $18 million of the $150 million outstanding BE bonds when, in fact, PPVA and its affiliates owned more than approximately $18 million BE bonds, a fact which Mr. Shearer did not believe was material to bondholders' decision whether to tender." And the second sentence of paragraph 34 should be struck.

- PSR ¶ 36: As the Court has observed, the evidence "point[s] towards [Mr. Small having made] a mistake," not making a false representation to Black Elk bondholders. (*See* ECF No.

5

1003 at 33.) Additionally, Mr. Small did not control any Black Elk bonds. Furthermore, non-conspirators Mr. Shearer, Mr. Hoffman, and Ms. Piché all knew that Platinum entities and/or entities friendly to Platinum owned approximately $100 million Black Elk bonds (*see, e.g.*, DX1-271; DX1-272; DX1-533; Tr. 427:22–428:2; Tr. 548:23–549:4; Tr. 560:22–561:3), but none of them objected to the dissemination of the Consent Solicitation Statement, which incorrectly stated that PPVA and its affiliates controlled approximately $18 million bonds. Accordingly, the first sentence should read "Communications prior to July 16, 2014 demonstrate that the Black Elk consent solicitation deal team including non-conspirators Hoffman, Piché, and Shearer, knew that Platinum entities and/or entities friendly to Platinum owned approximately $100 million of Black Elk bonds and did not notice the mistaken disclosure in the Consent Solicitation regarding PPVA and its affiliates' ownership of only $18.3 million of Black Elk bonds." And the phrase "they controlled at Platinum's hedge funds" should be replaced with "one of Mr. Small's alleged co-conspirators controlled at Platinum's hedge funds" in the second sentence of paragraph 36.

- PSR ¶ 37:   The information regarding the consent calculation provided by Black Elk's attorneys related to the TIA, which was inapplicable to the Consent Solicitation. (*See* GX-689.) Accordingly, the following sentence should be added to the end of paragraph 37: "Black Elk's attorneys provided information regarding the voting rules under the TIA, which were inapplicable to the Consent Solicitation."

- PSR ¶ 40:   Mr. Small did not control any Black Elk bonds. Additionally, non-conspirators Mr. Shearer, Mr. Hoffman, and Ms. Piché all knew that Platinum entities and/or entities friendly to Platinum owned approximately $100 million Black Elk bonds (*see, e.g.*, DX1-271; DX1-272; DX1-533; Tr. 427:22–428:2; Tr. 548:23–549:4; Tr. 560:22–561:3), but none of them objected to the dissemination of the Consent Solicitation Statement, which stated that PPVA and its affiliates owned $18.3 million bonds. Moreover, prior to disseminating the Consent Solicitation Statement, Mr. Shearer did not verify the $18.3 million figure (or even seek to do so). (*See* Tr. 625:24–626:6.) Accordingly, the phrase "they controlled" should be replaced with "one of Mr. Small's alleged co-conspirators controlled" in the first sentence of paragraph 40, and the following sentences should be added to the end of paragraph 40: "Non-conspirators Mr. Shearer, Mr. Hoffman, and Ms. Piché all knew that Platinum entities and/or entities friendly to Platinum owned approximately $100 million Black Elk bonds (and Mr. Hoffman and Ms. Piché sought advice from BakerHostetler on that issue), but none of them objected to the dissemination of the Consent Solicitation Statement, which stated that PPVA and its affiliates owned $18.3 million bonds. Moreover, prior to disseminating the Consent Solicitation Statement, Mr. Shearer did not verify the $18.3 million figure (or even seek to do so), though he knew the vote would take place subsequently."

- PSR pg. 11: As the Court has observed, the evidence "point[s] towards [Mr. Small having made] a mistake," not lying to Black Elk bondholders. (*See* ECF No. 1003 at 33.) Accordingly, the heading before paragraph 41 should be revised as follows: "Bonds Were Counted in the Bondholder Vote that Should Have Been Excluded."

- PSR ¶ 41:   As the Court has observed, the evidence "point[s] towards [Mr. Small having made] a mistake," not lying to Black Elk bondholders. (*See* ECF No. 1003 at 33.) Accordingly, paragraph 41 should be struck.

- PSR ¶ 42:   Mr. Bruno did not testify at Mr. Small's trial.  Nor was there any other testimony or evidence regarding the referenced statements.  Further, Mr. Bruno is not a credible witness and is clearly biased.  Among other things, Mr. Bruno was attempting to join the Organized Crime Drug Enforcement Task Force at the same time he was being considered as a trial witness.  Accordingly, paragraph 42 should be struck.

- PSR ¶ 43:   Mr. Small was not involved in voting bonds held by either BAM or BBIL, and he did not receive the emails referenced in paragraph 43.  (*See* GX-727; GX-728.)  Accordingly, the phrase "Levy, Nordlicht and their coconspirators" should be replaced with "Levy and Nordlicht" in the first sentence of paragraph 43, and the following sentence should be added to the end of paragraph 43: "Mr. Small did not receive the July 28, 2014 emails referenced in this paragraph."

- PSR ¶ 45:   The $65,839,500 figure assumes that bonds held by PPVA would be disclosed and excluded from the vote.  Accordingly, the phrase "PPCO, PPVA, PPLO, BAM and BBIL" should be replaced with "PPCO, PPLO, BAM and BBIL" in the last sentence of paragraph 45.

- PSR ¶ 46:   Mr. Small did not receive the emails referenced in paragraph 46.  (*See* GX-1796.)  Accordingly, paragraph 46 should be struck.  In the alternative, the following sentence should be added to the end of paragraph 46: "Mr. Small did not receive the emails between Nordlicht and Wallach referenced in this paragraph."

- PSR ¶ 47:   Mr. Small did not receive the emails referenced in paragraph 47.  (*See* GX-754.)  Accordingly, paragraph 47 should be struck.  In the alternative, the following sentence should be added to the end of paragraph 47: "Mr. Small did not receive the emails between Nordlicht and Wallach referenced in this paragraph."

- PSR pg. 12:  Mr. Nordlicht executed the Officer's Certificate, not Mr. Small.  Accordingly, the heading before paragraph 48 should be revised as follows: "Nordlicht Executed an Inaccurate Officer's Certificate."

- PSR ¶ 48:   Although the votes had been "cast," the Indenture had not been amended and the Consent Solicitation process could have been called off at that point.  Additionally, the Officer Certificate being requested was to be completed by Mr. Nordlicht, not Mr. Small.  (*See* GX-762.)  Moreover, the only Officer Certificate actually required under the Indenture was signed by Mr. Hoffman, who, as noted above, knew that Platinum entities and/or entities friendly to Platinum owned approximately $100 million Black Elk bonds and signed the certificate nonetheless.  (*See* Tr. 529:3–23; GX-286 at SKV_BH_00025005–06.)  Accordingly, the second sentence of paragraph 48 should be revised as follows: "On August 1, 2014, Shearer requested from Small an Officer's Certificate signed by Mr. Nordlicht—even though an Officer's Certificate from Mr. Nordlicht was not required pursuant to the Indenture and an Officer's Certificate from Mr. Hoffman was—and Small did not respond."  And the following sentence should be added to the end of paragraph 48: "Although the votes had been cast, the Indenture had not been amended and the Consent Solicitation had not yet closed and was still subject to the required closing conditions."

- PSR ¶ 49:   Mr. Small did not, and is not alleged to have, controlled Beechwood (or Beechwood's Black Elk bonds).  Additionally, notwithstanding the language of the cover email,

7

in the actual Officer Certificate sent by Mr. Small, the $43,293,000 in bonds are described as "beneficially owned by entities which may be deemed Affiliates of the Company which the Company disclaims beneficial ownership." (*See* GX-762.) Further, at that point in time, passage of the Consent Solicitation was not a foregone conclusion because, among other reasons, the Renaissance sale had not yet closed and key documents—including the Officer's Certificate from Mr. Hoffman and legal opinion letter from BakerHostetler required under the Indenture—had not been prepared. (*See* Tr. 520:12–521:21.) As such, it is misleading to suggest that Mr. Small "knew at this point that [there] . . . were enough [bonds] to establish a majority for the Consent Solicitation to pass." Indeed, after August 14, 2014, BakerHostetler issued a clean opinion letter stating, among other things, that "all conditions precedent set forth in the Indenture to the execution and delivery of the Second Supplemental Indenture by the Indenture Trustee have been satisfied . . . and the execution and delivery of the Second Supplemental Indenture by the Indenture Trustee is authorized or permitted by the Indenture." (*See* GX-286 at SKV_BH_00025011.) Notably, one of the conditions precedent was that the Consent Solicitation could close only if there "is not any statute, rule, regulation, judgment, order, stay, decree, executive order or injunction . . . which directly or indirectly . . . would or might prohibit, make illegal, or affect the [Consent Solicitation] . . ." (*See* DX1-8406 at BNYM_SEC_000033.) Accordingly, paragraph 49 should be revised as follows: "On August 14, 2014, at 12:36 p.m., Small sent the Officer Certificate to Shearer. The three scenarios included in the table in this email were largely identical to those Small had shared with Nordlicht and Levy approximately an hour and a half earlier. In the Officer's Certificate, $43,293,000 in bonds were described as 'beneficially owned by entities which may be deemed Affiliates of the Company which the Company disclaims beneficial ownership.' Although the voting period had closed, passage of the Consent Solicitation was not a foregone conclusion because, among other reasons, the Renaissance sale had not yet closed and key documents—including the Officer's Certificate from Mr. Hoffman and legal opinion letter from BakerHostetler required under the Indenture—had not been prepared. Indeed, after August 14, 2014, BakerHostetler issued a clean opinion letter stating, among other things, that 'all conditions precedent set forth in the Indenture to the execution and delivery of the Second Supplemental Indenture by the Indenture Trustee have been satisfied . . . and the execution and delivery of the Second Supplemental Indenture by the Indenture Trustee is authorized or permitted by the Indenture.' Notably, one of the conditions precedent was that the Consent Solicitation could close only if there 'is not any statute, rule, regulation, judgment, order, stay, decree, executive order or injunction . . . which directly or indirectly . . . would or might prohibit, make illegal, or affect the [Consent Solicitation] . . .' Further, prior to closing, Mr. Shearer believed that at least $43 million votes were cast by potentially affiliated bondholders. Notwithstanding his specific knowledge that the Consent Solicitation statement was inconsistent with his understanding of the number of affiliated bonds, Mr. Shearer decided not to correct it and to issue a public press release indicating that no votes had been excluded."

- PSR pg. 12: As the Court has observed, the evidence "point[s] towards [Mr. Small having made] a mistake," not engaging in fraud. (*See* ECF No. 1003 at 33.) Additionally, any Black Elk bondholder that wanted to be repaid had the right to do so. (*See, e.g.*, Tr. 464:19–23.) Accordingly, the heading before paragraph 50 should be revised as follows: "The Renaissance Sale Closed, and Proceeds Were Distributed to Tendering Bondholders and Preferred Equity Holders."

8

- PSR ¶ 50: As the Court has observed, the evidence "point[s] towards [Mr. Small having made] a mistake," not engaging in fraud. (*See* ECF No. 1003 at 33.) Additionally, any Black Elk bondholder that wanted to be repaid had the right to do so. (*See, e.g.*, Tr. 464:19–23.) As such, it is misleading to suggest that the Renaissance sale proceeds were "extracted." Accordingly, paragraph 50 should be revised as follows: "The Consent Solicitation passed, and to the extent money was left over after tendering bondholders were paid, proceeds of the Renaissance sale were transferred to Black Elk preferred equity holders."

- PSR ¶ 51: Mr. Small did not, and is not alleged to have, controlled Beechwood (or Beechwood's Black Elk bonds). Additionally, the public press release issued by Mr. Shearer following the close of the Consent Solicitation indicated that $110 million in bonds—a number which excluded no bonds that either consented or tendered (including PPVA's)—validly consented to the Consent Solicitation. (*See* GX-270; Tr. 510:5–12.) Further, Mr. Shearer did not testify that he actually excluded the bonds held by PPVA, PPCO, and PPLO from the vote. Accordingly, paragraph 51 should be struck.

- PSR ¶ 52: Mr. Small did not, and is not alleged to have, controlled Beechwood (or Beechwood's Black Elk bonds). Additionally, whether the Consent Solicitation would have passed if the bonds held by PPCO, PPLO, and Beechwood entities had been disclosed and excluded from the vote is merely counterfactual speculation. Probation has no basis for drawing conclusions as to how bondholders would have voted if they had received different information regarding the number of bonds held by affiliated bondholders. To the contrary, as the Court has observed, "[t]he Government's only evidence of materiality consists of the conclusory claims by two self-interested (and possibly embarrassed) witnesses that the misstatement was 'important' to them, but their firms' conduct during the relevant period points decidedly against a finding of materiality." (ECF No. 1003 at 41.) In fact, as the Court found, "once the result of the vote was announced . . . [t]he price of Black Elk bonds . . . went up," (*id.*), which is entirely inconsistent with the Government's theory of the case. Further, as the Court also observed, it is "not clear reasonable investors . . . read consent solicitation statements closely enough that this [alleged] misstatement would have been noticed." (*Id.* at 42.) Accordingly, paragraph 52 should be struck.

- PSR pg. 13: Black Elk preferred equity holders were paid only to the extent there was money left over after all tendering bondholders had been paid. (*See, e.g.*, Tr. 464:19–23.) Accordingly, the heading before paragraph 53 should be revised as follows: "The Renaissance Sale Generated Proceeds Sufficient to Repay All Tendering Bondholders and a majority of BE Preferred Equity Holders."

- PSR ¶ 53: Proceeds resulted from the Renaissance Sale, not any purported scheme. Further, Black Elk preferred equity holders were paid only to the extent there was money left over after all tendering bondholders had been paid. (*See, e.g.*, Tr. 464:19–23.) Accordingly, the first sentence of paragraph 53 should be revised as follows: "The Renaissance sale generated proceeds sufficient to repay all of the BE preferred equity investors who invested through Platinum entities after all tendering bondholders had been paid."

- PSR ¶ 54: Paragraph 54 incorrectly states that the alleged conspirators' goal was to repay their (i.e., Platinum's) investors. As the Court has observed, "the evidence at Small's trial made clear that defendants intended to use the proceeds of the Renaissance sale to pay out

9

all non-affiliated bondholders before using the remaining proceeds to pay off the higher[er]-interest preferred equity." (ECF No. 1004 at 8 (alteration in original).) Accordingly, paragraph 54 should be struck.

- PSR pg. 13: The "Texas law" referenced in paragraph 55 is a civil provision of Texas's Business Organizations Code. (*See* GX-773-R.) Additionally, the defendants did not pay anyone, Black Elk did. Accordingly, the heading before paragraph 55 should be revised as follows: "Black Elk Paid Its Preferred Equity Holders Notwithstanding Legal Concerns, Regarding a Civil Statute, Raised by Black Elk's Counsel."

- PSR ¶ 55: The "Texas law" referenced in paragraph 55 is a civil provision of Texas's Business Organizations Code. (*See* GX-773-R.) As such, it is misleading to describe a potential transfer as being "in violation of Texas law." Accordingly, the phrase "Texas law" should be replaced with "a civil provision of Texas's Business Organizations Code" both times it appears in paragraph 55.

- PSR ¶ 56: Proceeds were generated from the Renaissance Sale, not any purported fraud. Accordingly, the phrase "proceeds of their fraud" should be replaced with "proceeds of the Renaissance Sale" in the first sentence of paragraph 56.

- PSR ¶ 59: Notwithstanding the Government's position, and as noted in PSR ¶ 60, the Court's finding that there is no loss necessarily means that there are no victims. Accordingly, paragraph 59 should be revised as follows: "Although the provisions of the Mandatory Victim Restitution Act of 1996 apply to this Title 18 offense, there were no victims."

- PSR ¶ 65: Because Mr. Small will be sentenced after November 1, 2023 (*see* September 5, 2023 text-only Order), the Guidelines Manual, incorporating all guideline amendments, including, but not limited to, those with an effective date of November 1, 2023, should be used to determine Mr. Small's offense level. Accordingly, the phrase "incorporating all guideline amendments" should be replaced with "incorporating all guideline amendments as of November 15, 2023."

- PSR ¶ 75: Pursuant to the "Adjustment for Certain Zero-Point Offenders" (*see* § 4C1.1(a) in amendments effective November 1, 2023), Mr. Small is entitled to a two-level reduction in his offense level. As such, Mr. Small's total offense level is 5, not 7.

- PSR ¶ 115: The penultimate liability listed is an estimated future liability. Accordingly, the phrase "Estimated Future Liability – Not Yet Due" should be added to that line item.

- PSR ¶ 117: Based on our review of court records, our understanding is that Mr. Small does not have an outstanding judgment. Accordingly, the third sentence of paragraph 117 should be struck.

- PSR ¶ 118: Based on our review of court records, our understanding is that Mr. Small does not have an outstanding judgment. Accordingly, the last sentence of paragraph 118 should be struck.

10

- PSR ¶ 121:  As noted above, Mr. Small's total offense level is 5.  Based upon a total offense level of 5 and a criminal history category of I, the guideline imprisonment range is 0 months to 6 months.  Accordingly, the phrase "total offense level of 7" should be replaced with "total offense level of 5."

- PSR ¶ 125:  Given the Court's finding that there is no loss, restitution would be inappropriate. Further, given Probation's finding that Mr. Small is unable to pay a fine (*see* PSR ¶ 119), a fine would be inappropriate.  Finally, 18 U.S.C. § 3561(c)(1) does not establish a mandatory minimum penalty.  *See United States v. Zamora-Andrade*, 544 F. App'x 438, 439 (5th Cir. 2013) ("Under 18 U.S.C. § 3561, imposition of a term of probation is discretionary; it is not a mandatory minimum penalty . . . .").

- PSR ¶ 127:  Because Mr. Small's total offense level is 5, U.S.S.G § 5B1.2(a)(1) is inapplicable. Instead, U.S.S.G. § 5B1.2(a)(2) applies and, if any term of probation is imposed, it shall be no more than three years.

- PSR ¶ 134:  Given the Court's finding that there is no loss, restitution would be inappropriate. Accordingly, the second and third sentences of paragraph 134 should be struck.

We thank the Court for its consideration.

                                            Respectfully submitted,

                                            *Seth L. Levine*

                                            Seth L. Levine
                                            Paul A. Murphy
                                            Alison M. Bonelli

cc: All Counsel of Record (via ECF)
     Probation Department (via email)